Michael J. Peffer (SBN 192265)
mpeffer@pji.org
PACIFIC JUSTICE INSTITUTE
SOUTHERN CALIFORNIA OFFICE
2200 N. Grand Ave.
Santa Ana, CA 92705
T: 714-796-7150

Attorneys for Plaintiff Eric Thompson

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA
## EASTERN DIVISION

| | |
|---|---|
| **ERIC THOMPSON**, | Case No. _____ |
| Plaintiff, | |
| v. | **COMPLAINT FOR DAMAGES: VIOLATION OF FREEDOM OF SPEECH UNDER THE U.S. CONSTITUTION; VIOLATION OF PLAINTIFF'S RIGHTS UNDER THE U.S. CONSTITUTION TO ACADEMIC FREEDOM** |
| **RIVERSIDE COMMUNITY COLLEGE DISTRICT; MORENO VALLEY COLLEGE; ROBIN STEINBACK, Ph.D,** in her official capacity as President of Moreno Valley College; **SANDRA MAYO, Ph.D**, in her official capacity as President of Student Services at Moreno Valley College, and Does 1 – 50. | **[42 U.S.C. 1983]** |
| | **DEMAND FOR JURY TRIAL** |
| Defendants. | |

Plaintiff, ERIC THOMPSON (or "THOMPSON"), by and through counsel, and for his Verified Complaint against Defendants, hereby states as follows:

**<u>INTRODUCTION</u>**

1.  A diversity of viewpoints is at the heart of learning, and the cornerstone of public higher education is the freedom of professors to discuss competing viewpoints in the classroom. This freedom, comprised of the freedom of speech and academic freedom, preciously guards the faculty of public colleges and universities so that they can encourage students to ask innovative questions and then answer those questions with a variety of ideas and theories. But a movement has arisen, undirected and driven largely by students, to scrub campuses clean of words, ideas, and subjects that might cause discomfort or give offense.

2.  Such is the case at at Moreno Valley College ("MVC"), a college within the Riverside Community College District ("RCCD"), referred to as the "District," where academic freedom has been jeopardized because of the complaint of students and willing participants among the staff and administrators. All too often, university officials—including those at Moreno Valley College and Riverside Community College District—use a myriad of different policies to silence, censor, and restrict those who express ideas to which they or others object, even in opposition to their own board policies.

3.   Seeking to participate in this marketplace, Eric Thompson became a sociology professor at MVC. As such, he desired to help students understand the importance of the sociological perspective--that environmental forces influence

who we become. In 2014 he presented various views on the origin of same-sex attraction including a film entitled Understanding Same-Sex Attraction, which was mostly well-received. In Mr. Thompson's professional opinion, the film most closely reflected the foundational framework of sociological inquiry regarding the issue at hand—namely that our social environment is the main driver of our sexual preferences and identities.  According to the textbook Mr. Thompson used in his Marriage and Family class, this is called the social constructionist perspective, which is, in regards to sexuality, the view that human sexual identities are entirely socially constructed (Cherlin, Andrew. Public and Private Families, seventh edition, 2012).

4.   After viewing the film himself, Mr. Thompson thought it would make for a good collaborative discussion with the college community on the email listserve, so he sent the following email on September 15, 2014:

[regarding the then-recent rulings against the use of conversion therapy for minors]

"But now, you are not allowed to ask any questions about the childhood of gay people anymore. It's called 'homophobic'. The entire psychology establishment has shut itself down, politically...and also, Freud was kicked out by early feminism in the late 60's and early 70's. So, all the sophistication of analysis, in being able to analyze the family background (is) all gone. That entire discourse

is gone. Everything is political now. It's really sick. It's a sick and stupid way of looking at human psychology. We are in a period now of psychological stupidity." (Cammile Paglia, Lesbian-Feminist activist, January 14, 2014)

But not totally gone...

[inserted link to the video Understanding Same-Sex Attraction]

The research continues...

Eric Thompson

Associate Professor of Sociology

Moreno Valley College

5.  But the film angered some in the Diversity and LGBT clubs, and resulted in then President Sandra Mayo calling Mr. Thompson into her office for a meeting. During the meeting, Dr. Mayo requested, on behalf of those concerned, that Mr. Thompson agree not to show the film in class ever again. Mr. Thompson declined, but promised not to show it in class for the next semester. In fact, to keep the peace, he never showed it again, despite the District's policies which state: "It is recognized that an essential function of education is a probing of opinions and an exploration of information and ideas that may cause some students discomfort." (AP 3430). And "Academic professionals need the freedom to explore ideas that may be strange or unpopular, endeavors proper to higher education" (BP 4030).

Unfortunately, Dr. Mayo sided with the students instead of doing her job to shoulder the natural burdens that attend academic freedom policies.

6.   In Spring 2015, a discussion was held in Mr. Thompson's Sociology 1 class regarding the U.S. Supreme Court arguments in Obergefell v. Hodges regarding same sex—marriage. At this point, the case had yet to be decided. One of the students, Krista E. who was aware of the negative rumors that had been circulating about Mr. Thompson for showing the above-mentioned film in 2014, and who already had a bias against him before taking his class complained that Mr. Thompson had treated her differently than other students in the class by asking her a series of questions on the issue of legalizing same-sex marriage. Ultimately Krista E. abruptly left the class. Krista E. was crying as she left the classroom and purportedly continued to be upset after she left the classroom. Student Krista E. was a supporter of the LGBT (lesbian, gay, bisexual, and transgender) community.

7.   In point of fact, Mr. Thompson had not singled Krista E. out, but instead was leading a discussion about a major societal, indeed sociological, moment in the history of the United States—the legalization of same-sex marriage. He asked open-ended questions to the class and facilitated the discussion based on the readings they had done recently in the textbook. He called on several students by name, including Krista E. once, his desire was to engage her and the rest of the class in the discussion. During this discussion, a student asked a question that

stereotyped people based on sexual-orientation. Krista immediately stood up and objected, and Thompson attempted to correct the stereotype and redirect the discussion. Krista E., nevertheless, left the class. After the class in question, Thompson emailed the President of the MVC, then Sandra Mayo, about the incident and said that he desired to dialogue with the LGBT community on campus to ensure that they understood the point of the academic discussion during that class. Attached is the audio recording of this exchange, an exchanged that formed a substantial basis for Mr. Thompson's termination.

8.   Following Krista E.'s complaint, the college began an investigation into the incident, and other complaints which were largely made by students who were not in the Spring 2015 Sociology I class. From that point forward, it was very clear that the administrators and several students had grown hostile towards Professor Thompson for his presenting the unfashionable view that same-sex attraction may arise from environmental factors (again, a natural conclusion for the sociological perspective, which emphasizes the social/environmental rather than biological forces to determine people's sexual preference) and that they would stop at nothing to silence him. Sadly, this ended in Thompson's termination.

/ / /

/ / /

/ / /

## JURISDICTION AND VENUE

9.  This action raises federal questions under the First and Fourteenth Amendments to the United States Constitution and the Civil Rights Act of 1871, 42 U.S.C. § 1983.

10. This Court has original jurisdiction over these federal claims pursuant to 28 U.S.C. §§ 1331 and 1343 and supplemental jurisdiction over state law claims pursuant to 28 U.S.C. § 1367.

11.  This Court has authority to award the requested declaratory relief under 28 U.S.C. § 2201; the requested injunctive relief under 28 U.S.C. § 1343(3); and attorneys' fees under 42 U.S.C. § 1988.

12.  Venue is proper under 28 U.S.C. § 1391 in the Central District of California because a substantial part of the actions or omissions giving rise to this case occurred within the Central District and at least one Defendant resides in the Central District.

## PARTIES

13.  Plaintiff, Eric Thompson, is a resident of Hemet, California. He was a tenured member of the faculty at Moreno Valley College where he taught for the eleven (11) years.

14.  Defendant, Robin Steinback, Ph.D., is the current President of MVC. In other times, relevant to this matter, she began in January of 2013 as vice president of Academic Affairs. In January 2014, she was appointed to a RCCD position of

interim vice chancellor of Educational Services. She returned to her college appointment in January 2015 to be vice president of Academic Affairs again. At various times relevant to this action, her duties included the oversight of MVC, the execution of policies and regulations that govern the college, and decision-making concerning faculty employment. Dr. Steinback acted under color of state law when she violated Mr. Thompson's First and Fourteenth Amendment rights and rights under state law and District policy. She is sued in her official capacity.

15.  Defendant Sandra Mayo, Ph.D. began her tenure as the President at MVC in 2012, and continued until June 2016.  Dr. Mayo acted under color of state law when she violated Mr. Thompson's First and Fourteenth Amendment rights and rights under state law and District policy. She is sued in his official capacity.


## FACTUAL BACKGROUND
### A. Mr. Thompson's Teaching Career at the District

16.  In 1996, Mr. Thompson received a Bachelor of Arts degree with a major in Sociology from California State University Chico, and in 1998, a Master's of Arts degree with a major in Sociology from California State University Sacramento.

17.  In 2005 Mr. Thompson was hired by MVC as an Associate Professor of Sociology. Mr. Thompson became a tenured member of the faculty in 2009 and taught at MVC for nearly twelve years.

18.   Mr. Thompson taught Introduction to Sociology, Marriage and Family and Contemporary Social Problems throughout his tenure at MVC.

19.   During the time of his employment by the District, Mr. Thompson's work performance was more than satisfactory and he has never been disciplined until the instance that is the subject of this lawsuit. In fact, Mr. Thompson won two "faculty of the year" awards during his tenure at MVC.

20.   Student response questionnaires and student comments for 2015 also indicate that Mr. Thompson was a much appreciated and excellent instructor. The vast majority of students indicated that Mr. Thompson knew the subject matter of his courses; that he encouraged students to ask questions; that he encouraged individual thinking and differences of opinion; and conducted his classes fairly with respect to age, gender, disability, nationality, race, religion and sexual orientation.

21.   Apart from the testimony of a few disgruntled, ideologically driven students with a bone to pick, many of whom were swept up in the controversy regarding Mr. Thompson's showing the above-mentioned video in his classes in 2014, his 2015 student and faculty evaluations were nevertheless outstanding. In Dean Vakil's analysis of the student evaluations for the class, he wrote:

> "No student comments regarding weaknesses indicated any issues that
>
> needed to be addressed," and "Overall, neither section's quantitative results

nor student comments indicate any problems and are favorable about the quality of instruction."

"Several students also remarked that there were "no weaknesses" in the class."

22.   Moreover, a synopsis of the student comment portion of Mr. Thompson's evaluation of two of classes offers a striking contrast to complaints of the disgruntled students:

*Sociology 12-Marriage and Family, Spring 2015*

"…Makes me want to engage in class."

"Professor Thompson creates open environment to discuss topics."

"Allows class discussions with multiple viewpoints. No bias towards material."

"He is a really nice person and he's fair…."

"He's fair, reasonable and has great teaching ethics."

"No weaknesses"

"No negatives"

*Sociology 1, Introduction to Sociology, Spring 2015*

"Professor Thompson makes lecture enjoyable, relatable and interesting.

"Keeps an awesome in-depth discussion of Sociology"

"Good setting"

"There are no weaknesses"

"No weaknesses"

"Has no weaknesses"

23.   Surely if Mr. Thompson mistreated students or otherwise abused his position as a professor, at least one other student would have mentioned it in the comments portion of the evaluation of the class. Instead, Mr. Thompson's two 2015 student evaluations reveal that students, faculty and Dean Vakil considered Mr. Thompson to be an excellent instructor. Over a dozen student witnesses in the evaluation process for Mr. Thompson mentioned no signs of discriminatory treatment of any student in his classes, even in the classes taken by students who later filed complaints against him.

**B. District Charges**

24.   On June 28, 2017, MVC issued what became the "operative" charges against Mr. Thompson. [Note: the original charges were substantially similar, without the addition of the April 19, 2017 allegation added to charge No. 6 and charge 7.] They were "operative" because, it is upon these charges that Mr. Thompson's termination was recommended and eventually undertaken by the Board of Trustees. However, during the Arbitration that was to follow, the District once again changed the charges, apparently in an effort to make up for the fact that the charges that actually led to Mr. Thompson's termination were untrue, and/or

poorly construed statements. In other words, Mr. Thompson was terminated based on shoddy investigative work and hyperbolic restatements of the allegations against him. The June 2017 charges were as follows:

1. In May 2015 during THOMPSON's spring 2015 Sociology 1 course, THOMPSON singled out student Krista E. causing her to feel humiliated. THOMPSON discussed the U.S. Supreme Court arguments in Obergefell v. Hodges regarding same sex—marriage. Student Krista E. was a visible supporter of the LGBT (lesbian, gay, bisexual, and transgender) community. She had worn a shirt with the logo of the LGBT Student Association to THOMPSON's class. THOMPSON noticed the shirt and knew she was a supporter of that community. THOMPSON admitted to a District investigator that he believed Krista E. was gay. THOMPSON treated Krista E. differently than he treated other students in the class by asking her a series of questions on the issue of legalizing same-sex marriage. The questions directed at her developed only one side of the same-sex marriage arguments, the side against legalizing it. Krista felt attacked. She was not treated as other students were treated by THOMPSON. Ultimately Krista E. abruptly left the class. Krista E. was crying as she left the classroom and continued to be upset after she left the classroom.

2.  THOMPSON has made repeated statements during class that women who have children should not be out of the home. THOMPSON made these statements despite knowing that many of his female students in the class, including student Angela J., were mothers.

3. As a result of the foregoing, an investigation ensued and ultimately resulted in the District's issuance of a 90-Day Notice of Unprofessional Conduct and/or Unsatisfactory Performance dated March 3, 2016 to THOMPSON. The notice gave THOMPSON specific directives on what he needed to do to correct his conduct and performance.

4. [Note: for this charge we have used the May 22, 2018 revision.] On or about June 20, 2016, Derian H., a student at Moreno Valley College, made verbal complaints against THOMPSON pertaining to his treatment of her during Sociology 1-24915 in the spring 2016, alleging that his conduct was based or motivated by her sexual orientation.  The student also alleged that once THOMPSON became aware of her sexual orientation, his conduct towards her changed.  Derian wrote two extra credit papers. In one of those extra credit papers, Derian H. disagreed with the conversion or reparative video THOMPSON gave as extra credit; Derian H. described as being about "fixing being gay." Derian identified herself as gay in her extra credit paper. Derian did not receive a grade or her papers back from THOMPSON despite

asking for them several times. Derian asked several students in her class if they received their paper, and they told her they had. THOMPSON told his students not to tell anyone about the films he assigned as extra credit.

5. [Note: for this charge we have used the May 22, 2018 revision.]     On September 14, 2016, the District advised THOMPSON via US mail and email that it had retained investigator Kristine J. Exton, Esq. to investigate the allegations made against him by student Derian H. of discrimination based on Derian H.'s sexual orientation.  The District specifically directed THOMPSON "to refrain from discussing this matter with other students, faculty or members of the community in a manner that could be reasonably construed as threatening, retaliatory or an attempt to influence others."  The District further advised THOMPSON that "any attempt to take reprisals against, to intimidate, coerce or otherwise threaten any participant of this process constituted unacceptable and illegal conduct and will not be tolerated."  THOMPSON was further "directed to refrain from all such activities."  Yet, on September 24, 2016, THOMPSON emailed Derian H. about her complaint. THOMPSON attempted to coerce the complainant to withdraw her complaint.  THOMPSON'S email to the complainant stated as follows:

"First let me say that this email is not to intimidate, coerce or threaten in any way.  It is merely my way of reaching out to you since there is a chance that I will not be seeing you in the future.

It was with disappointment that I received a letter from the District about your complaint.  Looking at the policy for this sort of thing, it says: 'The District and/or the College administration shall make its best effort to resolve potential grievances without utilizing the formal grievance process' I can't help but to wonder what that looked like, but it seems to me some official would have talked to me about your grade/situation more in depth before encouraging you to go forward with a formal complaint of unlawful discrimination.

I wouldn't have minded if after I gave you a breakdown and explanation of your grade you asked for further clarification.  As teachers we all make input errors from time to time, and it's my job to give students every point they earn.  If I did make an input error, I'm willing to change your grade, but I can't imagine how you could know that my motive for giving you the grade I did was because of your sexual orientation, especially since I was unaware of it until I received notice of your complaint.

So I'm asking you to kindly reconsider going forward with this. It is a hassle for me and takes away from my obligations to my current students and family (my wife is due any day now).  And it likely costs taxpayers a lot of money.  If you choose not to, I will only think good thoughts about you and wish you the very best.  You have every right to proceed.  I'm only asking you to reconsider since my care for students doesn't depend on race, religion, sexual orientation, etc. --- none of that matters to me.  Why should it?  The world is made up of all kinds of people.  I care for them all and I care for you.

Your former teacher,

Mr. THOMPSON"

Prior to THOMPSON's email to Derian H., Investigator Exton was able to make contact with Derian H.; however, Derian declined to meet with the investigator for an interview.  Derian H. did not participate in the investigation. Derian read THOMPSON's email to her months later and it made her feel terrible.

6.  THOMPSON told Investigator Exton that he was "unaware of the status" of Derian H.'s complaint. However, when he made that statement, the District had given him notice of the complaint, pending investigation, and directives not to attempt to influence, intimate, coerce or otherwise threaten

any participant of the investigation process. He also received the notice

before he emailed Derian H. on September 24, 2016.

[7.] On April 19, 2017, THOMPSON appeared for a pre-disciplinary

meeting ("Skelly") with Interim President of Moreno Valley College, Dr.

Irving Hendrick, after receiving the District's Notice of Intent to

Recommend Dismissal. In that meeting, Dr. Hendrick provided

THOMPSON with the opportunity to present his side of the issues and why

the District should not proceed with its proposed discipline.     During the

Skelly conference THOMPSON stated that the District threatened his

family's stability. While looking directly at Dr. Irving Hendrick's eyes,

THOMPSON stated that the District had "drawn a sword" by pursuing

THOMPSON's dismissal and that THOMPSON would also "draw a sword."

THOMPSON then made a statement acknowledging he had made a threat

and using the word "threat" to describe his statement. Dr. Hendrick felt

threatened by THOMPSON's statement; instead of addressing the issues in

the statement of charges THOMPSON made the threatening statements to

Dr. Hendrick.

THOMPSON's attorney, who was present during the meeting intervened by

trying to explain what THOMPSON meant, resulting in THOMPSON

claiming he had spoken metaphorically, but Dr. Hendrick felt threatened.

Dr. Hendrick reported the threat to the authorities to protect his, his family's and campus safety.

8.      [Note: for this charge we have used the May 22, 2018 revision.] At the Skelly meeting, THOMPSON and his attorney also produced an audio recording of the subject lecture pertaining to the exchange between THOMPSON and Krista E. described above in paragraph 1.  This discussion represents a discussion in THOMPSON's class.  The audio recording included a discussion of polygamous marriage wherein THOMPSON described women as jealous and "already prone to being catty." THOMPSON later stated during that class on exogamy that, will "[T]here's a part of every one of you ladies, that kind of – kind of likes that a little bit, that…a strong, handsome man would ride into the village and pick and take you."  The audio provided by THOMPSON of the typical day in his class reveals that THOMPSON's offensive conduct on the basis of gender/sexual identity, sexual orientation, sexual expression was persistent and caused students to feel discriminated or harassed on the basis of gender/gender identity/gender expression/sex orientation and in general protected categories by state and federal law.  THOMPSON regularly made statements in class that denigrated women and gay or gender fluid students. THOMPSON also targeted students in class based on their protected status,

including based on gender, gender expression, gender identity, and religion. The recording produced by Thompson is consistent with the student report's that THOMPSON denigrated and sometimes targeted people in class discussions based on gender/sex orientation/sexual expression/sexual identity or religion. THOMPSON also presented only one view when discussing these issues. This conduct is consistent with the conduct asserted in paragraph 2 above. THOMPSON also discouraged students from presenting different ideas, or from discussing points of views that were different from his ideas, views and convictions.

### C. Mr. Thompson's Termination

25. On October 17, 2017, the Board of Trustees of the Riverside Community College took action to terminate Mr. Thompson. This action was purportedly based on the charges made against Mr. Thompson.

### D. Post Termination Mandatory Arbitration and Subsequent Appeals.

26. Following Mr. Thompson's receipt of the notice of dismissal, and pursuant to California Education Code 87673, Mr. Thompson timely filed his objection to the dismissal. Thereafter, an Arbitrator was selected, the Arbitration went forward on May 1, 3, 15-16, 22-23, 2018.

27. During the 6 days of hearings, the Arbitrator, Stephen Biersmith, heard evidence in the form of witnesses and received many documents as evidence as

well. On October 12, 2018, the Arbitration Opinion and Award was released to the parties.

28.   The Arbitrator upheld some of the charges, and rejected some of the charges, finally ordering that the evidence did not support termination. Instead, he ordered that Mr. Thompson be reinstated with back pay after a 90-day suspension.

29.   On November 26, 2018, the District filed an appeal to the Arbitrator's findings in the form of a Writ of Mandamus in the California Court of Appeals. The hearing on the writ was conducted on July 9, 2019. Thereafter, on August 9, 2019, the trial court denied RCCD's writ, upholding the suspension.

30.   The matter was briefed and argued in the California Court of Appeal. On October 15, 2021, the appellate court ruled in favor of RCCD, ruling that dismissal was the proper sanction for Mr. Thompson's conduct. On January 19, 2022, the Order to Show Cause regarding Submission of Formal Order was heard in California Superior Court. The Court made the following ruling:

a) The Court executed the Order issuing a Writ of Mandate and b) The Court executed the Writ of Mandate.

### E. Equitable Tolling.

31.  All of the above referenced hearings including contractual arbitration, the District's Writ to the Superior Court, and the District's Appeal on the Writ, were pursued as a matter of right, pursuant to Plaintiff's contract.

32.    Plaintiff should not lose such a critical right, of being able to fashion a lawsuit to seek redress for his civil and constitutional rights. Thus, Plaintiff brings this action.

## CLAIMS FOR RELIEF

### Count I-Violation of Freedom of Speech under the U.S. Constitution (42 U.S.C. § 1983)

### First Amendment Retaliation – All Defendants

33.    Plaintiff hereby reiterates and adopts each and every allegation in the preceding paragraphs 1-32.

34.    Mr. Thompson's speech touched on matters of public concern involving an issue of social, political or other interest to a community or public, a subject of legitimate news interest or of general interest. His interest in his expression outweighed MVC's interest in providing effective and efficient services to the public. Plaintiff's speech was a substantial factor in an adverse employment decision. Mr. Thompson has suffered injury likely to chill an ordinary person to engage in that speech.

35.    The reprimand that went into his personnel file concluding that Mr. Thompson was "unprofessional," his work "unsatisfactory," that he created a hostile environment and that Bible references he made were "indoctrination," and which ordered him to cease using religious material in assigned readings and as an

authority, caused Mr. Thompson to suffer an injury which chills him from giving his students facts calculated to stimulate critical thinking. The reprimand stated that Mr. Thompson had violated no board policy but nonetheless punishes Mr. Thompson because he followed the District policy on critical thinking and exposing his students to a diversity of viewpoints. These actions cast a pall of orthodoxy on instruction at MVC.

36.    Occasional references to ancient manuscripts such as the Bible, Koran and Talmud and their traditionalist prescriptions for the good of society allow students to learn different viewpoints and stimulates critical thinking. The information presented in Mr. Thompson's classes is protected speech and Mr. Thompson's interest in complying with MVC requirement of critical thinking far outweighs the District's interest in regulating the content of its Sociology classes. MVC services performed through Mr. Thompson remained effective and efficient and did not interfere with the performance of his duties, nor undermine legitimate goals and mission of MVC.

37.    Mr. Thompson has a right to academic freedom of inquiry derived from the guarantee of free speech, to teach and to communicate ideas or facts without being targeted for employment sanctions and censorship. By subjecting Mr. Thompson to a one-sided investigation and reprimanding him based on his research, established principles, statistics and critical thinking teaching methods on

matters of public concern, Defendants policy and practice, are a form of retaliation against Plaintiff for exercising his First Amendment rights and deprived him of his ability to freely express his ideas on issues of public concern at MVC.

38.   Defendants, acting under color of state law, and by policy and practice, knew or should have known that they explicitly and implicitly retaliated against Plaintiff for exercising his clearly established right to free speech without retaliation on issues of public concern.

39.   Defendants are not entitled to immunity because their conduct violated Plaintiff's First Amendment right which was so clearly established, that a reasonable person would have known that their actions violated that right.

40.   Because of Defendants' actions, Plaintiff has suffered, and continues to suffer, irreparable harm to his reputation in the college community.

41.   Pursuant to 42 U.S.C. § and 1988, Mr. Thompson therefore seeks equitable relief as follows: (1) a declaration as to whether the acts of the Defendants Steinback and Mayo were consistent under the First, Fourteenth Amendments and under District policy, and (2), injunctive relief to remove the reprimand from his personal file in the form of papers, writings, in whatever form, be they electronic or otherwise, relative to the disciplinary actions taken against Mr. Thompson.

/ / /

/ / /

## Count II-Violation of Freedom of Speech under the U.S. Constitution (42 U.S.C. § 1983)

### First Amendment viewpoint discrimination – All Defendants

42.   Plaintiff hereby reiterates and adopts each and every allegation in the preceding paragraphs 1-41.

43.   The application of the District's harassment policy left Mr. Thompson unable to pursue and participate in his career.

44.   Defendants, acting under color of state law, and by policy and practice, knew or should have known that they explicitly and implicitly discriminated against Mr. Thompson for expressing his viewpoint.

45.   Defendants are not entitled to immunity because their conduct violated Mr. Thompson's First Amendment right to have a viewpoint which was so clearly established, that a reasonable person would have known that his actions violated that right.

46.   Because of Defendants' actions, Mr. Thompson has suffered, and continues to suffer, irreparable harm to his reputation in the college community.

47.   Pursuant to 42 U.S.C. § 1983, Mr. Thompson therefore seeks equitable relief as follows: (1) a declaration as to whether the acts of the Ms. Steinback and Ms. Mayo were consistent under the First Amendment and under District policy, and (2), injunctive relief to remove the reprimand from his personal file in the form

of papers, writings, in whatever form, be they electronic or otherwise, relative to the disciplinary actions taken against Mr. Thompson.

## **Count III- Violation of Plaintiff's First Amendment Right to Freedom of Speech - Compelled Speech (42 U.S.C. § 1983)**

48.   Mr. Thompson hereby reiterates and adopts each and every allegation in the preceding paragraphs 1-47.

49.   By punishing and threatening to punish Mr. Thompson for refusing to communicate a District-mandated ideological message regarding the origins of sex and gender identity both in and out of the classroom, Defendants have attempted and are attempting to compel Mr. Thompson's speech, in violation of his rights under the First Amendment.

50.   Defendants' Nondiscrimination Policies and their enforcement of those policies compel Mr. Thompson to communicate messages about sex and gender identity that he does not hold, that he does not wish to communicate, and that conflict with (and for him to violate) his personal beliefs.

51.   Defendants' Nondiscrimination Policies and their enforcement of those policies violate Mr. Thompson's right to free speech as guaranteed by the First Amendment to the United States Constitution.

/ / /

/ / /

## Count IV- Violation of Plaintiffs' Right to be Free from Unconstitutional Conditions (42 U.S.C. § 1983)

52.  Mr. Thompson hereby reiterates and adopts each and every allegation in the preceding paragraphs 1-51.

53.  By conditioning Mr. Thompson's status as a professor in good standing at the College (and ultimately his employment at the College) on his willingness to surrender various constitutional rights, Defendants have imposed and are imposing an unconstitutional condition on him in violation of his First Amendment rights.

54.  Defendants' Nondiscrimination Policies and their enforcement of those policies impose an unconstitutional condition upon faculty members' right to free speech and their receipt of state benefits (e.g., avoiding disciplinary actions up to and including termination, remaining a professor at a public college).

55.  Defendants' Nondiscrimination Policies and their enforcement of those policies require faculty members to surrender their constitutionally protected rights to freedom of speech, free exercise of religion, due process, and equal protection to avoid disciplinary actions up to and including termination.

56.  Defendants enforced their Nondiscrimination Policies against Mr. Thompson, making it clear that he can only avoid further disciplinary action if he surrenders his constitutionally protected rights to freedom of speech, free exercise of religion, due process, and equal protection.

57.   Defendants' Nondiscrimination Policies and their enforcement of those policies violate Mr. Thompson's right to be free from unconstitutional conditions.

## Count V- Violation of Plaintiff's Rights under the U.S. Constitution to Academic Freedom (42 U.S.C. § 1983) and District policy (Administrative Regulation 4030) – All Defendants

58.   Mr. Thompson hereby reiterates and adopts each and every allegation in the preceding paragraphs 1-57.

59.   The actions of Defendants violated MVC's policy on academic freedom. Said policy is based upon the Free Speech Clause of the First Amendment.

60.   The actions of Ms. Steinback and Ms. Mayo were calculated to violate Plaintiff's rights of academic freedom and by extension his rights to free speech, said actions violated Mr. Thompson's right as instructor to discuss pertinent subjects within his field of professional competency in the classroom, which was consistent with course objectives.

61.   Because of Defendants' actions, Mr. Thompson has suffered, and continues to suffer, undue and actual hardship and irreparable harm to his reputation in the college community.

/ / /

/ / /

62.   § 53200 (2) (a) 2F provides:

> "The coursework calls for critical thinking and the understanding and application of concepts determined by the curriculum committee to be at college level."

63.   The Course outline of record, curriculum reference guide provides:

> "Assignment examples can include supplemental reading materials beyond the required text (s)…..

> Optional and alternate assignment examples can in some cases, be

included..

> The difficulty standard for degree-applicable credit courses requires that assignments must reflect college-level effort particularly in terms of critical thinking."

64.   The statewide Academic Senate guide on critical thinking was adopted by the District and MVC, the academic senate, and curriculum committee at MVC which mandates that professors include "critical thinking" within the class syllabus.

65.   Mr. Thompson's personnel file was tarnished and he was disciplined because he complied with District's and MVC's policy on critical thinking.

66.   Moreno Valley College's policies on academic freedom states: "Academic professionals need the freedom to explore ideas that may be strange or unpopular, endeavors proper to higher education." (BP 4030).

And.

67.   "All District programs and activities seek to affirm pluralism of beliefs and opinions, including diversity of religion, gender, ethnicity, race, sexual orientation, disability, age and socioeconomic class." (BP 7100).

68.   The conclusion of the investigation and administrative determination regarding Angela J. and Krista E.  was that Mr. Thompson had not violated any District Policy or Administrative Procedure. (Exhibit D-91).  But then, the President contradicted this on page four of the Statement of Charges, stating that "THOMPSON failed to follow district policies" in these matters.


## **PRAYER FOR RELIEF**

Plaintiff Eric Thompson respectfully requests that the Court enter judgment against Defendants RCCD, MVC, Ms. Steinback, and Ms. Mayo, and provide him with the following relief:

A.   A declaratory judgment as to whether the acts of the Defendants Ms. Steinback, and Ms. Mayo were consistent with the First and Fourteenth Amendments and with District policy.

B.     For a preliminary and permanent injunction requiring RCCD to expunge from Plaintiff's personnel file, all the reprimand and all papers, writings, in whatever form, be they electronic or otherwise, relative to the disciplinary actions taken against Ms. Steinback, and Ms. Mayo.

C.     Award Plaintiff backpay, including past loss of wages and benefits, plus interest;

D.     Award Plaintiff his front pay, including future wages and benefits;

E.     Award Plaintiff other and further compensatory damages in an amount according to proof;

F.     Award Plaintiff noneconomic damages, including but not limited to mental suffering;

G.     Mr. Thompson's reasonable costs and expenses of this action, including attorneys' fees in accordance with 42 U.S.C. § 1988 and other applicable law;

H.     All other further relief to which Mr. Thompson may be entitled.


Dated: January 25, 2023               /s/ Michael J. Peffer
                                      Michael J. Peffer
                                      Pacific Justice Institute
                                      *Attorneys for Plaintiff, Eric Thompson*

## DEMAND FOR JURY TRIAL

Plaintiff demands a jury trial on all causes of action and claims to which he has a right to a jury trial.

January 25, 2023                              /s/ Michael J. Peffer
                                             Michael J. Peffer
                                             Pacific Justice Institute
                                             *Attorneys for Plaintiff, Eric Thompson*