Mark H. Meyerhoff, Bar No. 180414
mmeyerhoff@lcwlegal.com
David A. Urban, Bar No. 159633
durban@lcwlegal.com
Jack Begley, Bar No. 337092
jbegley@lcwlegal.com
LIEBERT CASSIDY WHITMORE
A Professional Law Corporation
6033 West Century Boulevard, 5th Floor
Los Angeles, California 90045
Telephone:  310.981.2000
Facsimile:   310.337.0837

Attorneys for Defendant RIVERSIDE COMMUNITY
COLLEGE DISTRICT; MORENO VALLEY COLLEGE;
ROBIN STEINBACK

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA - EASTERN DIVISION

| | |
|---|---|
| ERIC THOMPSON,<br><br>             Plaintiff,<br><br>     v.<br><br>RIVERSIDE COMMUNITY COLLEGE DISTRICT; MORENO VALLEY COLLEGE; ROBIN STEINBACK, Ph.D, in her official capacity as President of Moreno Valley College; SANDRA MAYO, Ph.D, in her official capacity as President of Student Services at Moreno Valley College, and Does 1-50,<br><br>             Defendant. | Case No.:  5:23-cv-00138-SSS-SHK<br><br>Complaint Filed: January 25, 2023<br><br>**DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS PLAINTIFF'S COMPLAINT**<br><br>Date: June 9, 2023<br>Time: 2:00 p.m.<br>Location: Department 2 |

**TO PLAINTIFF AND HIS ATTORNEY(S) OF RECORD:**

**PLEASE TAKE NOTIC**E that on June 9, 2023, at 2:00 p.m., or as soon

thereafter as the matter may be heard in Courtroom 2 of the above-entitled Court,

located at 3470 Twelfth Street, Riverside, California, Defendants Riverside

Community College District ("District"), Moreno Valley College ("MVC"), and

Robin Steinback ("Steinback")(Collectively, "Defendants"), will move pursuant to

Federal Rule of Civil Procedure 12(b)(6) to dismiss each claim for relief in the

Complaint ("Complaint") filed by Plaintiff Eric Thompson ("Plaintiff") on the basis that Plaintiff fails to state claims upon which relief can be granted. Defendant moves that the Court order as follows:

1.     The first, second, third, fourth and fifth claims for relief lack merit because the Eleventh Amendment bars any relief claims against the District and MVC, as arms of the state, and bars the relief claims against the individual Defendants, who are sued in their "official capacity."  *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989); *Mitchell v. Los Angeles Community College Dist.*, 861 F.2d 198, 201 (9th Cir. 1988).  *See infra* Section IV.A.2.

2.     The first, second, third, fourth and fifth claims for relief are barred by the preclusive effect of his unsuccessful administrative appeal of his termination. *Univ. of Tenn. v. Elliott* 478 U.S. 788, 799 (1986).  In those administrative proceedings, an independent hearing officer determined Thompson was, pursuant to the Education Code, unfit for service, among other things.  The California Court of Appeal, in subsequent administrative mandate proceedings, determined that the hearing officer's determinations meant that the District's termination of Plaintiff was proper. The proceedings preclude Plaintiff's current claims under section 1983. (See *Riverside Cmty. Coll. Dist. v. Biersmith*, No. E073818, 2021 WL 4810632 (Cal. Ct. App. Oct. 15, 2021), attached to the Request for Judicial Notice as **Exhibit "A."**)

3.     The first, second, third, fourth and fifth claims for relief are time-barred by the applicable statutes of limitations. *Shalabi v. City of Fontana*, 35 Cal. App. 5th 639, 642, 247 Cal. Rptr. 3d 268, 270 (2019), aff'd, 11 Cal. 5th 842, 489 P.3d 714 (2021).

This Motion is made following issuance of meet-and-confer correspondence dated May 3, 2023, in which Defendants' counsel invited Plaintiff's counsel to meet and confer further by telephone.

//

LIEBERT CASSIDY WHITMORE
A Professional Law Corporation
6033 West Century Boulevard, 5th Floor
Los Angeles, California 90045

DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS PLAINTIFF'S COMPLAINT

12026568.4 RI083-136

This Motion is based on this Notice of Motion and Motion, the attached Memorandum of Points and Authorities, the attached Request for Judicial Notice, all of the pleadings and papers on file with the Court herein, on such matters of which this Court may take judicial notice, and any further evidence and argument that the Court may receive at or before the hearing on this Motion.


Dated:  May 11, 2023                    LIEBERT CASSIDY WHITMORE



                                  By:      */s/ Jack Begley*
                                          Mark H. Meyerhoff
                                          David A. Urban
                                          Jack Begley
                                          Attorneys for Defendant
                                          RIVERSIDE COMMUNITY
                                          COLLEGE DISTRICT;
                                          MORENO VALLEY COLLEGE;
                                          ROBIN STEINBACK

LIEBERT CASSIDY WHITMORE
A Professional Law Corporation
6033 West Century Boulevard, 5th Floor
Los Angeles, California 90045

DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS PLAINTIFF'S COMPLAINT
12026568.4 RI083-136

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.   INTRODUCTION

Plaintiff Eric Thompson contends that his first amendment rights were violated by employees of the Riverside County Community College District ("District") when the District terminated Plaintiff's employment as a Sociology professor.

The Eleventh Amendment bars each of Plaintiff's claims for relief against each Defendant.

Additionally, all five of Plaintiff's claims for relief against Defendants are barred by the doctrine of Res Judicata because of the preclusive effect of Plaintiff's unsuccessful administrative appeal of his termination. *Univ. of Tenn. v. Elliott* 478 U.S. 788, 799 (1986). In those proceedings, an independent hearing officer determined Thompson was, pursuant to the Education Code, unfit for service, among other things. As Plaintiff's current claims assert the same primary right as his administrative appeal (right to continued employment) his claims are barred.

Lastly, all five of Plaintiff's claims for relief are time-barred by the applicable statutes of limitations.  *Shalabi v. City of Fontana*, 35 Cal. App. 5th 639, 642, 247 Cal. Rptr. 3d 268, 270 (2019), aff'd, 11 Cal. 5th 842, 489 P.3d 714 (2021).

As such, Plaintiff's entire Complaint should be dismissed as a matter of law.

### II.   STATEMENT OF ALLEGATIONS

Plaintiff alleges he was hired in 2005 by Moreno Valley College ("MVC") as an Associate Professor of Sociology and became a tenured faculty member in 2009. (Complaint, ¶ 17.) Plaintiff taught Introduction to Sociology, Marriage and Family and Contemporary Social Problems throughout his nearly 12-year tenure at MVC. (*Id*., ¶¶ 17, 18.) On June 28, 2017, the District issued charges against

LIEBERT CASSIDY WHITMORE
A Professional Law Corporation
6033 West Century Boulevard, 5th Floor
Los Angeles, California 90045

DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS PLAINTIFF'S COMPLAINT
12026568.4 RI083-136

Plaintiff that became the bases of his termination. (*Id.*, ¶ 24.) [1]

      With regards to the charges filed against him, Plaintiff alleges as follows: (1) Plaintiff singled out a student named Krista E. while the class discussed the U.S. Supreme Court arguments in *Obergefell v. Hodges* regarding same-sex marriage (*Id.*); (2) Plaintiff treated Krista E. differently than he treated other students by asking her a series of questions regarding legalizing same-sex marriage (*Id.*); (3) Krista E. felt attacked by the questions directed at her because the questions developed only the side of the same-sex marriage arguments that opposed legalizing it (*Id.*); (4) Krista E. was not treated as other students were treated by Plaintiff (*Id.*); and (5) Plaintiff repeatedly stated during class that women who have children should not be out of the home, knowing that many of his female students in the class were mothers. (*Id.*)

      On March 3, 2016, the District issued to Plaintiff a 90-Day Notice of Unprofessional Conduct and/or Unsatisfactory performance which gave Plaintiff specific directives on how to correct his conduct and performance. (*Id.*)

      On June 20, 2016, Derian H., a student at MVC, made verbal complaints against Plaintiff pertaining to Plaintiff's treatment of her during class in spring 2016. Derian H. alleged that once Plaintiff became aware of her sexual orientation, his conduct towards her changed. (*Id.*) Derian H. also alleged that she wrote two extra credit papers for Plaintiff, in which she identified herself as gay and disagreed with the conversion or reparative therapy video Plaintiff gave as extra credit. (*Id.*) Derian H. alleged that she did not receive a grade on these extra credit papers from Plaintiff, despite asking for the grade several times, while other students told her that they did receive grades. (*Id.*)

      On September 14, 2016, the District advised Plaintiff that it had retained an investigator to investigate the allegations made against him by Derian H. (*Id.*) The

---

[1] The Complaint describes all of the District's charges against Plaintiff in Paragraph 24 (pp. 11-19).

LIEBERT CASSIDY WHITMORE
A Professional Law Corporation
6033 West Century Boulevard, 5th Floor
Los Angeles, California 90045

DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS PLAINTIFF'S COMPLAINT

12026568.4 RI083-136

District specifically directed Plaintiff "to refrain from discussing this matter with other students, faculty or members of the community in a manner that could be reasonably construed as threatening, retaliatory or an attempt to influence others." (*Id*.) The District further advised Plaintiff that "any attempt to take reprisals against, to intimidate, coerce or otherwise threaten any participant of this process constituted unacceptable and illegal conduct and will not be tolerated." (*Id*.)

The District's charges further alleged that on September 24, 2016, Plaintiff emailed Derian H. about her complaint and attempted to coerce her to withdraw her complaint. (*Id*.)

On April 19, 2017, Plaintiff appeared for a pre-disciplinary meeting ("Skelly") with Interim President of MVC, Dr. Irving Hendrick, after receiving a Notice of Intent to Recommend Dismissal. (*Id*.) Plaintiff was given the opportunity to respond to the charges and the proposed discipline. (*Id*.) During the Skelly conference, Plaintiff told Dr. Hendrick that the District had "drawn a sword" by pursuing Plaintiff's dismissal and that Plaintiff would also "draw a sword." (*Id*.) The charges against Plaintiff further allege that Plaintiff acknowledged that his statement about drawing a "sword" was a threat and that Dr. Hendrick reported this threat to the authorities. (*Id*.)

The District's charges also refer to an audio recording provided by Plaintiff of a "typical day" in his class. According to the charge, the recording reflected Plaintiff's offensive conduct on the basis of gender/sexual identity, sexual orientation and sexual expression. Plaintiff regularly made statements in class that denigrated women and gay or gender fluid students. Plaintiff also targeted students in class based on their protected status, including gender, gender expression, gender identity, and religion. The recording is consistent with the previous student complaints that Plaintiff denigrated and sometimes targeted people in class discussions based on gender/sex orientation/sexual expression/sexual identity or religion. Plaintiff also discouraged students from presenting different ideas, or

LIEBERT CASSIDY WHITMORE
A Professional Law Corporation
6033 West Century Boulevard, 5th Floor
Los Angeles, California 90045

6

from discussing points of views that were different from his ideas, views and convictions." (*Id*.)

On October 17, 2017, the District's Board of Trustees terminated Plaintiff based on the charges against him. (*Id*. at ¶ 25.) Plaintiff timely filed an objection to the dismissal, an Arbitration was scheduled and an Arbitration was conducted over the course of six days in May 2018. (*Id*. at ¶ 26.) During the Arbitration, the Arbitrator "heard evidence in the form of witnesses and received many documents as evidence as well." (Id.)

On October 12, 2018, the Arbitrator ordered that Plaintiff's discipline should be reduced from a termination to a 90-day suspension. The Arbitrator sustained a number of the charges against Plaintiff and determined Plaintiff was "unfit" to teach, pursuant to the Education Code. (*Id*. at ¶ 28; See Arbitrator's Opinion & Award Case No. C.S.M.C.S. No. 17-0158: In the Matter of Accusation Against Eric Thompson, attached to the Request for Judicial Notice as **Exhibit "B."**)

On November 26, 2018, the District appealed the Arbitrator's decision by filing a Writ of Mandamus in the California Court of Appeals. (*Id*. at ¶ 29.) The trial court denied the District's writ and upheld the suspension. (*Id*.)   The District appealed that ruling and the California Court of Appeal overturned the trial court and held that the Arbitrator's findings necessitated Plaintiff's termination.  (See *Riverside Cmty. Coll. Dist. v. Biersmith*, No. E073818, 2021 WL 4810632 (Cal. Ct. App. Oct. 15, 2021), attached to the Request for Judicial Notice as **Exhibit "A."**) "Here, Thompson's conduct in the classroom, which significantly impacted his students, coupled with the evidence that he had no remorse or plans to change his behavior, renders the decision to impose just a 90-day suspension a manifest abuse of discretion in this case." (*Id*. at *22.)

LIEBERT CASSIDY WHITMORE
A Professional Law Corporation
6033 West Century Boulevard, 5th Floor
Los Angeles, California 90045

DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS PLAINTIFF'S COMPLAINT

12026568.4 RI083-136

LIEBERT CASSIDY WHITMORE
A Professional Law Corporation
6033 West Century Boulevard, 5th Floor
Los Angeles, California 90045

### III.    THE STANDARD FOR A FEDERAL RULE OF CIVIL PROCEDURE 12(B)(6) MOTION TO DISMISS

Defendants in federal court can file motions to dismiss, pursuant to Federal Rule of Civil Procedure 12(b)(6), on the basis that a complaint fails to state a claim on which relief can be granted.  To survive a motion to dismiss under Rule 12(b)(6), the plaintiff must allege "enough facts to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). Allegations in the complaint need not be accepted as true if they are merely conclusory, unwarranted deductions of fact, or unreasonable inferences.  *Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir. 2001).  Likewise, Courts are not required to accept as true a plaintiff's legal conclusion "couched as a factual allegation." *Bell Atl. Corp v. Twombly*, 550 U.S. at 555.

### IV.    LEGAL ARGUMENT

#### A.    THE ELEVENTH AMENDMENT BARS EACH CLAIM FOR RELIEF AGAINST DEFENDANTS

"The Eleventh Amendment prohibits federal courts from hearing suits brought against an unconsenting state." *Brooks v. Sulphur Springs Vall. Elec. Co-op.*, 951 F.2d 1050, 1053 (9th Cir. 1991) (citing *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 100 (1984)).  This jurisdictional bar includes "suits naming state agencies and departments as defendants," and it applies whether a plaintiff "seek[s] damages or injunctive relief." *Id.*; *Pennhurst State Sch. & Hosp.*, 465 U.S. at 102.

As for section 1983 claims, "[A]n entity with Eleventh Amendment immunity is not a 'person' within the meaning of § 1983." *Howlett By & Through Howlett v. Rose*, 496 U.S. 356, 365 (1990). Thus, "neither a State nor its officials acting in their official capacities are 'persons' under § 1983." *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989). The Ninth Circuit has held that community

8

college districts are dependent instrumentalities of the state and are therefore immune from suit under the Eleventh Amendment. *Mitchell v. Los Angeles Community College Dist.*, 861 F.2d 198, 201 (9th Cir. 1988).

Here, Defendants Steinback and Mayo are sued in their official capacities. (See, Complaint, ¶ 14 ("[Dr. Steinback] is sued in her official capacity."); *Id.*, ¶ 15 (Dr. Mayo is sued in her "official capacity.").) Defendants Steinback and Mayo were and are employed by a community college district, which is considered tantamount to the state for Eleventh Amendment purposes. *Mitchell*, 861 F.2d at 201. Plaintiff sues the Defendants for compensatory and noneconomic damages. (Complaint, prayer for relief, ¶¶ E, F.) Accordingly, all claims for relief against Defendants in their official capacities for damages must be dismissed. *Will*, 491 U.S. at 71.

### B.   THE ADMINISTRATIVE APPEAL AFFORDED PLAINTIFF FOLLOWING HIS TERMINATION PRECLUDES THIS ACTION

#### 1.   The *Utah Construction* Standard

In *Univ. of Tenn. v. Elliott*, the U.S. Supreme Court held:

> "[W]hen a state agency "acting in a judicial capacity . . . resolves disputed issues of fact properly before it which the parties have had an adequate opportunity to litigate," *Utah Construction & Mining Co., supra*, at 422, federal courts must give the agency's fact-finding the same preclusive effect to which it would be entitled in the State's courts.

478 U.S. 788, 799 (1986); see also *Olson v. Morris*, 188 F.3d 1083, 1086 (9th Cir. 1999).

The Ninth Circuit has held, "the federal common law rules of preclusion described in *Elliott* extend to state administrative adjudications of legal as well as factual issues, even if unreviewed, so long as the state proceeding satisfies the requirements of fairness outlined in [*United States v. Utah Construction & Mining*

LIEBERT CASSIDY WHITMORE
A Professional Law Corporation
6033 West Century Boulevard, 5th Floor
Los Angeles, California 90045

LIEBERT CASSIDY WHITMORE
A Professional Law Corporation
6033 West Century Boulevard, 5th Floor
Los Angeles, California 90045

*Co.*, 384 U.S. 394, 422… (1966)]." *Miller v. Cnty. Of Santa Cruz*, 39 F.3d 1030, 1032-33 (9th Cir. 1994).[2]

The threshold inquiry is the adequacy of the state administrative proceedings. *Miller*, 39 F.3d at 1033; *Olson*, 188 F.3d at 1086. "[T]he only question, in light of California's incorporation of the *Utah Construction* standard, was whether the administrative hearing met the requirements of California law such that a California court would have accorded the determination preclusive effect." *Miller*, 39 F.3d at 1033 citing *Eilrich v. Remas*, 839 F.2d 630, 633 (9th Cir. 1988), cert. denied, 488 U.S. 819, 102 L. Ed. 2d 38, 109 S. Ct. 60 (1988). Below is the analysis as to why Plaintiff's claims are barred by his unsuccessful administrative appeal.

### 2. The Administrative Proceeding Was Sufficient to Warrant Preclusive Effect in this Action

The material issue is the adequacy of the administrative proceedings that were afforded. *Miller*, 39 F.3d at 1033 ("[W]hether a state administrative proceeding was conducted with sufficient safeguards…requires careful review of the administrative record…"); *B&B Hardware, Inc. v. Hargis Indus.*, 135 S. Ct. 1293, 1309 (2015) (In considering administrative preclusion, "[T]he correct inquiry is whether the procedures used in the first proceeding were fundamentally poor, cursory, or unfair.").

The California Supreme Court and the Ninth Circuit have set out a number of factors to consider in determining whether an administrative proceeding meets the fairness requirements (or requisite judicial character) entitling it to preclusive effect, including:

---

[2] "The fairness requirements of *Utah Construction* are: (1) that the administrative agency act in a judicial capacity, (2) that the agency resolve disputed issues of fact properly before it, and (3) that the parties have an adequate opportunity to litigate." *Miller*, 39 F.3d at 1033.

(1) the administrative hearing was conducted in a judicial-like adversary proceeding; (2) the proceeding required  [**20] witnesses to testify under oath; (3) the agency determination involved the adjudicatory application of rules to a single set of facts; (4) the proceedings were conducted before an impartial hearing officer; (5) the parties had the right to subpoena witnesses and present documentary evidence; and (6) the administrative agency maintained a verbatim record of the proceedings….In addition, a court may consider "whether the hearing officer's decision was adjudicatory and in writing with a statement of reasons," and whether the hearing officer's decision was adopted by the director of the agency "with the potential for later judicial review."

*White v. City of Pasadena*, 671 F.3d 918, 927-28 (9th Cir. 2012)

Here, the administrative appeal was conducted in a judicial-like adversary proceeding with witnesses who testified under oath. (Arbitrator's Opinion & Award, p. 5-25, attached to the Request for Judicial Notice as **Exhibit "B"**). The proceeding was conducted before an impartial hearing officer, who the parties selected by agreement. (Complaint at ¶ 26; Educ. Code Sec. 87675.) The parties had a right to request that the decisionmaker issue subpoenas for witnesses and documents [Cal. Gov. Code §§ 37104-37106]. The parties introduced documentary evidence, called witnesses, and cross-examined witnesses. (Arbitrator's Opinion & Award, p. 1-25). The parties made opening statements, arguments, and submitted briefs, and Plaintiff was represented by the same law firm that is representing him in this action. (Arbitrator's Opinion & Award, p. 1; *Riverside Cmty. Coll. Dist.,* at 16.) A court reporter kept a verbatim transcript of the proceeding. The hearing officer's decision was adjudicatory in nature and was expressed in writing with a statement of reasons. (Arbitrator's Opinion & Award.)  The administrative decision was subject to judicial review via petition for writ of mandate pursuant to § 1094.5. *Caloca*, 102 Cal. App. 4th at 444. Accordingly, the administrative decision is entitled to preclusive effect in this action.

The preclusive effect applies not only to the District, but also to the Individual Defendants who have been sued as District employees acting within the course and scope of their employment for the very same conduct as the District.

LIEBERT CASSIDY WHITMORE
A Professional Law Corporation
6033 West Century Boulevard, 5th Floor
Los Angeles, California 90045

DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS PLAINTIFF'S COMPLAINT

12026568.4 RI083-136

See *Miller*, 39 F.3d at 1038 ("Here, as in *Takahashi*, the individually named defendants were employees acting with in the course and scope of their employment in terminating Miller. *Id*. Because they have been sued solely because of their involvement in the termination process, the adverse finding before the Commission prevents Miller from asserting an inconsistent claim against those defendants here.") citing *Takahashi v. Bd. of Educ.*, 202 Cal. App. 3d 1464, 1477 (1988), cert. denied, 490 U.S. 1011.

>    3.    **The Preclusive Effect of the State Administrative Decision Bars Plaintiffs' § 1983 Claims Because both Actions Concern the Same Primary Right.**

Res judicata bars this proceeding to the extent it is based on the same primary right decided in the prior proceedings, including not only issues that were actually litigated but also issues that could have been litigated. *Fed'n of Hillside*, 126 Cal. App. 4th at 1202. "In other words, the doctrine of res judicata goes beyond the four corners of the operative pleading in the prior action: 'If the matter was within the scope of the action, related to the subject-matter and relevant to the issues, so that it could have been raised, the judgment is conclusive on it despite the fact that it was not in fact expressly pleaded or otherwise urged.'" *Franceschi v. Franchise Tax Bd.*, 1 Cal. App. 5th 247, 259 (2016). "Thus, in California, 'if two actions involve the same injury to the plaintiff and the same wrong by the defendant then the same primary right is at stake even if in the second suit the plaintiff pleads different theories of recovery, seeks different forms of relief and/or adds new facts supporting recovery.'" *Furnace v. Giurbino*, 838 F.3d 1019, 1024 (9th Cir. Cal. 2016) quoting *Eichman v. Fotomat Corp.*, 147 Cal. App. 3d 1170, 1174 (1983).

The primary right involved in Plaintiff's administrative appeal was the right to continued employment. See *Swartzendruber v. City of San Diego*, 3 Cal.

LIEBERT CASSIDY WHITMORE
A Professional Law Corporation
6033 West Century Boulevard, 5th Floor
Los Angeles, California 90045

DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS PLAINTIFF'S COMPLAINT
12026568.4 RI083-136

App. 4th 896, 901, 909 (1992)[3] (Finding that primary right involved in administrative proceeding challenging termination was the right to continued employment); *Takahashi v. Bd. of Trs.*, 783 F.2d 848, 849, 851 (9th Cir. Cal. 1986) (Ninth Circuit found right to employment was the primary right involved in teacher's administrative appeal of proposed termination); *cf. Miller*, 39 F.3d at 1034-35.

Regardless of the label and theory ("First Amendment Retaliation [42 U.S.C. § 1983]"), Plaintiff's claims in this action are based on his termination and, therefore, involve the same primary right to continued employment as his administrative appeal. Accordingly, Plaintiff's' claims in this action are barred, which is a conclusion dictated by the Ninth Circuit's *Miller* decision. Similar to Plaintiff, in *Miller*, a law enforcement officer lost the state administrative proceedings he initiated to contest his termination, opted not to challenge the administrative decision via petition for writ of mandate, and then filed a federal lawsuit pursuant to § 1983, claiming constitutional violations in relation to his termination and termination-related proceedings. *Miller*, 39 F.3d at 1032 and 796 F. Supp. 1316, 1319-1320. The Ninth Circuit held:

> *Swartzendruber* dictates the preclusive effect of the civil service commission in this case. Miller, in his complaint in district court, restates his wrongful termination contentions in constitutional terms. Whether characterized as the "issue" of the right to continued employment or as the "claim" of a civil rights violation, the unreviewed finding of the administrative tribunal precludes further litigation of Miller's contentions.

*Miller*, 39 F.3d at 1034-35; see also *Swartzendruber*, 3 Cal. App. 4th at 908 ("Inasmuch as the primary right at stake was her right to continued employment and the harm suffered was loss of that employment, her fifth cause of action does not present a separate injury from that litigated before the Commission.

---

[3] Disapproved on other grounds in *Johnson v. City of Loma Linda*, 24 Cal.4th 61, 72 (2000).

LIEBERT CASSIDY WHITMORE
A Professional Law Corporation
6033 West Century Boulevard, 5th Floor
Los Angeles, California 90045

Swartzendruber has merely restated her cause of action for wrongful termination in constitutional terms."); *Takahashi*, 202 Cal. App. 3d at 1476 ["All of plaintiff's alleged causes of action in this consolidated action arise in conjunction with or as a result of the alleged wrongful termination of her employment. Indeed, plaintiff specifically alleges that each act complained of caused the dismissal (wrongful discharge, conspiracy, unconstitutional discharge, discharge in violation of state civil rights) or was a consequence of the termination (emotional distress, damages), part and parcel of the violation of the single primary right, the single harm suffered."]; *Takahashi*, 783 F.2d at 851 ("While stating the primary right asserted in her first action in constitutional terms, Takahashi has failed to alleged a new injury….By invoking the Constitution and § 1983, Takahashi has merely presented a new legal theory upon which she seeks recovery."); *Baker v. White*, 2013 U.S. Dist. LEXIS 35051, at *8 (S.D. Cal. 2013) ("The record further establishes that Baker is challenging his termination in both actions and, therefore, the same primary right is involved. For this reason alone, this lawsuit is barred under California res judicata law.").

The Ninth Circuit in unpublished opinions has affirmed federal trial court's application of claim preclusion to bar 42 U.S.C. section 1983 claims by public employees asserting termination in violation of First Amendment rights, where the legitimacy of the terminations had already been adjudicated in administrative proceedings.  See *Garcia v. Bostic*, 818 F. App'x 686, 689 (9th Cir. 2020); *Freeman v. City of Port Hueneme*, 800 F. App'x 562 (9th Cir. 2020); see also Fed. R. App. Proc. 32.1(a) (allowing citation of unpublished decisions from after January 1, 2007).

Because the state administrative proceedings concerned the same primary right as Plaintiffs' §1983 claims here, Plaintiffs' §1983 claims are barred by res judicata.

LIEBERT CASSIDY WHITMORE
A Professional Law Corporation
6033 West Century Boulevard, 5th Floor
Los Angeles, California 90045

14

### 4.  Plaintiff's Claims are Long Time-Barred

"A federal civil rights cause of action is subject to the forum state's statute of limitations for personal injury claims. (*Wallace v. Kato* (2007) 549 U.S. 384, 387, 127 S.Ct. 1091, 166 L.Ed.2d 973 (*Wallace*).) In California, the statute of limitations for a personal injury claim is two years. (Cal. Code Civ. Proc., § 335.1.)" *Shalabi v. City of Fontana*, 35 Cal. App. 5th 639, 642, 247 Cal. Rptr. 3d 268, 270 (2019), aff'd, 11 Cal. 5th 842, 489 P.3d 714 (2021).

Here, all five of Plaintiff's civil rights claims stem from events that most recently took place in 2017—over five years ago. This is well beyond the two year statute of limitations proscribed by *Wallace* and Cal. Code Civ. Proc., § 335.1. As such, all of Plaintiff's claims are time-barred and subject to be dismissed.

## V.  CONCLUSION

Because Plaintiff's claims are barred by the Eleventh Amendment, subject to preclusive effect by the doctrine of res judicata, and also are time-barred, dismissal of Plaintiff's claims for relief is appropriate.

Dated:  May 11, 2023                    LIEBERT CASSIDY WHITMORE

By:    */s/ Jack Begley*
Mark H. Meyerhoff
David A. Urban
Jack Begley
Attorneys for Defendant
RIVERSIDE COMMUNITY
COLLEGE DISTRICT;
MORENO VALLEY COLLEGE;
ROBIN STEINBACK

LIEBERT CASSIDY WHITMORE
A Professional Law Corporation
6033 West Century Boulevard, 5th Floor
Los Angeles, California 90045

DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS PLAINTIFF'S COMPLAINT
12026568.4 RI083-136

**EXHIBIT A**

1  Mark H. Meyerhoff, Bar No. 180414
   mmeyerhoff@lcwlegal.com
2  David A. Urban, Bar No. 159633
   durban@lcwlegal.com
3  Jack Begley, Bar No. 337092
   jbegley@lcwlegal.com
4  LIEBERT CASSIDY WHITMORE
   A Professional Law Corporation
5  6033 West Century Boulevard, 5th Floor
   Los Angeles, California 90045
6  Telephone:  310.981.2000
   Facsimile:   310.337.0837
7
8  Attorneys for Defendant RIVERSIDE COMMUNITY
   COLLEGE DISTRICT; MORENO VALLEY COLLEGE;
   ROBIN STEINBACK
9

10                UNITED STATES DISTRICT COURT

11        CENTRAL DISTRICT OF CALIFORNIA - EASTERN DIVISION

| | |
|---|---|
| 12  ERIC THOMPSON, | Case No.: 5:23-cv-00138-SSS-SHK |
| 13                    Plaintiff, | Complaint Filed: January 25, 2023 |
| 14            v. | **REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS; DECLARATION OF DAVID A. URBAN IN SUPPORT OF REQUEST FOR JUDICIAL NOTICE** |
| 15  RIVERSIDE COMMUNITY COLLEGE DISTRICT; MORENO VALLEY COLLEGE; ROBIN STEINBACK, Ph.D, in her official capacity as President of Moreno Valley College; SANDRA MAYO, Ph.D, in her official capacity as President of Student Services at Moreno Valley College, and Does 1-50, | |
| 16 | |
| 17 | Date: June 9, 2023 |
| 18 | Time: 2:00 p.m. |
| 19 | Location: Department 2 |
| 20 | |
| 21                    Defendant. | |

22        **TO THE CLERK OF THE ABOVE-ENTITLED COURT, ALL**

23  **PARTIES AND THEIR ATTORNEYS OF RECORD:**

24        **PLEASE TAKE NOTICE** that on June 9, 2023, at 2:00 p.m., or as soon

25  thereafter as counsel may be heard in Courtroom 2, of the above-entitled Court,

26  Defendants Riverside Community College District, Moreno Valley College, and

27  Robin Steinback ("Defendants") will request the Court take judicial notice of the

28  following under Federal Rule of Evidence 201 and applicable law:

LIEBERT CASSIDY WHITMORE
A Professional Law Corporation
6033 West Century Boulevard, 5th Floor
Los Angeles, California 90045

1

12024196.2 RI083-136

1.   The Arbitration Opinion & Award for Arbitration Case No. C.S.M.C.S. No. 17-0158: In the Matter of Accusation Against Eric Thompson. A true and correct copy of the Arbitration opinion is ached hereto as **Exhibit "A."**

2.   The California Court of Appeal's opinion of *Riverside Cmty. Coll. Dist. v. Biersmith*, No. E073818, 2021 WL 4810632 (Cal. Ct. App. Oct. 15, 2021). A true and correct copy of the Court's opinion is attached hereto as **Exhibit "B."**

Dated:  May 11, 2023            LIEBERT CASSIDY WHITMORE

By:    */s/ Jack Begley*
           Mark H. Meyerhoff
           David A. Urban
           Jack Begley
           Attorneys for Defendant
           RIVERSIDE COMMUNITY
           COLLEGE DISTRICT;
           MORENO VALLEY COLLEGE;
           ROBIN STEINBACK

LIEBERT CASSIDY WHITMORE
A Professional Law Corporation
6033 West Century Boulevard, 5th Floor
Los Angeles, California 90045

REQUEST FOR JUDICIAL NOTICE
12024196.2 RI083-136

LIEBERT  CASSIDY  WHITMORE
A Professional Law Corporation
6033 West Century Boulevard, 5th Floor
Los Angeles, California 90045

## MEMORANDUM OF POINTS AND AUTHORITIES

A court may consider judicially noticed facts on a Federal Rule of Civil Procedure 12(b)(6) motion without converting the motion to a summary judgment motion. *Mullis v. U.S. Bankruptcy Court*, 828 F.2d 1385, 1388 (9th Cir.1987).  A court shall take judicial notice of such a fact if requested by a party and supplied with the necessary information. Fed. R. Evid. 201(d).

### I.   Judicial Notice of the Arbitrator's Opinion and Award is Proper

"[A] court may consider a writing referenced in a complaint but not explicitly incorporated therein if the complaint relies on the document and its authenticity is unquestioned." *Swartz v. KPMG LLP*, 476 F.3d 756, 763 (9th Cir. 2007). "[J]udicial notice may be taken of orders and decisions taken by other courts and administrative agencies." *Papai v. Harbor Tug & Barge Co.*, 67 F.3d 203, 207 (9th Cir. 1995), overruled on other grounds by *Harbor Tug & Barge Co. v. Papai*, 520 U.S. 548 (1997); see also *Kurtcu*, 2008 WL 2445080, at *2 (taking judicial notice of an arbitration award).

Here, judicial notice is proper, in part, because the Arbitrator's Opinion and Award is referenced in the complaint, the complaint relies on this document, and Defendants do not anticipate that Plaintiff will question its authenticity. Furthermore, it is clear from the *Papai* and *Kurtcu* decisions that the Court may take judicial notice of an arbitration award. Thus, Defendants request that this Court do so.

### II.   Judicial Notice of the Appellate Court Ruling is Proper

A federal court may "take notice of proceedings in other courts, both within and without the federal judicial system, if those proceedings have a direct relation to matters at issue." *United States ex rel. Robinson Rancheria Citizens Council v. Borneo, Inc.*, 971 F.2d 244, 248 (9th Cir. 1992); see also *Manufactured Home Cmtys., Inc. v. City of San Jose*, 420 F.3d 1022, 1037 (9th Cir. 2005) (noting that a federal court may "take judicial notice of a state court decision and the briefs filed

3

in that court to determine if an issue was raised and decided by the state court for res judicata purposes."); *Holder v. Holder*, 305 F.3d 854, 866 (9th Cir. 2002) (taking judicial notice of a California Court of Appeal opinion "and the briefs filed in that proceeding and in the trial proceeding and in the trial court" for the purposes of analyzing issue preclusion). A court may also take judicial notice of matters of public record. See *U.S. v. 14.02 Acres of Land*, 530 F.3d 883, 894 (9th Cir. 2008). Likewise, judicial notice is appropriate when government entities make information publicly available and neither party disputes the information's authenticity or accuracy. See *Daniels-Hall v. Nat'l Educ. Ass'n*, 629 F.3d 992, 998 (9th Cir. 2010).

Here, the California Court of Appeal's decision in *Riverside Cmty. Coll. Dist. v. Biersmith*, No. E073818, 2021 WL 4810632 (Cal. Ct. App. Oct. 15, 2021) has a direct relation to the matters at issue, as it involves the same parties and the same claims. Additionally, pursuant to *Manufactured Home Cmtys., Inc.,* Defendants request that this Court take judicial notice of the Court of Appeal's decision to determine if these same issues were raised and decided by the state court for res judicata purposes, which Defendants assert that they were.

Furthermore, pursuant to *U.S. v. 14.02 Acres of Land*, the related Court of Appeal opinion is a matter of public record, of which the Court may take judicial notice. Lastly, pursuant to *Daniels-Hall*, Defendants do not anticipate that Plaintiff will dispute the authenticity of the Court of Appeal's decision.

As such, Defendants respectfully request that this Court take Judicial Notice of the relevant Arbitrator's Opinion & Award and Court of Appeal's opinion.

LIEBERT CASSIDY WHITMORE
A Professional Law Corporation
6033 West Century Boulevard, 5th Floor
Los Angeles, California 90045

1    Dated:  May 11, 2023                    LIEBERT CASSIDY WHITMORE

2

3

4                                 By:   _____
                                           /s/ Jack Begley
5                                         Mark H. Meyerhoff
                                          David A. Urban
6                                         Jack Begley
                                          Attorneys for Defendant
7                                         RIVERSIDE COMMUNITY
                                          COLLEGE DISTRICT;
8                                         MORENO VALLEY COLLEGE;
                                          ROBIN STEINBACK

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

LIEBERT CASSIDY WHITMORE
A Professional Law Corporation
6033 West Century Boulevard, 5th Floor
Los Angeles, California 90045

REQUEST FOR JUDICIAL NOTICE

12024196.2 RI083-136

1
2
**DECLARATION OF DAVID A URBAN IN SUPPORT OF DEFENDANTS'**
3
**REQUEST FOR JUDICIAL NOTICE**
4
I, David A. Urban, declare as follows:

5        1.        I am an attorney at law duly licensed to practice in all Courts of the
6 State of California and all United States District Courts. I am Senior Counsel with
7 the law firm Liebert Cassidy Whitmore, attorneys of record for Defendants
8 Riverside Community College District, Moreno Valley College, and Robin
9 Steinback (Collectively, "Defendants") in the above-captioned matter. I am familiar
10 with the papers and files in this case, and I have personal knowledge of all facts set
11 forth herein. If called upon to testify to the same, I could and would so testify. I am
12 making this declaration in support of Defendants' Request for Judicial Notice.

13        2.        I was counsel of record for Defendants during the underlying
14 arbitration Case No. C.S.M.C.S. No. 17-0158: In the Matter of Accusation Against
15 Eric Thompson, before arbitrator Stephen M. Biersmith, decided on October 26,
16 2018. Attached hereto as **Exhibit "A"** is a true and correct copy of the Arbitration
17 Opinion & Award.

18        3.        I was counsel of record for Defendants in the underlying appellate
19 case: Court of Appeal, Fourth District, Division 2, California Case No E073818
20 *Riverside Community College District, v. Stephen Biersmith*.  Attached hereto as
21 **Exhibit "B"** is a true and correct copy of the Court's opinion from this matter.

22        I declare under penalty of perjury under the laws of the State of California
23 that the foregoing is true and correct.

24        Executed this 11th day of May, 2023, at Los Angeles, California.

25
26                                        */s/ David A. Urban*
27                                        David A. Urban
28

LIEBERT CASSIDY WHITMORE
A Professional Law Corporation
6033 West Century Boulevard, 5th Floor
Los Angeles, California 90045

6

12024196.2 RI083-136

**EXHIBIT A**

## IN THE MATTER OF ARBITRATION

|  |  |  |
|---|---|---|
| **IN THE MATTER OF ACCUSATION AGAINST ERIC THOMPSON** | ) ) ) ) ) ) ) ) ) | **ARBITRATION OPINION & AWARD**<br><br>**Case No. C.S.M.C.S. No. 17-0158** |

### APPEARANCES

| For the Petitioner: | For the Respondent: |
|---|---|
| Ms. Pilar Morin, Esq. & Mr. David Urban | Mr. Michael J. Peffer, Esq. |
| Liberty, Cassidy Whitmore | Pacific Justice Institute |
| 6033 W. Century Blvd., 5th Floor | P. O. Box 11630 |
| Los Angeles, CA. 90045 | Santa Ana, CA. 92705 |

### ISSUES

1. Did College establish cause to dismiss or penalize Thompson, by a preponderance of the evidence, *any one* of the causes for discipline listed below under the Education code.

    a. Whether Respondent engaged in immoral conduct under Section 87732, subdivision (a); or

    b. Whether Respondent was dishonest under Section 87732, subdivision (b); or

    c. Whether Respondent was evidently unfit for service under Section 87732, subdivision (d); or

    d. Whether Respondent persisted in the violation of, refusal to obey, the school laws of the state or reasonable regulations prescribed for the government of the community colleges by the board or governors or by the governing board of the community college employing him or her.  (Ed. Code section 87675)

2. If College established cause, the arbitrator shall determine whether Thompson will be dismissed, the precise penalty to be imposed, and whether the decision should be imposed immediately or postponed pursuant to Section 87672. (Ed. Code section 87675)

1

EXHIBIT A-1

## EXHIBITS

**For the Petitioner:**

1. Moreno Valley College Diversity Committee Operating Procedures (Joint)
2. Syllabus – Sociology 1, Introduction to Sociology online class (Joint)
3. Syllabus- Sociology 1, Introduction to Sociology
4. Syllabus – Marriage and Family/Soc 12 (Joint)
5. Syllabus – Sociology 1 (Joint)
6. Syllabus – Sociology 1 – Introduction to Sociology online class (Joint)
7. Integrated Course Outline of Record – Sociology, Introduction to Sociology (Joint)
8. Integrated Course Outline of Record – Sociology 1, Introduction to Sociology (Joint)
9. Integrated Course Outline of Record – Sociology 12, Marriage and Family Relations (Joint)
10. Integrated Course Outline of Record – Sociology 12, Marriage and Family Relations
11. Transcript of Thompson Interview (Deposition Exhibit 6) (Joint)
12. Transcript of Thompson Lecture during Spring 2015 Sociology 1 class (Deposition Exhibit 4) and disk recording of Monday May 4, 2015 class (Joint)
13. Transcript of Thompson Interview (Deposition Exhibit 7) (Joint)
14. List of Documents/Materials Requested from Investigator Lindoerfer to Thompson – Thompson's responses to questions 2 & 3 – Thompson's responses to questions 8 and copy Thompson's memo to Sandra Mayo dated May 11, 2015 (Joint)
15. Confidential Investigation Report Re Krista E. and others and Executive Summary by Investigator Sandra Lindoerfer (without attachments) (Joint)
16. Transcript of Krista E. Interview (Joint)
17. Transcript of Sergio M. Interview (Joint)
18. Sergio M. class notes, Diagram from Sociology 12 provided to investigator
19. Transcript of Ann Pfeifle Interview
20. Transcript of Victor S. Interview (Joint)
21. Transcript of Angela J. Interview
22. Transcript of Robin Steinback Interview
23. Transcript of Larisa Broyles Interview
24. Transcript of Jeffrey Rhyne Interview

EXHIBIT A-2

25. Withdrawn

26. 90-day Notice (Deposition Exhibit 8) (Joint)

27. Notes of Interview of Derian H. by Dean David Makil

28. Notice of Investigation from Lorraine Jones to Thompson re Derian H. complaint to be investigated by Kristine Exton

29. E-mail from Thompson to Derian H. (Deposition Exhibit 5)

30. Report of Investigation of Complaint Re: Professor Eric Thompson prepared for the Riverside Community College District by Kristine J. Exton (Joint)

31. Sociology Instructor Job Description/Announcement

32. Peer Review Committee, Regular Faculty Evaluation (Joint)

33. Notice of Intent to Recommend Dismissal signed by Dr. Hampton, with statement of charges dated March 22, 2017, and exhibit list (Deposition Exhibit 2) (Exhibits excluded) (Joint)

34. Fax Cover and Letter to Dr. Hendricks, President, from Michael J. Peffer, Senior Counsel, Re Response to Objections and Objection to *Skelly Hearing* -Enclosing Eric Thompson's Initial Response to Statement of Charges, and Response to 90 Day Letter (Deposition Exhibit 9) (Joint)

35. Amended Statement of Charges signed by Dr. Hendrick and Dr. Burke (Joint)

36. Fax Cover and Letter from Michael J. Peffer to Dr. Hendrick, President, responding to amended statement of charges (Deposition Exhibit 10) (Joint)

37. Statement of Charges signed by Dr. Steinback and Dr. Burke including list of attachments (but excluding attachments) (Joint)

38. Decision Following Second Skelly Conference, Notice of October 17, 2017 Board Meeting and Right to Have Complaints or Charges Heard in Open Session signed by Shawn Larry (without exhibits) (Joint)

39. Riverside Community College District Board Policies – BP/AP 3050, Institution Code of Professional Ethics – BP/AP 3420, Prohibition of Harassment and Retaliation – BP/AP 3410 Nondiscrimination – AP 3435, Handling Complaints of Unlawful Discrimination, Harassment or Retaliation – BP 7100, Commitment to Diversity (Joint)

40. Governing Board Resolution of Dismissal (Joint)

41. Statement of Decision to Dismiss signed by Dr. Burke, Chancellor (Joint)

3

EXHIBIT A-3

42. Notice of Decision to Dismiss (Deposition Exhibit 3) (without exhibits) (Joint)

43. Letter from Michael J. Peffer to Terri Hampton re Response and enclosed Notice of Objection to Statement of Decision to Dismiss signed by Eric Thompson (Joint)

44. Accusation (Joint)

45. Respondent's Notice of Defense (Joint)

46. Riverside Community College District Administrative Procedure AP 5522 Student Grievance Process for Instruction and Grade Related Matters (Joint)

47. Withdrawn

48. RCCD Quick Look Facts page printout from Riverside CCD web page http://ww.rccd.edu/administration/chancellor/Documents?RCCD QuickFA CTS 2016.pdf (Judicial Notice)

49. Board Policy 3420 – Equal Employment and EEO Plan http://www.rccd.edu/administration/board/New$20Board20Policies/3420BPAP.pdf.

50. Moreno Valley College LGBT ALLY printout from http://www.mvc.edu/lgbt-allies/

51. Moreno Valley College Welcome and Mission Statement http://www.mvc.edu/aboutus.cfn#mission (Judicial Notice)

52. Moreno Valley College Diversity Committee webpage

53. Riverside CCD Diversity file://C:LCW%20office/Thomson%20Termination/EX%2053%20MVC%20Diversity%20Initiative%20.pdf.

54. Daniel C.F. Casella, MA, LMFT, CHT, Curriculum Vitae

55. Accreditation Standards, Accrediting Commission for Community and Junior College, Wester Association of Schools and Colleges Accreditation Standards (Adopted June 2014) https://accjc.org/wo-content/uploads/Accreditaiton-Standards Adopted-June 2014.pdf. (Joint)

56. Dear Colleague Letter Sexual Harassment of Student. U.S. Department of Education, Office of Civil Rights. https://www2ed.gov/about/offices/list/ocr/letters/sexhar-2006.html (Judicial Notice)

57. Dear Colleague Letter re Title IX Compliance. UJ.S. Department of Educations, Office of Civil Rights. https:www2.ed.gov/about/offices/list/ocr/letters/colleague-201104.pdf (Judicial Notice)

EXHIBIT A-4

58. Questions and Answers on Title IX and Sexual Violence – U.S. Department of Educations, Office of Civil Rights (Judicial Notice)

59. Dear Colleague Letter re Gender Identity - U.S. Department of Educations, Office of Civil Rights, https://www2.ed.gov/about/offices/lost/ocr/letters/colleague-201605-title-ix-transgender.pdf. (Judicial Notice)

60. Dear Colleague Letter re withdraw of 5/13/16 Gender Identify DCL Guidance – U.S. Department of Educations, Office of Civil Rights-https://www.2.ed.gov/about/offices/list/ocr/letters/colleague-2011702-title-ix.pdf

61. Q&A on Campus Sexual Misconduct- U.S. Department of Educations, Office of Civil Rights-file://C:/LCW%20office/Thompson%20Termination/qa-title-ix-201709.pdf/

**For the Respondent:**

A. March 3, 2016 Administrative Determination and Summary of Investigative Report-Complaint of Unlawful Discrimination singed by Dr. Mayo.

B. Withdrawn

C. Fall 2015 Faculty Evaluations including student evaluations

D. Select pages from Audio Transcript of Recorded Interview November 15, 2016 (pages 1-4, 60-61, 121-123, and 142-143 and the reporter's declaration)

E. Riverside Community College District Policy

## **TESTIMONY PRESENTED**

**Derian H.**

Derian H. took Thompson's Sociology I course at Moreno Valley (hereinafter "College") during the Spring 2016 where for about 70% of the day Thompson would talk about his Christian religion. As Derian H. was a practicing Christian she was not put off by his discussion of her religion. Since Derian H. believed she might fail the class, she went to Thompson to see if she could improve her grade. Derian H. was told it was possible if she did the extra credit. The extra assignment was to watch a movie about gay individuals and the possibility of change, before writing how she felt about the video. When she did so, the video confused her emotionally and as

5

EXHIBIT A-5

to how others would look at it.  About two weeks before the semester ended, Derian H. submitted the extra assignment disagreeing with what was presented in the film. In it she both disclosed her sexual orientation and wrote one could not fix being gay. Afterwards she would only participate somewhat in the class. His responses to her became shorter and there was less eye contact.

Derian H.  submitted another review where she agreed with that video's point that one could be born gay. He never returned the extra credit although others had already got theirs back. She asked him about it on four different occasions. He told her that he would bring it in the next time. When the semester ended she still expected it on her grade. Later Derian H. received an email from Thompson. She did not read it until about two months later since it had gone to her student email account. When she did read the email, it made her feel terrible, especially the last paragraph where he mentioned his wife was due any day.  She did not know he was being investigated until after an investigator called. The investigator called several times and wanted to speak to her, but Derian H. told her "no." She just wanted to move on, wish him the best, and not lose his job She was never told about the results of the investigation.

**Dr. Robin Steinback**

Steinback, president of the College since July 1, 2017, testified, the goals of the College included preparing students for careers and transfers to a university. The institution had various policies which prohibited harassment due to one's age, sexual orientation, etc. with a mission that promoted diversity and inclusion while providing a safe learning environment. Prior to this disciplinary matter, she had a cordial working relationship with Thompson. She served as the *Skelly* officer in his second such meeting where six different charges were alleged.  Originally, they included: unfitness for service, dishonesty, conduct in the classroom, targeting students, and

EXHIBIT A-6

interfering with the investigation by contacting a witness. The second *Skelly* included an additional charge relating to a threat made by Thompson against Dr. Hendricks when he used the word "sword" during his first *Skelly*. Hendrick had taken the threat seriously given Thompson's agitated demeanor at the time.

As to the various charges, Steinback felt the email Thompson sent to Derian H. interfered with the investigative process. If one is found to be untruthful during an investigation, it meant to her the employee was dishonest and untrustworthy. In reviewing the tape and the transcript of that class meeting, Steinback believed Thompson targeted and mocked Krista E. on the basis of her involvement with the LGBT community. From her training Steinback thought she could pick-up on the anguish Krista E. felt as she left the room. Steinback was also concerned about other statements by Thomson how they could alienate persons in such positions. They included the sexist comment that mothers with small children should remain at home. In the same audio one could hear Thompson make the statement women are "caddy" and other comments about the preference for strong men. It sounded as if he was trying to get his students to agree with him in this regard. Steinback believed such targeting was contrary to College policy, caused a chilling effect, and made the campus less welcoming. He made it seem as if women were less powerful.

Steinback was aware that Thompson was given a written directive not to contact any witnesses during the investigation, but he failed to follow that instruction. His also made a false statement when Thompson said he did not know of the status of the investigation. After reviewing the audio tape and his *Skelly* response, she made the determination to discharge him. Her decision was subsequently voted on and supported by the Board.

Steinback confirmed course outlines were developed by the faculty and that evaluations were done every three years by several faculty peers and an administrator. Part of the process

EXHIBIT A-7

included an observation component where the instructor was aware of the dates when it would occur. She defined academic freedom as a free exchange of ideas. She agreed it was important to challenge students and that there were a variety of ways to teach Sociology, including using the Socratic method. It was her belief "targeting" could lead a student to either stop participating or drop a class.

Steinback recalled an incident during a party at Mayo's home when Thompson told her she must be a feminist because she was working. At that time, she was V.P. of Academic Affairs. When she asked him why it was a problem for her to work, Thompson told her it was because she was married with children. Steinback replied it was odd for him to suggest she was a bad mother when he was sitting and drinking at a party while his wife was home expecting a new born child.

**Daniel Casella**

Casella is employed with the College and serves it students in crisis intervention. He noted when one seeks services for harassment, it cannot be reported unless either the student signed a release or there was a potential threat to themselves or others. It was his opinion non-physical harassment based on gender could cause students to experience depression, low self-esteem, and trouble with studying. Even students, who are not targeted, but are aware of such incidents, could feel the same. It was also Casella's opinion that students look up to the faculty. They want to be in their good graces and may worry about their grade if they say something. He considers it illegal for one to engage in conversion therapy which is not approved by the American Psychological Association.

**Angela J.**

8

EXHIBIT A-8

Angela J. attended the College back in 1993 and returned in the Fall of 2013. She was involved in the Student Association as both a student senator then as vice-president. She also served on several clubs including the Diversity Committee which promoted inclusion in the College regardless of race, sexual orientation, religion, age, or income. While taking Thompson's class she was concerned whether her fellow students would be graded differently if they expressed view-points other than his. Angela J. did not feel as if she could write a paper which honestly expressed her opinions given his staunch viewpoints. She did not believe there was an opportunity for rebuttal with students afraid to speak out. When Angela J. read a paper written by Victor S. she thought it was bold since it was contrary to what Thompson believed. It made her sad that Victor S. thought he was going to receive a lower grade because of it. She does not know all of the reasons why or even if, he got a lower grade.

Thompson would constantly present his Christian viewpoints with a passion and in absolute terms. They included such positions as women should be at home, work before they have children, and be subservient to their man. He would denigrate women during discussions about their role in the family. He would discuss religion at least once a week and state how a patriarchal was better than matriarchal family structure, with former being the way he ran his family. As a single mother, who had gone back to school for the betterment of her children, she found his comments offensive and degrading. Thompson knew she had children at home. His comments he made her feel guilty as if she was stealing time from them to go to school.

Although Angela J. personally loved the movie "Fireproof" she was concerned about it being shown to others since it was told from a Christian point of view. She told the investigator Thompson would have been better suited teaching at a Christina school. She could not recall him discussing other faiths or if he expressed his religious views on-line. A syllabus was given out,

9

EXHIBIT A-9

but the movie he showed was not on it. Thompson said the document was fluid and that they may not get through it all in class.

Thompson showed a conversion video which presented being gay as a cognitive distortion. After the course ended, Thompson sent it out via a "MVC all email", which went to student leaders and employees of the College. Angela J. discussed it with the Diversity Committee before she took the matter to the Student Senate. About ten people approached her about it, most of whom were angry. They included a gay student, Charles C., who was emotional and on the verge of tears. Thompson had asked the class if anyone had these symptoms. By having them raise their hands he would "out them." Her heart went out to those who she believed were gay. She emailed the President about it, but never received a response or was made aware of how they reacted to it.

Angela J. agreed everyone should be able to express their own ideas as long as they are respectful and did not hurt others. In Thompson's class there was a free flow of ideas. She characterized his demeanor as friendly, concrete, and passionate. He would call on students and have a lot of discussions. There were some who did not feel comfortable about participating and for others it was not their style. She also had other teachers she disagreed with.

**Dr. Irving Hendrick:**

Hendrick returned as Interim President of College in 2016. He was a strong believer in its academic freedom policy, which to him meant a free exchange and exploring of multiple points of view in an atmosphere where scholars on both sides felt safe and were able to explore their ideas. He presided over the first *Skelly*, where both Thompson and his counsel made a presentation. Without reaching for anything Thompson told him since they had raised their sword against him, he was going to raise his own believing his family was being harmed. At the

10

EXHIBIT A-10

time their eyes were joined leading Hendrick to believe Thompson meant business. Hendrick did not take it to mean it as a threat to his job since he was only on an interim assignment. Thompson acknowledged it was a threat. His attorney said usage of the word "sword" was only meant as a metaphor. After this comment was made Hendrick believed the meeting changed from discussing the charges and possible corrections to a threat of retribution and violence.

After thinking more about it, the next morning Hendricks called the College's police department, who in turn would not let Thompson back on campus. Hendrick has been worried about his security since the event first happened. He believed in the integrity of the investigative process and thought the charges presented fitted well.

**Krista E.**

Krista E. graduated from the College in 2017 during which time she served as treasurer for the LGBTSA. Krista E. believed Thomson knew she was part of that group in that she would wear the club's shirt and wear an "Ally" button to class every day. Thompson would make comments that denigrated women probably once a week.  When Thompson made such statements as equating one woman, who tried to help others out of prostitution to Harriet Tubman, he was flippant and highly offensive. During one class, he repeated a question from a student who had asked "Why are dykes so ugly." Krista E. was offended because she has a daughter who identified with the community. On another occasion, he showed a video of a married couple where a church was able to convince an individual he was no longer gay. Thompson called it "normal." There were plenty of times when she wanted to get up and leave because of such comments.

At times Krista E. felt Thompson could be an effective teacher, but did not feel he really cared about her reaction. She did receive a final grade of "A" in the class. She was concerned

11

EXHIBIT A-11

about younger students being influenced when Thompson promoted his values and did not present a diversity of ideas. He only put forth arguments in opposition to same sex marriage. During one class she started to walk out after someone mentioned about how tax breaks related to such a relationship and after Thompson cited an example where a father and daughter wanted to be married. When he asked her about it and Krista E. responded, it was like comparing "apples to oranges." As she was walking out one of the students asked why one person in a lesbian relationship was half ugly and looked like a boy. These comments made her sick to her stomach and she started to cry.

**Kristine Exton, Esq.**

Exton owns a firm which investigate allegations of employee misconduct. In this case she was given a number of questions to answer. As part of her investigation, she talked to 5 or 6 other students in the class before Thompson. Exton tried to contact Derian H., but she told her that she wanted to move on and did not want to meet. In Thompson's email to Derian H., he told her that she was causing him a lot of trouble and costing money. Krista E. believed this transmittal violated two paragraphs of the memo he had previously been sent informing him about the investigation. She was shocked and characterized his action as egregious in that, as a professor, he was an authority figure. It looked to her as if he tried to coerce and influence this witness. She believed Thompson knew that was the case since he had been involved in an earlier investigation at the same level.

During their interview meeting, Thompson told Exton he did not know the status of the Derian H.'s complaint and believed the Administration did not followed its own policies to resolve the dispute. Exton thought Thompson would have been personally contacted about the investigation and told not to discuss it with witnesses. She acknowledged one may not know the

12

EXHIBIT A-12

status of an investigation at every step, but was unable to imagine how someone in his position

would not have known. She also agreed it was possible Thompson did not know about the status,

but noted his email was within 10 days of receiving the letter regarding the investigation. She

confirmed the conclusions reach in her report including that the charge of discrimination was

"unfounded" and there was no animus associated with Derian H. having been received a low

grade in Thompson's course.

**Larisa Broyles**

Broyles is a professor of anthropology and currently is chair of the Humanities, Arts and

Social Sciences Department. Her relationship with Thompson was cordial and superficial. She

noted that MVALL was a way to send out announcements about upcoming events and other

matters to faculty, administration, and staff throughout the campus. Sometimes it would be used

for non-business purposes. She was unaware of any written rules on how to use it. In 2014 an

electronic message was sent out with a video. Broyles never saw it, but understood it to favored

aversion therapy. Even though it did not go out to students, some of them did have access, which

Broyles believe gave it validity. The comments she heard about it were pretty heated. Some

faculty members were upset and called it garbage with no scientific validity. Some cited

opposite studies and were concerned that people could be hurt by it.

In 2015 Broyles chaired the Diversity Committee, which was a forum to discuss and

solve problems including those which had been raised about Thompson. "Viewpoint diversity"

was raised when they were speaking of Thompson and his viewpoints. There was some

discussion how unfair it would be if his opinions were embedded in students without the benefit

of hearing different viewpoints. In 2014 and after the Committee came up with some

recommendations, Broyles, two other faculty members, and some students met with Dr. Mayo to

13

EXHIBIT A-13

discuss Thompson.  Mayo told them the video would not be shown anymore. Broyles and others were unhappy with such a response. It seemed as if Mayo was telling them to "shut it down."

Broyles did not feel Thompson was sensitive to the diversity and felt others were affected as well. When Charlie C. first came to the College he was afraid because he had been out of school so long and was different. Over time he became very confident and started branching out, having fun, including going to off campus events. One day in 2015 he was sitting outside and seemed very despondent about an incident which had occurred in his Sociology class. Charlie C. did not believe he was fitting in and felt deviant after he had raised his hand in class. Broyles was concerned about his well-being and felt it could have been prevented since they had discussed it with Mayo the previous Fall.  Some of the faculty also felt they were targeted because they were homosexual. They did not want to work with Thompson.

Angela J. did not come directly to Broyles, but she heard elsewhere about this student's discussion with Thompson after she was absent from class because of a family matter. Thompson told Angela J. she should be home taking care of her family. Broyles felt this comment was inappropriate and made her feel uncomfortable in that they were not there to judge if someone should be at home or at college.  Danny C., a student going through a gender identity, expressed a frustration with Thomson talking about sexual issues in class and was concerned he was being targeted as a model of what one was not supposed to be.  Danny C. felt he could hold his own, but was worried about others.

As to "diversity," Broyles agreed it was important for an instructor to listen to both sides of controversial issues and give students the tools to evaluate different ideas. She agreed sometimes it could be uncomfortable to present students with certain information. With difficult topics instructors needed to let students know they had their support to learn about them.

14

EXHIBIT A-14

**Charles C.**

Charles C. attended the College from 2011– 2015 and was a student in Thompson's class in 2014. On a weekly basis, he would hear Thompson make statements that denigrated women, including that a women's place was doing domestic duties. There was an occasion when he watched the film about how one could be changed so as not be a homosexual.  It called homosexuality an illness. He did not leave the class so as to show respect.  After viewing the film, things changed Charles C. did not believe he could not be himself. He felt threatened, scared and targeted in that he thought Thompson had talked about him. On occasion Thompson would walk up and be only about 2 feet away. Charles C. became much quieter and wondered if he needed to be careful about how he dressed or what he said for fear Thompson could fail him.

After the film was shown, there was some discussion in class about it including a question whether the College knew about the film. Thompson said he had tenure and could do want he wanted in his classroom and that what the film showed was an option that could work. Later Charles C. went to talk Broyles and Dr. Bunk about how he felt. He was surprised when he got a "C" in the course since he had received "A" and "B's on his papers and had some tutoring. If Charles C. had known such things about Thompson, he would have taken the class with someone else. Charles C. thought Thompson was respectful, but he did not feel he could challenge him.

**Lorraine Jones**

Jones currently served as the Compliance Officer in Human Resources for the College responsible for responding to harassment and discrimination complaints. She provided services to student, applicants, or third parties. The College's non-discrimination policies and procedures were located on line, in annual notices, in the student handbook, and were posted at different

EXHIBIT A-15

locations.  All faculty members acknowledge receipt of the policies and are responsible employees for reporting purposes. If a student reports a complaint to an employee, that person is responsible for either forwarding it to one of the coordinators, the website, or by directly contacting her. All of them are investigated and there are protections for anyone involved in the process and against those who try to influence an investigation.

Jones confirmed a letter was sent to Thompson which put him on notice Derian H. had filed a complaint against him.  Subsequently Thompson sent Derian H. an email despite what was written in the opening sentence of the letter he had received. Jones then asked the matter be investigated. As to why his complaint was not processed under the College's grade policy, Jones believed such protected classification complaints must be processed differently. Retaliation was an additional offense, which still needed to be investigated, whether the other allegation was sustained or not in that Title IX and the laws of California prohibited such action.

Jones was aware Derian H. did not cooperate in the investigation, but unless one withdrew her complaint in writing, the process continued.  She confirmed there should be an informal effort to resolve such charges, but the College still has an obligation to maintain compliance, so it still may need to go forward. There was no such get together in this case. If the College was found not to be compliant, it could be sued and/or lose use financial aid funding.

**Jeff Rhyne**

Rhyne. a Professor of English and Chair of Department of Communications, had an office opposite of Thompson, during which time they had a cordial relationship. In 2014 there was a brief quote on the MVALL List Serve from a scholar and a link to video regarding conversion therapy. There was quite a bit of online response about it. Most of the postings were against, while some wanted more explanation as to why Thompson sent the video.

16

EXHIBIT A-16

Rhyne watched the video and then sent responses supporting the LGB community. The film made it appear as if homosexuality was some sort of choice. He found the video to be both dangerous and non-academic because it promoted a tool that made people feel some aspect of themselves was not okay and could put in a vulnerable position. It was non-academic because it was one-sided and ran counter to American Psychological Association's position against such treatment, a matter he believed was now well-settled. Ryne was on the Diversity Committee and part of the group that met with President Mayo whose main focus was that the Committee come up with a written response to use in controversial issues should there be such a post in the future. It was posted for a couple of semesters.

Rhyne reviewed an audio and transcript of the class submitted into evidence. His first thought was that Thompson targeted a particular student. His judgement as to the value of such an interaction depended on what Thompson knew about the student and maybe, if he called people random. He noted even academic freedom should protect students from being harassed because of who they are. He agreed it could include different viewpoints and that some students might be uncomfortable with them, but that could be part of the learning process. There was a difference between presenting challenging ideas and targeting students.

**Sergio M.**

Sergio M., a student until Spring 2015, was a member of the Student Senate and the Diversity Committee. He took two courses from Thompson and told the investigator he was not offended by statements made in his class. He was not one to challenge faculty back then. He was originally close minded, but eventually grew to become more culturally aware with a more inclusive mindset. In December of 2014 Sergio M. was one of students from the Diversity Committee who went to Mayo after he heard about some issues regarding Thompson. He went to

report what he had heard from other students and to make a complaint for himself, in that now he had different beliefs as to those issues. During the meeting with Mayo they talked about different ways to investigate or address their concerns. He did not know what action was decided on.

When a God-Man-Women diagram was shown during a class discussion about polygamy and maternalism there was some laughter while other students rolled back in disgust. In regards to religion and the family, he could only recall him talking about Christianity. He believed Thompson would carefully choose his words. He was approachable to other students, respectful and charismatic.

**Ann Louise Pfeifle**

Pfeifle has been a professor of history at the college since 2001. She did not have a great deal of interaction with Thompson. Krista E. came to her on three different occasions about him. The first was when she was upset about what he had said in class. Pfeifle suggested she say something in class or talk to Thompson afterwards. She came to her again after Thompson made some comments about gays or gay marriage. Pfeifle told her if she did not feel comfortable with talking to him, she could make a complaint. Krista E. did not want to do so and get a bad grade.

When Krista E. came to Pfeifle a third time, she was frantic and shaking. Thompson called her out, inquired about her opinion on gay marriage, and then asked her to defend it. She believes Thompson did so because he knew how she felt about the issue as a member of the student LGBT club. Krista E. was upset and left the class after Thompson made some comparisons and after a student used the word "dyke. Another student asked if someone dressed like a man, why she did not marry one. Krista E. was upset Thompson did not intervene. As an educator, Pfeifle was troubled because of the effect this incident had on Krista E.

**Faith N.**

18

EXHIBIT A-18

With the exception of about one or two sessions, Thompson would make some offensive comments based on race, gender, religion, and sexual orientation during his Sociology 1 class. There were some African Americans in the class, when on five or six occasions, he said blacks had a victim mentality and would refer to them as "those people." He complained about one professor, who thought he was better than anyone else and was trying to get everyone to speak Ebonics.

There were several occasions when he characterized gays as being deviates and that they had no business being around children. It was a common theme in this class. He would often make comments regarding gender including that women belong in the home and should be subjected to their husbands. He also said there should be an increase in paternalism, and how feminists, including some faculty members, were tearing apart the moral fabric of society. There were a couple of times he said it was the Protestants who made the nation great and would talk about Catholics and the horrors he said they had inflicted.

When she tried to comment about women in the Bible, he would cut her off and say that text did not lie. Faith N. was irritated and put down by such comments. She learned very quickly not to question him. For the first couple of weeks there were students who had dissenting opinions, but then everyone just shut up and would not ask him about anything outside of his personal beliefs. Towards the end of the semester he offered an extra credit assignment regarding homosexuality. She felt bad for those who were trying to bring their grade up. Faith N. had not viewed the extra credit film, but by that time she had seen other videos that were not academic in nature and were hateful with a specific agenda. There was no true presenting of philosophy or fact. Thompson said he had previously got into trouble for not being politically correct enough.

19

EXHIBIT A-19

Although he did not necessarily speak directly to them, she saw students who were dejected or irritated. You could tell they wanted to say something but they would not. Some of them were high school students. Faith N. felt very cheated, in that she wanted to get information but about 50% of the class was not from the book but propaganda. She did not complain because it was her first semester and she did not know who to go to. It was his understanding Thompson was the head of the Department. Since Faith N. was unsure about her future course of study, she was afraid of ending up in another of his classes where he could retaliate. Faith N. received an "A" in the class. She characterized Thompson as a very nice gentleman. Although he never yelled or screamed, it was obvious which students he did not care for. He would not call on them, cut them off, or look directly at the one who fit a certain category with an unfriendly facial expression.

**Victor S.**

Victor S. participated in a number of campus activities including serving as a student senator and on the Diversity Committee. During a meeting in the latter "viewpoint diversity" was discussed in the context that someone should not take offense at something that is different, have empathy, and take into consideration the feelings of others. As a senator, students would bring issues about Thompson to his attention. He took both Sociology I and a course on marriage and family from Thompson. He completed an evaluation where he noted the Thompson would be a great instructor at a private, but not a public institution. He told the investigator Thomson had an amazing desire to instruct and to engage in dialogue.

Thompson knew what religion Victor S. practiced and that he was taking classes at a Christian college. Thompson had said professional women did not make good housewives. For about six (6) class meetings, he presented women as being there to serve men, by cleaning, meal

prep, and so forth. On two or three occasions Victor S. had to clear his thoughts before going back into Thompson's class. Those comments bothered Victor S. both spiritually and emotionally. When he voiced his concern, it literally became a scripture battle. It was as if Thompson was trying to change his mind based on his interpretation. Even though Victor S. did not wish to participate, Thompson would walk up, stand about foot and a half away and say "I really want to know what you think." He would then chuckle, walk off, and be unwilling to entertain Victor S.'s comments. He believed Thompson targeted him based on his religious belief, his speaking up in class, and because he was a student senator.

Thompson would say how being gay was an abominable sin and that they were going to hell. Victor S. would walk out on those occasions when the subject of conversion therapy was discussed. The only alternative view Thompson presented was that of prayer. This was a tender issue for Victor S. in that his Aunt was transitional. It was his belief that for about 75% of the time there was some sort of tension in class with gays, transgenders, or women because of such topics. On one occasion, after he asked about his grade, Thompson reconsidered and changed it.

**Eric Thompson**

Thompson was a tenured professor at the College and has both a B.A. and Masters in Sociology. In March 2016 and even though an investigation found he did not violate any Board or College policy, Mayo sent him a 90-day notice for unprofessional conduct claiming he treated students differently. He sent Mayo a certified letter response, but he received a reply. Afterwards, he changed his behavior. Even though he did not do the things Mayo alleged, he felt she was trying to appease the Diversity Committee and faculty. He understood academic freedom as supporting the independence for instructors to teach and student to learn, even if it is

EXHIBIT A-21

uncomfortable for others. It was his belief the mission of higher education was the search for knowledge and truth which could not be limited if academic freedom was curtailed.

As to the allegations involving Krista E. the subject in class that day was the legalization of gay marriage and the risk factors of divorce. He asked questions of about 25 students. After he asked Krista E. the first question, there were several others and some back and forth. She did not appear offended and he believed she was fairly treated. He had asked the class about a question posed by Judge Alioto and a report where a man had married his own daughter. At one point in the discussion another student asked him why in a lesbian relationship, one of them always dressed as a man. At that point Krista E. stood up and with her voice shaking said something like that was a stereotype. Thompson wanted to ameliorate the situation, but it happened too fast. He then suggested one should not stereotype and told the student who asked the question if she could delicately ask her friends if she knew such individuals.

The statement Thompson made in class suggesting women remain at home was not a view he held.  He did so just to encourage discussion and keep things interesting. He had assigned a Forbes' article, "Don't Marry a Career A. Women," as an example how data is used in sociological research, and to show conclusions on such research could be misunderstood. He also assigned a rebuttal article, "Don't Marry a Lazy Man."  The comment about a woman wanting a strong man was made in a playful tone.  It was not his personal belief, but one based on research which showed women preferred a man who was strong took risks. He used the term "caddy" in the context of polygamy as reflected in research where a man, who has more than one wife, has problems with such an arrangement. He referenced an article, generally accepted in his field, which said "women are hard wired" in that regard. He added that anything which has to do with human beings in society and was peer reviewed was acceptable within the behavioral sciences.

EXHIBIT A-22

Thompson stated he was never given any guidelines as to how use the MVAll List Serve before he posted the video titled "Understanding Same Sex Attraction." Mayo wanted him to agree to stop using it so she could get back to those who brought the complaint. Thompson told her that he would do so for the next semester, but was unwilling to shelve it forever. As to the video "Fireproof," it was about a couple who were having problems with communication, divorce, career, work, pornography, religion, and other categories. All of those topics were in the textbook and discussed in his class. There was a chapter in the marriage class about religion where he would use the Bible to understand current society. The course outline defined the objectives of the class, methods of instruction, and textbook. As an instructor he had to adhere to those guidelines. He did not modify the text.

In response to testimony that 70% of the time he talked about his religion, his students may have implied that was what he was saying. As to how sociologist view society in general, it depends on the framework from where they are coming. He characterized himself as more of a structural functionalist. Thompson admitted to sending the video to Derian H. asking her not to go forward with the complaint. In doing so he copied all of the leaders of the college, which showed he did not try to bribe her. He was approachable and offered her a higher grade if she deserved it. He would make such adjustments a couple of times a year. When asked about "status" by the investigator he was referring to Derian H.'s sexual orientation and not the investigation. He had no idea about Derian H. sexual identity. He raised this same point in his *Skelly* response.

Thompson argued the letter to Derian H. could not have been about the investigation in that by that time, the grades had already been submitted. He did not believe posting of the video was part of the investigation. He also did not know why the list of people he emailed was not

23

EXHIBIT A-23

included. They were "bcc." He acknowledged he had all of the grades and could have done the calculation without contacting or sending her an email. He did tell Derian H. if she reviewed the video, it could help her grade.  As to the class and the Supreme Court arguments, he never told another student not to use stereotypes when referring to gay couples.

The "sword" comment he made during his *Skelly* was in defense of the Administration trying to illegally push him out for exercising his academic freedom. As his lawyer mentioned during the meeting, it was just a metaphor in that he was responding to them for having drawn their sword against his family. He had nine dependents and they were trying to take away his income. It was not meant to be a violent comment, but rather a reference to a legal remedy and that he intended to file a lawsuit due to their abuse. Thompson told Hendrick during the same meeting he always liked him.

Every three years tenured faculty were assessed to see if there were deficiencies which needed to be remedied. The process would include student feedback and had one done in Spring of 2015. As to the student evaluation piece, he was not aware of any complaints about how he was teaching. The responses he received were very favorable. He would give students the opportunity to present their points as he liked classroom discussions. Thompson confirmed that during his deposition, he never admitted to having done anything wrong while at the College. He remembered going to a post commencement get together at Mayo's house, but did not recall telling Steinback she was feminist or that women belonged in the home.

The extra credit was available to all students. All required was a quick write up with some personal comments. He did not read them. Thompson did not believe he can teach Sociology without hurting someone's feelings in that if you are going to think, talk, and evaluate,

EXHIBIT A-24

someone is going to get offended. The concept of academic freedom contemplates some students may get offended.

## DISCUSSION OF THE ALLEGATIONS

1. **Whether Thompson improperly targeted Krista E. in class because of her affiliation with the LGBT community and perceived sexual orientation**

The College alleged Thompson had directed a series of harsh and embarrassing questions towards Krista E. which caused her to become upset and leave his classroom (Ex J p. 13:21-18:23). She reported he confronted her with his one-sided views against legalizing gay marriage. In addition, there had been a number of other occasions during the semester when she wanted to get up and leave because of statements made in his class (TR 282:8-21, Ex. 12 p.18:2-23).   It was the College's position his actions violated various internal policies which prohibited harassment and/or discrimination.

An investigation into the matter found the allegation "sustained in part" as to such comments being made in class, but did not sustain Krista E.'s assertion his conduct was motivated by her association with or support of the homosexuality (Ex. A p. 5). Thompson admitted knowing Krista E. was an advocate for the gay community and did not deny she left the classroom during a discussion about gay marriage. She would wear a shirt with a LGBT logo and an *ALLY* button to his class (Ex. 13 p. 101:6-21). Thompson put forth several defenses against this and several of the other allegations including, but not limited to: 1) the events did not occur as alleged and as reflected on the recording taken during the class; 2) the subjects discussed in class did not exceed the bounds of his academic freedom; and 3) the comments from a few students were inconsistent with his 2015 evaluations (Ex. 32 p.11). After a review of the documents introduced and testimony presented, what Thompson said and allowed to be said by

EXHIBIT A-25

others could well have caused Krista E. to become upset, but did not violate any of the College's policies or procedure and/or rise to the level of unprofessional conduct.

Thompson did not dispute the College's contention he was aware of the various State laws, policies and procedures and other internal safeguards in place to in place to protect students from harassment and discrimination (Exs. 39, 49, 56 - 62). They included a Prohibition of Harassment and Retaliation which applied to the classroom as well as and grades (Ex. 39 p.4). Inappropriate conduct could include making verbal "ridiculing statements that convey derogatory attitudes" to one in a protected class (Ex. 39 p. 8). Jones testified the sociology instructor job posting required one to have "evidence of sensitivity to and understanding of the diverse academic, social, economic, cultural, disability, and ethnic backgrounds of community college students" (TR 447:22-451:25). The "Schools Diversity Initiative" recommend there be a committee of students and faculty to advise the College President on diversity and equity. (Ex. 52 & 53). During the hearing several student and faculty witnesses testified they participated in the same. Finally, there was the 90-day notice Thompson received from Mayo on March 3, 2016 which reaffirmed that students are protected against discrimination and harassment on the basis of gender, sexual orientation and sexual identity (Ex. 26).

It was important to note the College's own investigator did not find he directed questions that day to Krista E. because of her support of the LGBT community (Ex. A p. 5 &15:37). Thompson was correct that the recording taken in the class that day did not corroborate Krista E.'s version of the events in several respects as to whom and what was said (Ex. 12). The College pointed to the fact that during her investigation Lindoerfer did not have access to the tape since in that it was not produced until the *Skelly* hearing. It was difficult to see how the

investigator would have changed her findings even though not all of what Thompson or Krista E. said occurred was verified by the recording.

As an example, it did not appear as if Krista E. was singled out as she claimed. Thompson could be heard calling several other students by name at the exact same time (Ex. 2 p.13:21-23). Even Ryhme, one of those who disagreed with Thompson's opinions, recognized that any value in evaluating such an interaction depended on what he knew about the student and if he called people random. Such appeared to have been the case in this instance. Although three others were also called on by name at that exact time, only Krista E. responded. As to why she did so, Krista E. said it was because of the tone of Thompson's voice, his physical location at the time, and the delay after the question was asked. His physical location of course could not be verified by the tape however, his tone and amount of delay could be evaluated. His tenor did not seem argumentative or much different what one can hear for the rest of the lecture that day. There was also no real pause on the tape between his question to the four students and Krista E.'s lone response. Her representation that she did not want to be called may well have been true, but the rest of the interaction seemed inconsistent with her preference not to respond. She continued with the discussion for some period of time, including after another student had already entered the conversation and/or when no question was pending (Ex. 12 p. 16 – 17).

It was also noteworthy, that it was another student who posed what Krista E. considered was an offending question as to why one of the partners in a lesbian relationship would dress like a man. The question, which seemed a little off topic, was asked by this other student without any prodding by Thompson. In addition, both in the transcript and the recording, it was clear this was not the question that triggered her to leave. She was already leaving by that point. Even then she continued to engage in the discussion as she left the class. There was no doubt she was upset by

27

EXHIBIT A-27

the conversation. Thompson apparently saw that was the case when he asked and tried to get her to stay (Ex. 12 p. 18:2-13). He can also be heard telling the other student he did not have an answer to her question while several of the students continued to debate among themselves. In part, this confirmed his representation he tried to ameliorate the situation, but was unable to do so because she left the room so fast.

On the tape, it did not sound as if other students were upset with the presentation or discussion beyond several being actively engaged.  During the investigation one of the student's instead characterized Krista E.'s leaving as immature (Ex. 15 p. 29 – 30). One perhaps could argue Thompson should have been more emphatic in shutting that particular topic down quicker, but at most, his failure to do so was more of an instance of poor judgment and not an intentional violation of policy.

Some interaction between students and their instructor was to be expected. The course syllabus made it clear class participation was a grading consideration (Ex. 3 p.2). As to the subject matter, the course outline noted topics for the semester would include "social interaction and the process of socialization; groups, organizations, and deviance; economic social inequality based upon class, race, sex and age; social institutions (marriage) and dimension of social change" (Ex 7 p. 1.8-1). There was no assertion the lecture material he presented that day regarding family and gay marriage was inappropriate for his sociology course. Krista E. testified Thompson told the class he did not agree with some of the subject matter, there was no evidence he did went beyond those documented parameters (TR 264:10-265:8).  Thompson testified he taught within the syllabus.

Part of the discussion that day focused on Supreme Court Judge Alito's comments regarding a pending case on same sex marriage. It was clearly a current event at the time, the

EXHIBIT A-28

subject of national debate, and relevant to the course topic involving "marriage and family" (Ex. 5 p. 1). Prior to Krista E. leaving Thompson could be heard setting the stage for the discussion when he noted "so my point is this, is that culturally we are moving away from the strict definition as we've been taught initially of family, which is – all of you have said it, the book definition – people who are related, by blood, marriage, or adoption" (Ex. 12 p. 4 :21-24). The conversation about the family structure then began to expand, including when one student mentioned his understanding that four men had married (Ex.12 p. 13:1-3). Even Krista E. spoke up about polygamy and its historical practice in Mormon church (Ex 12 p.13:9-25). Although Krista E. was upset with the direction the lecture drifted, there was no evidence Thompson's participation antagonized Krista E. with the points he made or the questions he asked during the discussion of these topics. She went on to receive an "A" in the course (Ex. 19 p. 10:63-69).

Even if one concluded Krista E. had been targeted, Thompson argued the manner in which he conducted himself both that day and when the other allegations were said to have occurred were protected by his right to free speech and the latitude afforded with academic freedom.  The College's academic Freedom policy noted that "Academic professionals need the freedom to explore ideas that may be strange or unpopular, endeavors proper to higher education, while also maintaining the responsibility of related subject matter to the classroom". In addition, "nothing in these policies and procedures shall be interpreted to prohibit bona fide academic requirements for a Specific District program course or activity." There must be a balance between a "faculty's right to teach and the student's right to learn." (Ex. 39 p. 9). The College did not disagree that faculty members, at some level, were afforded such protection as to their method of discussion. Hendrick testified he was a strong believer in academic freedom, which he

summarized as a free exchange of ideas and exploring multiple points of view in an atmosphere where scholars on both sides are safe and able to explore their ideas.

Both parties agreed such instructional latitude was not unlimited. In regards to this and several of the allegations, it was College's position his comments did not serve a pedagogical purpose while Thompson argued the law was clear in that the College may only limit speech on matters of public concern if it was detrimental to the objective of the college in educating its students. Both referenced the *Pickering* case and its balancing test (Ex. 39 p. 9). It consisted of two parts, the employee's need to show the speech was a matter of public concern and that the employee's interest in commenting on such matters outweighed the employer's interest in promoting the efficiency of the public services it performed through its employee (*Pickering v. Board of Education*, 391 U.S. 563 (1968). There was no doubt that commenting on a pending Supreme Court case, which also was the subject of nationwide debate, was a matter of public concern.

There was a difference between presenting challenging ideas and targeting students to such a level as to harass, threaten, ridicule, or impose his one's views on students.  The College's policy on the "Prohibition of Harassment and Retaliation" recognized that academic freedom does not permit unlawful discrimination or harassment (Ex 39 p. 8). The College's policy on "Handling Complaints of Unlawful Discrimination or Retaliation" included similar language (Ex 39-19). The College's Administrative Procedure AP 3430 also recognized academic freedom but still did not permit unlawful discrimination or harassment (Ex. 39, p.8). At some level one cannot claim First Amendment protection by targeting a student (*Demers v. Austin,* 9th Cir. 2014, 729 F.3 at 1020). As Steinbeck noted, targeting students was not an acceptable method of teaching Sociology (TR 71:3-22).

Reaching a determination as to what is acceptable academic speech can well be subtle and "difficult" (*Demers*, supra, 746 F.3d at 413). The various topics offered in Thompson's sociology courses made an evaluation in this case particularly difficult. Steinback recognized the difficulty associated with making such determinations noting, "that's the knife edge we walk on in Sociology" (TR 22:19:17).

Thompson was in large part correct that the College should not be able to prohibit an instructor's expression of an idea simply because society finds it offensive or disagreeable. Broyles agreed sometimes it could be uncomfortable to present certain information to students. Pfeifle acknowledged Thompson had academic freedom to present anything he believed as an expert in his field (Ex. 19 18:60-63). As to the same, she also noted "that's fine as long as it doesn't cross the line, but you never know where the line is" (Ex. 19 p. 20). As noted, "it is recognized that the essential function of education is probing of opinions and an exploration of information and ideas may cause some students discomfort and there is a need to balance the "faculty's right to teach and the student's right to learn." (Ex. 39 p. 9). In addition, "vigorous debate and even disagreement on issues of public concern are valued elements of the learning process."

During Ryne's testimony he agreed academic freedom contemplated different viewpoints and that some students might be uncomfortable, but that could be part of the learning process. It is quite possible then for there to be a presentation of ideas that are challenging at some personal level for a student without there being any intent to harass and target one for his or her views, including those in a protected class. Broyles also agreed during her testimony that sometimes it could be uncomfortable to present certain information to students.

31

EXHIBIT A-31

It was difficult to understand, if students had concerns about targeting one for harassment or discrimination and/or the manner, bias, and/or inappropriate comments why historically they were not reported on his various evaluations. Thompson's testified to the importance of student evaluations in the tenured instructor evaluation process.  They were apparently not taken lightly in that Hendrick stated the improvement instruction committee or panel both read all the student evaluations and did their own.  Subsequently, a report is written with a recommendation which is read by VP academic Affairs and then passed along (Ex 22 p. 3:55-58). Steinback would read the student evaluations and develop of plan of plan of remediation to improve instruction (Ex. 4 p. 50-53 & 22 p. 4:32-36). The only explanation as to why there were not more complaints were that students just "tuned" him out or because the class was easy (TR 272:11-24 & TR 537:14-538:3). Victor S. said he wrote a negative comment, but there was no such reference in any of those evaluations reviewed by Thompson's faculty peers (TR 628:2-23).

As opposed to their not being any such negative surveys, there were several which indicated his performance was, at a minimum, acceptable to both faculty and students. Thompson reported he had twice had won a "Faculty of the Year Award" which was an honor voted on by students. He testified and the College did not dispute, there were both student class surveys every year and a review by his pears every third year, including classroom visits as recently as 2015. There were positive evaluations written by David Vakil, (Dean of Instruction), Gregory Elder, (Faculty Chair), and Travis Gibbs (Faculty Member) (Ex. C-3). Elder wrote, "on many previous occasions I have seen him in the classroom and his work is always of the finest quality. His students find him interesting and challenging and have many good things to say about him" (Ex. C p. 6). In what appeared to be a rebuttal to the allegations of Thompson being "unprofessional" Elder also wrote, "I commend him for his professionalism and dedication to the

32

EXHIBIT A-32

College and the craft of teaching." There was no indication of what alleged to have been concerns or issues as alleged elsewhere by other faculty or students.

His written student evaluations, which were a mandatory part of the "Peer Review Committee's report, also appeared to be in stark contrast to what was asserted by the College (Ex. C p.2). As to his class discussions, it was reported there was "more than a modicum of student input and questions" and that he would challenge "students in a non-threatening manner" (Ex. C p. 7). Although he may have had notice in advance of such a faculty visit, these positive comments were consistent with other peer and student reviews.

In evaluating two of his classes, Gibbs characterized him as being "very considerate of his students." He also noted "Thompson must be doing something right and that 84% and 91% of his students would recommend those respective classes" (Ex. C p. 9). In his multi-class evaluation Vakil wrote there were not any student comments regarding a shortcoming that needed to be addressed and that "both courses had very similar and positive student comments" (Ex. C p. 11). In his student evaluations he "typically received all of nearly all marks in the "Outstanding" or the "Above Average categories." As to any "weakness in class' there was only one negative comment with dealt with his untimely response to emails, which was relatively minor and not in any way related to any of the present allegations (Ex. C p. 16). In all 13 students 15 students, who responded, had good things to say about his class. Finally, it should also be noted these comments and the evaluation from the Peer Review Committee were in the Spring of 2015, after students had come forward and presented with Mayo their concerns over the showing of the video and/or to other faculty regarding other concerns (App. D p. 60:10-23).

EXHIBIT A-33

What occurred in the classroom that night might have been handled a little differently, but there was no evidence Thompson crossed the line when he attempted to get Krista E. or others to engage in such a relevant and important topic that particular day.

### 2. Whether Thompson made statements that women with children should stay at home and not go to college

Thompson did not contest the fact there were mothers in his class who may have had children at home. There were also a number of witnesses who testified in support of the College's position that Thompson made such comments about women both in and outside of class.  Charles C. and Angela J. both stated he made what they considered were biased and derogatory statements. Krista E. testified Thompson would do so about once a week (TR 268:2-6).  In addition to what she believed were anti-gay comments, Faith N. testified that during her class in the Spring of 2016 Thompson said women belonged in the home and should be subservient to men (TR 566:5-567:22 & TR 567:5-9).  Sergio M. confirmed much the same when he referenced a drawing from Thompson's class which illustrated the view a woman should serve a man and a man should in turn serve God (Ex. 18).

Thompson did not deny making such statements. He represented they were not his personal views and were only made to encourage debate (TR 662:6-666.3). He referenced an article in *Forbes* titled "Don't Marry a Career A. Women" to try and support that his claims were supported and a legitimate instructional position. As opposed to other alleged classroom statements by Thompson, which may have been within the bounds of academic expression, in this instance there was additional evidence which showed such one-sided statements about women, represented his true mindset, both inside and outside the classroom.

34

EXHIBIT A-34

Although Thompson could not recall making such a comment, Steinback testified that during a social function at Mayo's house he called her a "feminist" and a "bad wife and mother" for working while she had children at home (TR 845:12-848:20). Such sentiments mirrored what his students reported were made in the classroom as to how he felt about working women making it more likely than not, his comments were intentional and indicative of his personal prejudices. Unlike his interactions with Krista E. as noted above, there was no need to consider the "balancing" of academic freedom in this instance. The interjection of such personal views about a mother's place in society in such a repetitious, direct, and definitive way, did not serve a material pedological purpose.

Such comments about women had a negative effect on his students and were contrary to established College policies which prohibited discrimination and harassment (Ex. 39). Angela J. testified Thompson's statements made her feel guilty in that by choosing to go back to school somehow, she was not being a good mother. As Mayo correctly stated in Thompson's 90-Day Notice, degrading the educational experience of female students could deter them from pursuing an education (Ex. 26 p. 3). It was clear from the documents and testimony presented the College has a proud tradition of promoting an environment which offered such students an entrée back into the academic world.  The College was an institution that provide individuals in the community with an opportunity to improve the lot of both their children and themselves. Having a faculty member actively discourage such participation under the guise of instruction, was prejudicial and contrary to the mission of the College.  An academic institution should not have to tolerate such behavior at the expense of its students.

**3.  Whether Thompson failed to adhere to the requirements presented in the 90-day Letter of Unprofessional Conduct**

EXHIBIT A-35

Prior to moving towards a possible discharge, the College was required to provide a written notice "with specific instances of behavior and with such particularity as to furnish the employee and opportunity to correct his faults and overcome the grounds for such discharge" (*CA. Ed. Code 87734*).  Thompson received such a 90-day notice in March 2016 from President Mayo for having treated students differently in the classroom and on the basis of gender (Ex. 26). This letter put Thompson on notice there could be disciplinary action if he again 1) treated students differently or provided them with different standards based on the perception they were gay or associated with the LGBT community, and/or 2) if he made discriminatory statements on the basis of gender. It also reserved the right to proceed to dismissal if he again engaged in unsatisfactory or unprofessional conduct.

Thompson attacked the basis of the notice given the administrative determination "that no violation of District Policy of Administrative Procedure occurred" (Ex. A. p. 6).  Such a summation was somewhat misleading in that with the exception of a part of Allegation 6, the findings of the other five allegations were noted as "sustained." They were not seen as violative of policy, but as Mayo noted, did constitute unprofessional conduct (Ex. C p. 6). The College's argument that Mayo's determination would have been even more severe had she been given the benefit of some of the testimony presented in this case should not be a consideration. For whatever reason, neither party chose to call Mayo and as such, it would only be speculation at this point to believe she would have changed her determination from that outlined in her letter.

With this baseline finding, the determinative factor as to this allegation was whether Thompson's subsequent actions were in conflict with the admonitions in this letter. It was alleged there were several different occasions when he failed to abide by the directives in his 90-day notice. The first was the charge he discriminated and/or retaliated against Derian H. based on

36

EXHIBIT A-36

her sexual orientation. The second was the assertion he disregarded the written instruction not to contact or otherwise interfere in the subsequent investigation related to the same. A third was the false statement that he was unaware of the status of that same investigation. Finally, it was also alleged he physically threatened Hendricks during his first *Skelly*. As noted, elsewhere in this decision, the College was able to carry its burden of proof on just two of these charges.

Mayo's letter was a reaffirmation of the law and College's various policies prohibiting such conduct. A mitigating point, but one still insufficient to prevent not sustaining this charge, was the 90-day notice also indicated the College would provide him with assistance in modifying his behavior. Beyond the notice itself and the distribution of a policy document, there did not appear to have been any such assistance. During his deposition Thompson said he did not get any help from the administrators (Thompson Depo p. 122:17-19). In addition, Thompson represented he also sent an email to Mayo on May 11th which requested he be able to engage in discussions with members of the LGBT community. He said Mayo told him to contact her assistant. Thompson stated he did so, but no meeting was ever arranged. Regardless, the weight of the evidence clearly established, he engaged in additional unprofessional conduct after receiving the notice with the letter sent to Derian H. and his false statement to the investigator.

**4. Thompson's failure to give Derian H. credit for an extra credit assignment.**

Derian H. claimed she submitted two extra credit papers while taking Thompson's class. One was a review of a film about conversion therapy as a way of "fixing being gay." Derian H. alleged she never received credit for this extra assignment even after her repeated requests for its return. Others in her class had received such credit. (TR 32:9-34:8). Derian H. also claimed she should have received a higher course grade based on her final exam score (TR 34:9-35:6). She believed Thompson's failure to make any grade adjustment was motivated by his awareness of

37

EXHIBIT A-37

her sexual orientation after she had self-identified in the extra credit submittal. If true, such conduct would have been a violation of several College policies including one which specifically prohibited harassment and retaliation in grading students (Ex. 39 p.4). In his response Thompson denied any knowledge of her sexual orientation and/or using grades as a way to "target" her. His position was more persuasive.

There was insufficient evidence to show there was an inappropriate cause and effect between Derian H. either not receiving the benefit of the extra credit and/or a higher grade for the course. With the exception of her testimony, there was little additional information as to what final grade she should have received been beyond Exton's report. Exton's investigation was hampered somewhat by Derian H.'s refusal to be interviewed (Ex. 30). As such there was no confirmation as to of some of its factual findings, including whether she actually missed an examination as the review indicated. It that was the case, obviously it would have had a negative effect on her final grade. This conclusion was consistent with Derian H.'s testimony she was failing the class when she went to Thompson to see how she could improve her grade (Ex. 24 pages 13-15).

Although neither a copy of her extra credit submittal or her recorded grades were introduced into evidence, Exton's report also included an explanation of the methodology Thompson used in calculating grades and extra credit. Exton found this explanation to be satisfactory and went on to conclude "the preponderance of the evidence shows that it is UNFOUNDED there was discriminatory animus on the basis of sexual orientation by Professor Thompson in assigning a grade for Derian H. (Ex. 30 p.6). "Unfounded" in this context meant the investigation clearly established her allegation was not true (Ex. 30: 6-7). Exton affirmed this earlier conclusion later during her testimony (TR   331:16-2).

38

EXHIBIT A-38

Also found as "not sustained/inconclusive" was Derian H.'s claim that Thompson's conduct towards her changed after she disclosed her sexual orientation and for that reason, he did not give her the extra credit (Ex. 39 p. 52). Exton's report indicated the grading record showed Derian H. received credit for two extra assignments, which were all this student reported she submitted. The investigator found even if Thompson failed to credit Derian H. for completing another extra credit assignment, it would not have had an effect on her final course grade (Ex. 30 page 6 & 8).

Beyond the documentary review by Exton, there was also no persuasive evidence that others were likewise mistreated.  Grading in his classes was not anonymous (TR 111 290:6-19). Charles C. felt his final grade was unfair, but beyond his testimony there was no review of his grade record to substantiate his claim (TR 415:20-416:7). On the other hand, there were several other students, who even though they too actively commented on or complained about Thompson's views, did not have any grade complaints. Faith N. testified she did not do the extra credit assignment because she did not need it (TR 574:1-6). Victor S. challenged Thompson about his grade before he agreed to change it to an "A." which was what he also received in his other sociology class (Ex. 20 3:31-33 & 5:30 -34). Angela J. also went on to get an "A" in her Sociology course (Ex. 21 6:58-60 & TR 263:9-11).

Thompson argued the College did not attempt to resolve Derian H.'s complaints as required by Administrative Procedure 3425 (Ex. 39-19). According to Compliance Officer Lorraine, it was not necessary in this case in that the allegations were so serious the College had to act to ensure a safe learning environment for its students.

**5.  Whether Thompson failed to adhere to the directives in Exton's letter of September 14, 2016.**

39

EXHIBIT A-39

The letter Exton sent to Thompson on September 14, 2016 regarding Derian H.'s complaint required that he "refrain from discussing this matter with other students, faculty, or members of the community in a manner that could be reasonably construed as threatening, retaliatory or an attempt to influence others" (Ex. 28). He was put on notice that any "attempt to take reprisals against, to intimidate, coerce, or otherwise threaten any participant of this process constituted unacceptable and illegal conduct and will not be tolerated." He was to "refrain from all such activities." It was the College's position that Thompson subsequently violated these directives (Ex 30 p. 62 & TR 335:16-336:19). Such a finding was supported by the record.

There was no claim of any other written or verbal communication by Thompson regarding this notice beyond the email he sent to Derian H. on September 24, 2016 (Ex. 29). It was the College's position the purpose of this latter transmittal was to try and threaten or coerce Derian H. into dropping her complaint by offering to change her grade. He admitted in his deposition the purpose of sending the email was to get her to drop the complaint (Thomson Depo. at 88:24-90:11). Even though the evidence was insufficient to prove he had discriminated or retaliated against Derian H. in grading, his denial that he was not trying to threaten or coerce her when wrote his letter was unpersuasive (Ex 36 p.18).

As Thompson asserted, Exton's letter did not expressly prohibit him from contacting Derian H. If for instance, Thompson had seen Derian H. on campus and just said "hello," there would not have been a violation of any directive in the letter. However, when Thompson wrote and mentioned such things as his wife was expecting, how the matter would take away from his obligation to his students, and cost to the taxpayer if it went on, he was clearly trying to make her feel somehow contributory if she did not drop the matter.

EXHIBIT A-40

Thompson was correct in his assertion the letter did not impede the investigation. Derian H. did not read it until several months later and after she had already refused to participate in the investigation. She testified it had gone to her old college email account and by that time she no longer attended the institution. During the hearing Derian H. also made the point she just wanted to move one, wish Thompson well, and did want him lose his job (TR 42:6-45:2 and 47:20-48.17). The problem with his reliance on such a time line was the fact that to prove this violation, there was no prerequisite he actually had to succeed in influencing the process. The notice was clear that just an "attempt" was sufficient. Exton rightfully concluded even this type of behavior could have interfered with the investigation and pressured Derian H. to change her testimony (TR 319:17-320:16). If Derian H. had read the letter sooner, it was reasonable to conclude it could have had such an effect. Derian H. testified that when she finally did read the note, it made her fell "terrible" (TR 43:14-23).

Thompson's explanation he was not trying to influence her from continuing with the complaint process, but rather address her grade concern had little credibility (Ex D p. 142:7-9). During his deposition he made the point ".. if she feels it's unfair, let's look at the grade book and if it's if it's not marked correctly, I'd be more than happy to change it." He added a grading error could have been made if he did not count a homework or some other assignment (Ex. D-123:11-22). The fallacy with such an argument, was even if true, there was no real need for such a letter once Thompson was notified of her concern. He admitted to already having in his possession all of the information necessary to check to see if he had made an input mistake. If Thompson's real concern was responding to her grade concern, he could have simply sent a letter clarifying his grading methodology and whether his grading record matched hers. Such an inquiry would not have been prohibited by the notice.

41

EXHIBIT A-41

As to the point he did not try "bribe" her in that he also sent copies of the transmittal to leaders in the College, there was no indication that was the case beyond his own testimony. There was no "bcc" noted in the transmittal and no one, who supposedly received one, testified to the same during the hearing. Derian H. was the only addressee on the document (Ex. 29).

6.   **Whether Thompson made a false statement when he told Exton he was unaware of the status of Derian H. H.'s complaint.**

The College accused Thompson of making a false statement when he told Exton he was "unaware of the status" of the complaint prior to sending his September 24, 2016 email to Derian H.  With Thompson having denied making such a representation a determination as to the merits of this allegation was fairly straight forward and required a simple timeline review. The letter he received from Jones prior to his own transmittal clearly put him on notice that with the retention of Kristine Exton, an outside investigator, an inquiry was already underway (Ex. 28).  Exton testified it was possible, but unlikely, Thompson did not know about the investigation given his email was sent within 10 days of receiving this letter (TR 329:22 – 330:5). In addition, Thompson's letter to Derian H. clearly indicated he knew the investigative process had begun when he told her "it was with disappointment that I received a letter from the District about your complaint" (Ex. 29).

Thompson contended when he heard the word "status," he took it to mean Derian H.'s sexual preference and not as to whether she had filed a complaint (Ex. 34 p.15 & TR 725:19-726:11).  Such an excuse was inconsistent with a plain reading of his email where he specifically referenced her complaint and that he had been contacted by the College regarding the same. Even if there was some indication of misunderstanding on his part, in an administrative or

disciplinary forum there was no need for the College to prove this or any of the  allegations with absolute certainty. In this instance, what was presented was sufficient to sustain the allegation.

### 7.  **Whether Thompson Made a Threat to Hendrick during a *Skelly* Meeting**

It was the College's assertion Thompson made a physical threat against Hendrick during his first *Skelly* meeting. Hendrick's testified when Thompson said he had "drawn a sword" by trying to discharge him, he looked him directly in the eye (TR 227:3-228:23 & 230:3-7). After further reflection, Hendrick became so concerned about his safety he reported what had occurred to campus security the next day. Hendrick also stated he personally took this comment to be a different kind of threat than what Thompson was facing with the loss of his position. Hendrick's had come out of retirement and accepted his latest assignment only on a temporary basis (TR pages 227:9-18, 228:4-12).

Thompson acknowledged he made the threatening statement, but denied it was meant to be taken as a physical one.  As his counsel noted during the same meeting, the phrase was simply a metaphor. Thompson testified the use of these words was his way of letting Hendrick know since the College had "drawn a sword" and threatened his family's financial welfare with a discharge, he would fight back by seeking a legal remedy (Ex. 36 p. 5).

It should be noted this statement was made in the compound. Thompson said it was the College which first raised the "sword" against him.  Hendrick confirmed this to have been the case when he testified "he stated that I had raised my sword against him and the threatening part was that he would raise his sword against me" (TR 227:9-11).  Clearly, such a physical threat then was not meant or possible by either side. There was no indication Thompson ever had any such weapon.  There was also no contemporaneous movement at that time indicating such a possibility. In addition, Hendrick testimony that prior to this meeting they had a good

43

EXHIBIT A-43

relationship coincided with Thompson's comment during the meeting he had he always liked him as well.

Thompson's statement was more likely than not just an unfortunate use of words which were somewhat understandable given the strain and pressure he was under in facing termination. Any feeling of apprehension on Hendrick's part most likely could have well been mitigated further or negated had Thompson not waited until later to clarify his remark. Still, his explanation as to what he wanted to get across that day to the *Skelly* officer was reasonable and was not meant to be a physical threat.

**8.  Whether the audio tape of an exchange between Thompson and Krista E. was evidence of gender-based bias**

It was the College's position the tape was reflective of Thompson's persistent offensive conduct in targeting students based on their protected status (Ex. 12).  It was also as an example of how he would discourage students from presenting or discussing views different from his own. Although the arguments as to whether he exhibited such harassing and/or discriminating conduct that particular day with Krista E. were already addressed above, in bringing forth this allegation the College attempted to show there were other statements which indicated Thompson had a gender-based bias. The evidence was sufficiently supportive in that regard.

In the recording and confirming transcript, Thompson described women as being "jealous" and "already prone to being catty" (Ex. p.12 24 - p. 13-25.3).  He also said "there's a part of every one of you ladies, that kind of-kind of likes that a little bit, that. . a strong, handsome man would ride into the village and pick and take you" (Ex. 12 p. 36:8-22).  As to the first comment, it was made while the class was discussing what he characterized as the "downsides" of polygamous marriage. It was not Thompson, but a student in the class who first

44

EXHIBIT A-44

used the term while discussing multi-spouse marriage. This student said "they'll (the multiple wives) start to get jealous" before adding they would "fight for you (the male)" (Ex. 12 24:13 - 25). Although Thompson was not the one who first used this phrase, he did go on to agree that in such a relationship, jealously could arise.

In support of using such adjectives to describe women, Thompson argued there existed some foundation for this opinion in the research community.  As such, his comment remained within the bounds of free expression and academic freedom. He noted there were many papers on evolutionary psychology which supported the view that a significant proportion of women reported having feelings of extreme jealousy in their romantic relationships and that they preferred strong and risk-taking men (Ex. 36 p.12 -13).

The problem for Thompson is that he went too far and with his follow-up comment that "women are already prone to being catty, aren't they? Aren't they? No? They are (12-25-1-3). His argument that it too was taken out of context was not convincing. There was no apparent value, academic debate, or support for making what was clearly a derogatory statement. In light of his other comments about working mothers and their place in the home, his prejudices were real and quite evident. Such improper characterizations and/or name calling was unacceptable.

**9. Whether Thompson discouraged students from presenting in his class points of view that were different from his ideas, views, and convictions.**

There were several students who reported feeling either intimidated or otherwise discouraged by Thompson from presenting their different points of view.  Several were concerned about the power he had as a faculty member and that by raising such viewpoints their grade could be negatively affected. Faith N. believed Thompson did not want to hear different opinions to such an extent that after a while, "everyone would shut up." It appeared to her as if

these other students wanted to say something but did not feel safe in doing so (TR 575:4-576:60). Victor S. said Thompson would walk away when he would make a comment as if his views were of no value. He did tell investigators Thompson "was amazing in engaging in class dialogue," but added some students felt uneasy to even challenge his ideas (TR 603:12-15) & 613:22-614:18). Charles C. reported being shocked, threatened, and scared in his class. He did not believe he could challenge Thompson (TR 414:7-13). Broyles testified about a Danny C., a student who was going through gender transition. This student had expressed a frustration with Thomson talking about sexual issues and was concerned he was being targeted as a model of what one was not supposed to be like.  He felt he could handle it, but was worried about others.

In contrast to the impressions of these students, there was a fair amount of evidence which showed Thompson would encourage students to participate in class. Thompson testified he would use the "Socratic" method during class time. Steinback agreed such a teaching style, which emphasized classroom questions and answers, was appropriate for the classes he offered. When one listens to the class tape, this appears to have been the case. Some of those same students who raised concerns about Thompson also saw positives in the way he taught.

Angela J. agreed everyone should be able to have their own ideas and voice, as long as they were respectful and did not hurt others. She characterized Thompson's classroom demeanor as friendly, concrete, and passionate and that he would call on students and have a lot of discussions. She confirmed there was a free flow of ideas, even though some people did not feel comfortable about participating and for others it was not their style. Angela J. considered him to have been "very positive" although she also thought he should not have pursued his religious viewpoints (Ex. 21 3:59-60).

Historically, Thompson also received good reviews in this area, several of which were at the other evaluative extreme of tolerance for different views and discussion. Student comments as to some of Thompson's "Strengths" included that he created an "open environment to discuss topics," allowed "class discussions with multiple viewpoints," had "no bias towards material," and "made students want to engage the class" (Ex. C p. 14). Others specifically noted he would allow "differing points of view" and was courteous and impartial in his relationship with students (Ex. C p. 19). Although there may have indeed been instances, as was the case with Victor S., when Thompson cut him off in class, with such a mix of student reviews the College was unable to persuasively show he discouraged class discussions because they differed from his views.

**10.  Whether Thompson targeted students in his class based on their protects status, including based on gender, gender expression, gender identity, and religions and affected students with his bias and discriminatory conduct**

During the hearing, the College made a motion to amend its earlier accusations pursuant to Government Code section 11507 including this more general charge.  Beyond the specific examples noted earlier, it was their position there was additional testimony which showed Thompson acted inappropriately as to such protected classes. As an example, Faith N. testified Thompson said gay people were deviants and should not raise a family. She also said he made statements critical of Catholics and that such comments made it difficult for her to be in his class (TR 567:11-14 & 570:14-572:3). Her assertions he was anti-Catholic seemed inconsistent with another student's comment during the investigation who had the impression Thompson practiced that religion. In addition, Angela J. could not recall him discussing other faiths. Victor S. stated he held different views on Christianity and that Thompson would chuckle when he did respond in class.  He also stated Thompson's statements about how gay people were an abomination and

47

EXHIBIT A-47

would cause him to walk out (TR 606:21-612:22). Charles C. testified certain comments bothered him such that he felt the need to be careful in such manners as dress, believing Thompson would treat him differently.

There was a fair amount of discussion about the various videos shown both in class or for extra credit which several individuals considered as biased and/or discriminatory. Thompson did not dispute the fact there were a number of faculty members and students who were disturbed by them either in class or when posted campus wide on-line. Although Thompson disagreed, during his testimony Rhyne cited the *CA. Business and Education Code* and the American Psychological Association's position on conversion therapy as indicative of the generally accepted position that such attempts at resolution should be avoided. He believed giving individuals such therapy and exposing them to anti-gay behavior could instead be harmful and lead to depression, anxiety, and others conditions. He and others discussed their concerns in both the Diversity Committee and Student Senate before it was presented to Mayo.

The concerns about the video were went back several years and were already thoroughly investigated. Although Mayo's determination that Thompson's actions represented unprofessional conduct, she also wrote they did not violate any of the school's policies and procedures. Neither side of the issue appeared satisfied with this outcome. Thompson considered the verbal agreement he reached with Mayo as attempt by her to appease those who had complained. She apparently was not successful in that regard in that Broyles and others, who had taken the matter to her, were disappointed and/or upset with what they considered to have been a "low-key" resolution to their concerns. Still as the school's president, there was no indication she did not have the discretion and authority to reach her conclusions as outlined in the 90-day letter.

48

Steinback acknowledged during her interview she might have sanctioned presenting Thompson's video clip had there been a showing of other perspectives (Ex. 22:14:71-74). Such appears to have been the case. In addition to Thompson's representation he presented a different view in another video, Derian H. testified she watched and wrote papers on both (Ex 13:10-18). As to the subject itself, after some hesitation Steinback appeared to concede human sexuality was a proper topic for even an introductory sociology course (TR 22: p.13:10-18).

These charges of bias and discrimination were also in conflict with his historical teaching record of student and teacher evaluations. Once again, the 90-day letter apparently included the 2015 evaluation as an attachment, which despite the reported concern of some students and faculty members, had no such negative references. Steinback reported she would review them and if necessary, put together an action plan. There were no such "need improvement" indications on his evaluations (Ex C p. 1). There is little doubt Thompson had strong opinions in certain areas, however, with the exception of the clearly inappropriate comments he made about women attending college or working, there was insufficient evidence he actually "targeted" individuals based on gender, religion, or another protected class.

**The Appropriateness of the Discipline**

In addition to not all of the allegations being sustained, a problem with discharging Thompson was that several of the incidents cited by the College occurred prior to the issuance of the March 3, 2016 Administrative Determination and accompanying 90-day Notice (Ex. 26). Those shortcomings and corresponding corrective action were already addressed in that transmittal. At that time Mayo reviewed the record and opted not to discharge or assess any other disciplinary action and instead effectively issued a 'notice to correct." The same transmittal did put Thompson on notice his performance would be monitored and that there could be additional

49

EXHIBIT A-49

disciplinary action up to termination if he violated such policies again. It was his latter conduct, which although still only sustained in part, warranted some type of severe discipline.

The College argued several of these latter actions constituted immoral conduct. They included what it alleged was his continued harassment which impaired the ability of students to pursue their educational goals, interference with the investigation, and the threat made to Hendrick, all of which it represented harmed the institution. Although not each of them was supported by the evidence, the College was correct in arguing Thompson again demonstrated lack of fitness, immoral conduct, and a refusal to obey rules when he made the false statement as to the status of Derian H.'s claim, attempted to contact her for the purpose of influencing the investigation, and when he continued to make comments about female students with children.

The College pointed to several false statements he made even though they were not specifically included the letters of accusation. They included Thompson's denial as to having the conversation with Steinback during the party at Mayo's home, telling students in his class not to let anyone know about the film, and, as already discussed, when he told Exton he unaware of the complaint's status. Thompson did not deny, but said he was unable to recall the first. As to the second, there was no dispute the films were shown, but as noted, there was a legitimate question as to why such a statement would have been made in such an open forum.

Each of the *Morrison* factors applied to some extent in this case and supported disciplinary action. They included 1) the likelihood his conduct adversely affected students or fellow teachers; 2) the proximity or remoteness in time of the conduct; 3) the type of teaching certificate he held; 4) the presence of extenuating or aggravating circumstances; 5) the likelihood of reoccurrence of the conduct; 6) and whether there would be a chilling effect on Thompson's constitutional rights as a teacher.

EXHIBIT A-50

Thompson's actions negatively affected both students and fellow faculty members in that dishonesty can lead to a breakdown in trust. Trustworthy associations are essential in any workplace, especially in an academic environment. There were no timeliness concerns in that all of the sustained allegations occurred in the last couple of years. Even though he was a tenured professor, some type of impressionable discipline was still appropriate for such wrongdoing.

As to aggravating circumstances, there appeared to be a lack of remorse or acceptance of responsibility on Thompson's part. He exhibited a certain amount of arrogance when he told his students that tenure gave him the right to do what he wanted. He did not deny making any such statement when students asked about whether the College knew about the videos (TR 409:8-410:22). Even though the 90-day letter clearly put Thompson on notice certain conduct would not be tolerated, he still chose to ignore the directive.

In mitigation, there were the multiple evaluations from faculty and students, which were reviewed by the Administration. They were relatively positive and lacked a notice of any concerns raised in the various allegations as recently as the Spring of 2015. As to whether any such discipline would have a chilling effect on his constitutional rights as a teacher, to the extent there was such a concern, it was addressed as a defense in those allegations where it was relevant. His falsification and writing to Derian H. did not involve and such expressions.

The College's mission in serving the varied interest of a diverse student body is to be commended. It should be proud of those individuals who appeared in this matter as to their dedication and the sacrifices they have and continue to make in the furtherance of their education. The students who testified, appeared to have done so honestly. There was little if any doubt what they perceived as to how Thompson taught and/or treated them during their respective semesters was real to them. Thompson owes it to his future students to be more

51

EXHIBIT A-51

credible going forward and to a present a wider and/or more balanced approach in his course presentations, educating his students while at the same time allowing them to formulate for their own questions and answers as to the various sociological issues of the day.

**If cause is established the arbitrator shall determine whether the decision should be imposed immediately or postponed pursuant to Section 87672 (Education Code section 87675).**

There was sufficient cause for disciplinary action. The suspension should be imposed immediately and used as a credit in the determination of back-pay from the effective date of his discharge.

## FINDINGS OF FACT

1. Thompson was hired as a professor at Morena Valley City College on August 25, 2005. He was granted tenure on March 17, 2009.

2. Thompson was given a 90-Day Notice of Unsatisfactory Performance/Unprofessional Conduct for making discriminatory statements on the basis of gender and treating students differently based on being gay or associated with the LGBT community.

3. On March 22, 2017 Thompson was issued a "Notice of Intent to Recommend Dismissal." After his first *Skelly* additional charges were added and a second *Skelly* was held. Thompson had an opportunity to respond to the disciplinary action and did so in writing.

4. On October 17, 2017 and at Dr. Steinback's recommendation, the Board of Trustees of the College decided to discharge Thompson. A written notice confirming the same was sent to him on October 19, 2017.

5. The District issued an "Accusation" of the charges on January 28, 2018 and later amended it to add additional allegations.

52

EXHIBIT A-52

6. The Parties agreed to the Stipulation of Issues, Facts, and Exhibits on May 14, 2018.

7. Thompson was aware of the College's policies and procedures which prohibited harassment and/or discrimination based on one's protected status as defined by State and Federal law.

8. Thompson did not cause Krista E. to be humiliated based on her affiliation with the LGBT community and/or her perceived sexual orientation.

9. Thompson made statements derogatory towards women, including that those with children should stay at home and not go to college. He continued to make such statements as late as the Spring of 2016.

10. Thompson failed to adhere to the requirements of his 90-day notice of unprofessional conduct when he made discriminatory statements on the basis of gender.

11. Thompson did not fail to give Derian H. credit for any extra credit assignment. There was no discriminatory animus by Thompson on the basis of Derian H.'s sexual orientation when he calculated her final grade.

12. Thompson failed to adhere to the directive in Exton's letter of September 14, 2016 when 1) he interfered with an investigation by improperly contacting Derian H. in an attempt to get her to drop her complaint, and 2) when he made a false statement to Exton regarding whether or not he aware of the status of Derian H.'s complaint.

13. Thompson did not make a physical threat to Dr. Hendrick during a *Skelly* meeting.

14. The audio tape of exchange between Thompson and Krista E. was not evidence of gender-based bias.

15. Thompson did not discourage students from presenting in his class points of view that were different from his ideas, views, and convictions.

53

EXHIBIT A-53

16. With the exception of those comments made about women with children attending college, Thompson did not target students in his class based on gender, gender expression, gender identity, and/or religion.

17. The District established sufficient cause to suspend Thompson by a preponderance of the evidence in that he 1) engaged in immoral conduct under Section 87732 subdivision (a); 2) was dishonest under Section 87732, subdivision (b); 3) was evidently unfit for service under section 87732 subdivision (d); and 4) refused to obey the school laws of the state and reasonable regulations prescribed by the government of the community college by the governing board of the District.

18. The application of each of the seven *Morrison* factors supported Thompson's disciplinary action due to his unfitness to teach.

19. Given not all of the allegations were sustained and because of the presence of mitigating circumstances, the discharge was not appropriate.

20. The record was sufficient to immediately impose a suspension.

## AWARD

1. The allegations are sustained in part and denied in part as explained in Discussion and Findings of Fact of this Opinion.

The discharge is to be converted to a ninety (90) calendar day suspension without pay effective from the original termination date.

Ss/
Stephen M. Biersmith, Arbitrator

Issued at Ventura County, California on this 26th date of October, 2018

54

EXHIBIT A-54

## DECLARATION OF SERVICE BY MAIL

I am employed in the County of Ventura, State of California, I am a citizen of the United States, over the age of 18 years and not a party to nor have an interest in the within action.  My business address is 5462 Rincon Beach Park, Ventura, California 93001.

On October 26, 2018 I served the within document described as:

### ARBITRATOR OPINION AND AWARD AND OPINION

__X__  By placing the true copies in a sealed envelope(s) addressed as follows:

Mr. Michael J. Peffer, Esq                    Ms. Pilar Morin, Esq.
Pacific Justice Institute                         Mr. David A. Urban, Esq.
P.O. Box 11630                                    Liebert Cassidy Whitmore
Santa Ana, CA. 92705                          60033 West Century Blvd. 5th Flr.
                                                           Los Angeles, CA. 90045

__X__ (BY MAIL) I am readily familiar with the normal business practice of my employer for the collection and processing of correspondence and other materials for mailing with the United States Postal Service.  In the ordinary course of business, any material designated for mailing with the United States Postal Service and place by me in a designated "OUT" box in the office of my employer is deposited the same day with the United States Postal Service.

I declare under penalty of perjury under the laws of the State of California that the above is true and correct.

Executed on October 26, 2018 at Ventura, California

Stephen M. Biersmith, Esq.

EXHIBIT A-55

**EXHIBIT B**

Case 5:23-cv-00138-SSS-SHK Document 14 Filed 05/11/23 Page 80 of 118 Page ID #:154

Riverside Community College District v. Biersmith, Not Reported in Cal.Rptr. (2021)

2021 WL 4810632
Not Officially Published
(Cal. Rules of Court, Rules
8.1105 and 8.1110, 8.1115)
Only the Westlaw citation
is currently available.

California Rules of Court, rule 8.1115,
restricts citation of unpublished
opinions in California courts.

Court of Appeal, Fourth
District, Division 2, California.

RIVERSIDE COMMUNITY COLLEGE
DISTRICT, Plaintiff and Appellant,
v.
Stephen BIERSMITH, Defendant;
Eric Thompson, Real Party
in Interest and Respondent.

E073818
|
Filed 10/15/2021

APPEAL from the Superior Court of Riverside
County. Chad W. Firetag, Judge. Reversed.
(Super.Ct.No. RIC1825186)

**Attorneys and Law Firms**

Liebert Cassidy Whitmore, Pilar Morin, David
A. Urban and Meredith Karasch for Plaintiff
and Appellant.

No appearance for Defendant.

OPINION

MILLER J.

**\*1** *See dissenting and concurring opinion.*

Pacific Justice Institute, Kevin T. Snider and
Michael J. Peffer for Real Party in Interest and
Respondent.

Real Party in Interest and respondent Eric
Thompson was a tenured Sociology professor
at Moreno Valley College (College), which
is part of plaintiff and appellant Riverside
Community College District (District).
Students complained to the College that
Thompson made inappropriate comments in
class about women and made those who
identified with the Lesbian, Gay, Bisexual
and Transgender (LGBT)[1] community feel
uncomfortable. Further, he sent a video
about conversion therapy called *Understanding
Same-Sex Attraction* (video) to all staff at the
College with the subject line "The Research
Continues," and showed it in his classes in the
Spring 2014 semester.[2] In 2015, the District
started an investigation into Thompson, which
resulted in a 90-day notice of Unprofessional
Conduct and/or Unsatisfactory Performance
under Education Code section 87734 (90-Day
Notice).

After the 90-Day Notice, students reported
that Thompson continued to make disparaging
remarks in the classroom regarding women.
Further, a student complained that her low
grade in Thompson's class was based on
her sexual orientation. After she made the
complaint, and an investigation had begun,
Thompson sent her an email asking her to drop
her complaint. The District opened another

EXHIBIT B-1

investigation, and ultimately, the District determined in October 2017 to discharge Thompson. Thompson requested arbitration. After a lengthy hearing during which several of the College's students testified, and Thompson testified, the arbitrator determined that Thompson engaged in immoral conduct, was dishonest, was evidently unfit for service and refused to obey the school laws within the meaning of Education Code section 87732. However, the arbitrator found mitigating circumstances, and imposed the penalty of a 90-day suspension without pay rather than terminating Thompson's employment.

The District filed a petition for writ of mandate arguing that since Thompson was found unfit to teach, he should be dismissed (petition). The trial court denied the petition without issuing a statement of decision. The District filed this appeal from the denial of the petition.

On appeal, the District claims (1) the trial court committed reversible error by refusing to issue a statement of decision; (2) the trial court and arbitrator erred by finding that some of the charges were not supported by the evidence; (3) the trial court and arbitrator abused their discretion by finding that Thompson should only be suspended for 90 days when he should have been dismissed; and (4) the court and the arbitrator erred by finding that allegations prior to the issuance of the 90-Day Notice could not form the basis of the discipline. We reverse.

**FACTUAL AND PROCEDURAL HISTORY**[3]

**A. FIRST INVESTIGATIONS OF THOMPSON REGARDING STATEMENTS TO A FACULTY MEMBER AND CONVERSION THERAPY VIDEO**

**\*2** Thompson was a Sociology professor employed by the College, who, by 2014, had been teaching for over 14 years. He had been hired by the College in 2005 as a full-time professor and had tenure. Thompson had a Master's Degree in Sociology. He was married and had seven children. According to his syllabus, which he handed out to students for the classes he taught in 2014 and 2015, grades in his classes were based on exams, written assignments and participation. The accredited College consisted of over 8,500 students with 55 percent of the student body being female. The College had an ALLY program that supported the LGBT community on campus. The College had a "Diversity Committee" that was dedicated to fostering an inclusive and accessible student experience.

In 2014, a male professor filed a formal complaint of harassment against Thompson with the College administration. The male professor, who was homosexual, was told by Thompson that the only way he would find true happiness would be to divorce his husband and beg the Lord for forgiveness. Thompson also told the male professor he taught his students about conversion therapy. Thompson sent out a link to the video on an all-faculty email service.

In 2015, an attorney, Sandra Lindoerfer, was hired to investigate the complaint. Thompson was interviewed on March 10, 2015. He was teaching three in-person classes, and other online classes. Thompson was asked about a

EXHIBIT B-2

complaint that had been made about him and was asked what he believed the complaint to be about. Thompson replied that he had emailed the video around September 2014.[4] He explained that the video "in a rather neutral way" showed the "other side" of the debate considering a person's sexual identity. He wanted to present the opposing view. He sent the link to the video in an email to the entire College staff and employees; it did not go to students. He felt that conversion therapy had been "demonized" by the American Psychological Association and the American Sociological Association because it did not fit their "political interests." He wanted to get the information out. He did not want to hurt feelings. Thompson believed that a person who was homosexual could, according to the research, change. Thompson also showed the video in class.

Thompson felt pressure from the president of the College to stop showing the video. Thompson thought it was appropriate to show the video in class as it was an appropriate subject to discuss in a college class. Thompson felt he was persecuted by "radicals" on campus. Thompson agreed with the president of the College to not show the video in class just that semester.

As a result of the complaints, Lindoerfer submitted a report; the report is not part of the record. Based on the report submitted on April 1, 2015, Thompson was required to complete sensitivity training, which he completed.

## B. SECOND INVESTIGATION AND 90-DAY NOTICE

One of Thompson's students, Krista E., who was in Thompson's class in Spring 2015, made a complaint against Thompson. In June 2015, Krista was interviewed by Lindoerfer. Krista was the treasurer of the LGBT Straight Alliance (LGBTSA) Club on campus. Her daughter, who was gay, also attended the College. Krista had been told of some "issues" that Thompson may have with the gay community prior to her taking his class.

Thompson showed a video to the class about a Mormon man who was gay but married. After it was over, he told the class that he showed it to the class to show that it was possible to have these types of feelings but overcome them and have a straight, "normal lifestyle." Thompson also mentioned in class that his wife was not educated and he liked it like that so she would not go anywhere. Krista insisted that someone used the word "dyke" in the classroom and that Thompson repeated the word.

**\*3** Krista told Lindoerfer that there was a time in class when he called on her when they were talking about same-sex marriage. She insisted he did not normally call on people in class. During the discussion, Thompson talked about a biological father marrying his daughter after years apart. Krista was offended that he compared homosexual relations with a case involving a biological father and daughter. When students in the class started talking about lesbian women dressing like men, she left the classroom. She felt Thompson was encouraging the stereotype. She was upset that Thompson continued to question her about same-sex marriage and no one else. In July 2015, Lindoerfer interviewed several other students and faculty members.

EXHIBIT B-3

Several students confirmed Krista left Thompson's class the day same-sex marriage was discussed. Some students did not think that Thompson was singling out Krista. Greg A. reported that someone in the classroom used the work "dyke" but Thompson never used the word; one student stated Thompson said not to use that word.

Sergio M. was interviewed on June 8, 2015. He had been a student at the College. He took two Sociology courses with Thompson. Thompson always started his classes discussing that he was the breadwinner and that his wife stayed at home, homeschooling his children. Sergio interpreted his statement to mean he thought that is how a family should be. Sergio felt that Thompson did not allow students to express their opposing views. Sergio provided that Thompson had made a diagram of the family in class which was god, man and then woman. Sergio really liked Thompson and thought that no one complained about him because he had a charming personality and his classes were easy.

Ann Pfeifle was interviewed on June 23, 2015. She was a history professor at the College. She was the advisor for the LGBTSA on campus. She had served on the "Diversity Committee" at the College. Pfeifle had complained to the Diversity Committee about Thompson. She confirmed that Krista told her Thompson discussed liking his wife to be uneducated so she would not leave him. Pfeifle had viewed the video and could not watch all of it because it was very upsetting. She considered it anti-gay propaganda. It was not a neutral presentation of the issue. Another student named Erick had come to her crying over the video shown by Thompson in Fall 2014. Erick had confided in Thompson and felt that Thompson had betrayed him. Thompson used the terms "symptoms" of homosexuality. Pfeifle recommended Erick talk to Thompson. Erick spoke with Thompson about students leaving the classroom during the video. Thompson responded that they should have stayed to discuss it and they were cowards.

Victor S. was interviewed on July 28, 2015. He had been at the College since 2012. He served on the Diversity Committee. Victor thought that Thompson was great in encouraging students to participate in class but needed to keep his personal views out of class. Thompson said in class that the man came before women in all respects. Thompson oftentimes compared gay marriage to pedophiles and polygamists.

Angela J. was interviewed on July 28, 2015. Angela had been at the College for two years and was part of the Diversity Committee. She had taken two classes with Thompson. She felt he pushed his fundamentalist Christian ideals on the class. He quoted Bible scripture in class. Angela believed that when students wrote papers, he would give lower grades to the students who expressed viewpoints different than his. Thompson made it clear one day in class that women who have children should not be out of the home. Angela watched the video and it was very upsetting to her. One student, Charles, who was in class with Angela, was crying after the video and asked if something was wrong with him.

**\*4** Dr. Robin Steinbeck was interviewed on July 21, 2015. She was an administrator at the College. One time Thompson had

called her a feminist because she worked and had children at home. He told her it made her a bad mother. Dr. Steinbeck was told by other faculty they were offended by the video. On July 8, 2015, Dr. Larisa Broyles was interviewed. She was teacher at the College. She was actively involved in the Diversity Committee. She got the video from a school-wide email sent by Thompson. In the email, Thompson stated that conversion therapy was scientifically valid. After that, at a Diversity Committee meeting, several students, including Victor and Angela, complained about Thompson. Dr. Steinbeck confirmed a student named Charles had expressed that Thompson asked the class if anyone had the symptoms in the video. Charles felt forced to answer. Charles had "ambiguous" sexuality. Students stayed in Thompson's class because they felt they had to get the credit to graduate.

Thompson was interviewed again by Lindoerfer on September 3, 2015. Thompson acknowledged he showed a video in his classes about a Mormon man who had homosexual attractions but was married. Thompson showed the video in one of his classes, and Charles mentioned that he had all of the "symptoms" in the video. Thompson denied that he used the word symptoms. Thompson described Charles as being older and wearing colorful clothes. Thompson stopped showing the video after the Fall 2014 semester because he felt pressured to stop. He did not want to make the commitment to stop showing it indefinitely.

Thompson denied he ever told a female student that if she had children she should not be going to college. He also denied ever telling his students that he thought the ideal family

structure was the female staying at home and the male being the bread winner. He may have discussed this family structure but only in discussing cultural ideas.

Thompson gave Krista an "A" in his class. He knew she had children and a husband. He had noticed that she wore a T-shirt with LGBT on it to class. He assumed that she was sympathetic towards that "cause" or may be homosexual. He recalled she had left class abruptly during a discussion of families and same-sex marriage. He insisted he started calling on students by name in class to encourage more participation. He thought it was "immature" of her to leave class when they discussed stereotypes about lesbians including why some lesbians dress like men. Thompson thought that college students believed they had a right not to be offended.

On May 11, 2015, Thompson emailed the president of the College detailing what had occurred in the classroom when Krista walked out. Thompson referenced that the LGBT community on campus was targeting him. He ended the email by stating, "At the very least, the LGBT community needs to STOP WHINING, to GROW UP, and to realize that this is COLLEGE."

Thompson denied ever using the work "dyke" in class as it was offensive. He did not recall anyone else using the term in class.

Lindoerfer filed a report on November 9, 2015. The report addressed the impact of the video on faculty and students; how the email sending the video impacted faculty and students; whether Thompson made a comment in class that the ideal family structure was the husband as

Riverside Community College District v. Biersmith, Not Reported in Cal.Rptr. (2021)

a bread winner and the wife staying home; whether he told a student who had children she should stay home rather than go to college; and the impact on Krista as to comments made in class.

As for the video's impact on students, Lindoerfer was advised by students that Thompson had told his students prior to showing the video to watch for the symptoms in the video, and if they had them, they probably had a disorder. After the video, he asked the class if anyone had symptoms. Thompson denied this statement. Another student stated that Thompson only asked generally how the students felt about the video. Lindoerfer was unable to interview Charles. Lindoerfer found that there was not sufficient evidence of the statement by Thompson.

 **\*5** Lindoerfer concluded that showing the video caused several students in his classes and faculty members to be emotionally upset. It had such a significant impact as it was discussed by several student organizations. Thompson showed the video based on his own religious beliefs. Further, based on Thompson sending the video to the homosexual male professor, and other interactions, the professor was caused anxiety and started having panic attacks. He had to take medication.

As for statements made by Thompson regarding a man being the breadwinner and women staying home, students stated that Thompson had expressed that he followed this patriarchal model in his own home. Lindoerfer relied on the reports from Krista, Victor, and Angela to conclude that Thompson had made comments derogatory toward women,

including that women who have children should stay at home.

As for the complaints by Krista, Lindoerfer found that Thompson did direct questions regarding same-sex marriage to her. The evidence showed that Thompson attacked Krista, who was a visible LGBT supporter, by continuing to ask questions about same-sex marriage. He was unable to argue both sides of an issue.

The District sent Thompson notice of the administration determination and a summary of Lindoerfer's investigative report. It stated, "Based on the foregoing as summarized ... it is the District's conclusion that no violation of District Policy or Administrative Procedure occurred. However, it is imperative that you understand the fact pattern of the investigation showed that your conduct was unprofessional. Therefore, the matter has been referred to ... Human Resources and Employee Relations for consideration of an appropriate course of action."

On March 3, 2016, Thompson was sent the 90-Day Notice. It listed the facts that supported the notice and what areas Thompson was to correct. Thompson was advised he was not to single out students or treat them differently because of their sexual orientation. Further, Thompson was advised not to make discriminatory statements on the basis of gender. Such statements degraded the educational experience of the females in his class and may deter them from pursuing education. Thompson was directed to correct the deficiencies immediately. He was not to engage in conduct that violated laws

EXHIBIT B-6

prohibiting discrimination based on protected status, including gender and sexual orientation. His performance would be monitored and the administration at the College would help him. It he continued to demonstrate these types of behavior, he would be subject to disciplinary action, including dismissal.

### C.  COMPLAINTS ABOUT THOMPSON AFTER THE 90-DAY NOTICE

In June 2016, a complaint was made by Derian H. to the dean of instruction at the College that Thompson had them complete extra credit assignments in his Sociology course about "fixing being gay." She was concerned because she had written in her extra credit paper about the video that she was gay. After Thompson received the paper, Derian clamed he did not make eye contact with her and he had not given her a grade on the written assignment. She was worried about her grade.

In September 2016, Thompson was notified about the complaint from Derian. He was advised that an investigator, Kristine J. Exton, had been hired to investigate. In the letter, Thompson was advised: "You are advised that any attempt to take reprisals against, to intimidate, coerce or otherwise threaten any participant of this process constitutes unacceptable and illegal conduct and will not be tolerated. As such, you are directed to refrain from all such activities."

 **\*6**  After receiving notice of the complaint, Thompson sent an email to Derian. He stated that his email was not an attempt to coerce or intimidate her in any way, mirroring the language of the letter. He expressed that he was disappointed that she had made a formal complaint against him. He was unaware of her sexual orientation until he received the complaint. He wrote, "So I'm asking you to kindly reconsider going forward with this. It is a hassle for me and takes away from my obligations to my current students and family (my wife is due any day now)." He further stated it would cost the taxpayers money. He then stated she had every right to proceed with the complaint. He said that he cared for all of his students and he cared for her.

Exton interviewed Thompson on November 15, 2016. Thompson had tried to exercise his academic freedom but a minority of the students complained about his exploring alternative ideas of sexual identity. He felt bullied and harassed by members of the LGBT community and some of the administration.

He acknowledged that he was using the video as extra credit in 2016. He did so because he did not want to give up his academic freedom. He insisted it was necessary for the class to show social constructionist perspective on sexuality. He insisted he provided another video for extra credit that showed biological reasons for homosexuality. Extra credit assignments were turned in but only given credit if the student was close to a higher grade. He sometimes handed them back but not usually.

He recalled Derian was an average student. She emailed him about her grade and he responded with her scores on everything. She had a 63 percent in the class so she did not receive the points for extra credit. His email to her about the complaint was to show he cared about her and her grade was not based on her sexual orientation. He mentioned input errors in the

EXHIBIT B-7

grade book so that she could tell him if she made any mistakes in entering her grades. He never read her extra credit assignment where she stated she was gay. He did not treat her differently after it was turned in.

Exton filed her report detailing her investigation into Derian's complaint on February 4, 2017. The question for the investigation was whether Thompson awarded Derian's grade in Sociology based on her sexual orientation. Derian refused to be interviewed. Exton reported that Derian had performed poorly on some of the examinations in the class. Any extra credit would not have improved her grade. Thompson insisted he did not read Derian's extra credit assignment and was unaware she was gay until he was advised of her complaint. Exton concluded, "The preponderance of the evidence shows that it is UNFOUNDED there was discriminatory animus on the basis of sexual orientation by Professor Thompson in assigning" Derian's grade. As for whether he changed his attitude toward her in class, several students stated that they did not observe any change and Thompson stated he was unaware that Derian was gay until the complaint. The allegation was unfounded.

Exton addressed comments made by Thompson in class regarding his family and religion. Faith N. was interviewed and recalled Thompson discussing that men were superior to women, and a man should be the head of the household. She recalled the video was an extra credit assignment. Thompson encouraged the class to view the video because it contained the truth. He said homosexuality was deviant. His classes were filled with his philosophies and not book material. Thompson said in class that "whiny feminists" were ruining the world. She did not file a complaint because she was worried he would find out. David W., Vanessa S., and Michelle M. watched the video, which was extra credit, and did not know Thompson's views on homosexuality. Thompson encouraged discussions in class and listened to other viewpoints. Jessica F. stated Thompson would oftentimes connect his lecture to the Bible but it did not bother her. She knew nothing about the video. Iris I. reported that no one in Thompson's class was offended by anything he said or did. He did not talk about his personal views of homosexuality.

 **\*7** Exton stated that Thompson told her he talked about his family in class to personalize himself. He discussed his personal religious views as a way to discuss different ideologies. He believed homosexuality was caused by environmental factors and not biological but never told his students what he believed. He never said homosexuality was deviant. He admitted showing the video in his classes. Thompson felt harassed by the administration and students for trying to exercise his academic freedom. Thompson believed the video was important to his curriculum. He claimed that Dr. Steinbeck told him that it was okay to show the video as extra credit. He also added another video regarding the biological explanation of homosexuality. Thompson denied calling someone "whiny feminists" but did mention the term in class for discussion. He only emailed Derian to let her know he cared about her. Exton had reviewed the proceedings leading up to the 90-Day Notice.

Exton found that Derian's complaint that Thompson spoke in class about his religious

EXHIBIT B-8

beliefs and family was true. Exton also found that the email sent to Derian inferred that he would change her grade if she dropped the complaint.

### D.   DISTRICT DECISION TO TERMINATE THOMPSON

On March 22, 2017, the District sent a letter to Thompson informing him that it was recommending to the Board of Trustees that he be terminated. A predisciplinary *Skelly*[5] review process would occur prior to the recommendation of termination.

The District's recommendation for dismissal was based on the following violations of Education Code section 87732: (a) Immoral or Unprofessional Conduct; (b) Dishonesty; (d) Evident Unfitness for Service; and (f) Persistent violation of or refusal to obey the school laws of the state or the reasonable regulations prescribed for the government of the community colleges. Attached was a Statement of Charges, which discussed the investigations involving Krista, the 90-Day Notice and the investigation involving Derian.[6] The District noted that Thompson had been advised of its policy regarding discrimination and retaliation. Thompson filed an objection and intent to be present at the *Skelly* hearing.

At the *Skelly* hearing, Thompson presented an audiotape of the class session where Krista left during a discussion of the United States Supreme Court's hearing a same-sex marriage case. In the audiotape, Thompson discussed the fact that the United States Supreme Court was discussing same-sex marriage and that Justice Alito had brought up a question during oral

argument about what if four people wanted to get married. One of the students brought up a situation in another country where three men had gotten married. Thompson stated, "Wow. Other thoughts? Raymond? Martin? Krista, what do you think? Does Alito have a point here or is he all washed up."

Krista responded that she thought marriage was by definition only between two people. Thompson brought up a situation in which a woman had never met her biological father. She searched him out when she was older, they liked each other and got married. Thompson stated, "Now, these are consenting adults. They're also —they also meet the people's requirement of, oh, it should just be two people. What do you think about that, Krista? You have—by your definition, it should be just two people, you said." Krista responded that it was morally wrong. Thompson asked, "Are you judging, Krista?" She responded, "[A]bsolutely."

Krista then discussed that a person who was not married to their significant other would have no rights if that person was sick. A female student asked, "Well, it's not—okay. I'll—lesbians— well, girls, lesbians like a girl right, so she decides 'I don't want a guy because I like a girl.' " Thompson responded, "Okay." The female student continued, "Okay. If she likes a girl, why does—have you noticed every time there's a lesbian couple, two girls, why does one dress like a guy if she likes—and she likes girls, why doesn't she dress—" Krista interrupted, "That is so—I'm gonna—I'm sorry." The female student finished, "Why doesn't she dress like a girl? Why does she dress like a [boy]." Thompson then stated, "Maybe Krista will stay, because— " and Krista responded, "No, I'm not staying."

Thompson then stated, "I'm going to say that that doesn't always happen, but you bring up a good point and it's worth considering." Krista stated that it was completely false and a generalization. Thompson stated, "My thing is I don't know why," and "Does anyone have a guess? I don't know."

**\*8** Other students discussed the possible reasons.[7] Thompson suggested that the students ask their lesbian friends. Thompson then discussed polygamy. He stated, "But my point is, if I had another wife, however, I could take one out on a date and the one would be home with the kids." A student brought up that the two wives would become jealous. Thompson agreed. He stated, "They get jealous. To such a degree that the whole atmosphere at times in the house might be characterized by this cloud —thick cloud of resentment between the two because one woman thinks that the husband loves her—the other woman more and the— women are already prone to being catty, aren't they? Aren't they? No? They are. Okay. Corrina agrees. She's smiling."

Thompson discussed the differences between marrying someone in your same culture or race and going outside such culture to marry someone. He told the class about a man who rode into a village and just grabbed the girl he wanted. Thompson asked, "Now, you got to admit, ladies, there's a part of every one of you, ladies, that kind of—kind of likes that a little bit, that a strong man would ride a— a strong, handsome man would ride into the village and pick you and take you. 'I want you for my (Inaudible).' That doesn't ring as kind of interesting at all?"

After the *Skelly* hearing, an amended statement of charges was filed in June 2017. It alleged the same four Education Code section 87732 violations. The amended statement of charges were as follows:

1. In May 2015, Thompson singled out Krista in class causing her to be humiliated. This was during the discussion of same-sex marriage. Krista was a visible supporter of the LGBT community. Thompson admitted to an investigator he believed Krista was gay. She was treated differently in class.

2. Thompson repeatedly stated in class that women who have children should not be out of the home despite having mothers in his class, including Angela.

3. As a result of the above conduct, Thompson was given a 90-Day Notice. Thompson was on notice that such behavior was unprofessional. He was given directives to correct his conduct.

4. Derian made a verbal complaint in June 2016 stating that the grade she received in Thompson's Sociology course was based on her sexual orientation. Derian also alleged that once Thompson became aware of her sexual orientation, he treated her differently. An investigation ensued.

5. Thompson had been advised of the investigation. He was to refrain from discussing the matter with other students, faculty and members of the community. He was not to make any attempts at reprisals, to intimidate, coerce or threaten any participant in the complaint process. Thompson sent the email to Derian discussing the complaint and asking

EXHIBIT B-10

her to consider withdrawing it. After the email, Derian would not return Exton's calls.

6. In an interview with Exton, Thompson said when he sent the email to Derian he was "unaware of the status" of Derian's complaint but it was clear he had received the letter about the pending investigation.

7. On April 19, 2017, Thompson appeared at the *Skelly* hearing. During the hearing, Thompson stated the District threatened the security of his family. He also stated to Interim President of the College, Dr. Irving Hendrick, that the District had "drawn a sword" and that he would also "draw a sword." Dr. Hendrick felt threatened by the statement. Dr. Hendrick reported the threat to authorities.

8. Thompson and his counsel produced at the *Skelly* hearing an audiotape of the lecture, which included the exchange between Krista and Thompson. In the audio, Thompson made a statement about polygamous marriage that women were prone to be "catty" and be jealous. Further, that every woman wanted a strong handsome man to ride into her village and pick her up. This audiotape showed Thompson's offensive conduct on the basis of gender/sexual identity in the classroom.

**\*9** The District noted that a minimum qualification of faculty members at the College included sensitivity to and understanding of the diverse academic, socioeconomic and ethnic backgrounds of community college students. The District alleged, "Thompson has not shown any regret, understanding or appreciation of the harm his conduct has on the diverse community

of students he and the District serve." The District sought Thompson's dismissal.

Thompson responded to the amended statement of charges again claiming academic freedom and the free exchange of ideas in the classroom. Further, Thompson's mention of drawing his sword was a metaphor for the fact he was going to seek a legal remedy if the claims against him were continued. It was not a threat. Further, the audiotape provided showed that he had not discriminated against Krista. He justified his statement that women are catty and that they wanted a strong man to pick them, by citing other research papers calling women catty.

Another *Skelly* hearing occurred on September 8, 2017. The District, after considering the two *Skelly* hearings, decided to recommend to the Board of Trustees that Thompson be terminated. The hearing would be conducted on October 17, 2017. The Board of Trustees voted to terminate Thompson on October 17, 2017. A statement of decision was filed. Thompson objected to the decision. The matter was sent to arbitration.

E. <u>ARBITRATION HEARING</u>

The District filed an accusation against Thompson. It again stated the four sections under Evidence Code section 87732 for which they sought Thompson's dismissal: immoral conduct, dishonesty, evident unfitness for service, and persistent refusal to obey school laws. The District also cited the statement of charges as stated in the amended statement of charges filed with the Board of Trustees. The District alleged that Thompson's conduct had compromised his students' rights to learn. The College and District were committed

EXHIBIT B-11

to diversity and his actions did not support diversity. Thompson had not shown any regret or understanding of the harm of his conduct. Thompson filed a response.

The parties stipulated that the arbitrator was to determine whether (1) the District established cause for dismissal pursuant to Evidence Code section 87732, subdivisions (a), (b), (d) or (f); and (2) if the District established cause, the arbitrator shall determine the proper penalty. Further, the evidence was restricted to anything occurring after March 2013.

## 1. *DISTRICT EVIDENCE*

At the hearing, which commenced on May 1, 2018, the District introduced excerpts of Thompson's deposition taken on April 12, 2018. Thompson acknowledged that same-sex marriage was not specifically part of the curriculum for Sociology in May 2015, but he felt it was important to discuss because of the United States Supreme Court considering the issue. He insisted he was unsure of Krista's sexual orientation. He was aware that Krista was upset when she left his classroom during the discussion of same-sex marriage. He felt the audio supported his position in that he followed the academic freedom policy, which allows for asking questions that may cause discomfort. He insisted his "tone of voice" in questioning Krista showed he did not intend to be hostile toward her.[8] Krista left the class before he had time to discuss the statement made by the student about lesbians dressing like men.

 **\*10**  Thompson could not recall stating in class that women with children should stay at home.

He did admit he may have shared the pros and cons of a women working outside the home. He became aware of Derian's complaint when he got a letter from the College. He sent the email to Derian to show he cared and that he did not base her grade on her sexual orientation. Thompson reached out to Derian because he did not want "another fake investigation carried out" like the one Lindoerfer did.

Thompson denied he threatened Hendrick at the *Skelly* hearing. Thompson acknowledged that in the audiotape, while discussing polygamy, he agreed a woman may get jealous in this type of marriage. He said that one student smiled when he called women catty, and did not remember any other reactions. He said some of his statements were a "gimmick" to make the concept stick. His claims were supported by the research.

He admitted he received the 90-Day Notice. When asked if he changed his conduct, he said, "There was nothing to change, so no."

Derian testified at the arbitration hearing. She transferred out of the College after Spring 2016 to another college to have a different experience. It was not because of Thompson. She confirmed that she made a complaint about Thompson. Thompson told her if she did the extra credit and got a certain test score, he would pass her. She described the extra credit as watching a film about "fixing being gay." She had newly been out as gay and it affected her emotionally. She disclosed in the writing she did for the assignment that she was gay. Thompson did provide another video about being born gay. She felt Thompson stopped making eye contact with her after the

EXHIBIT B-12

assignment. She never got a grade on the extra credit nor did she get the papers back.

Derian felt "terrible" after she got Thompson's letter although she did not read it until several months after he sent it. After the investigator called her, she no longer wanted to pursue the complaint. She knew Thompson was having another baby and she felt terrible.

Dr. Steinbeck testified she had been appointed the president of the College on July 1, 2017. She indicated the College was committed to diversity and inclusion in a safe learning environment. She served as the presiding officer at the second *Skelly* hearing involving Thompson. Steinbeck had reviewed both *Skelly* hearings, the Lindoerfer investigation, the audiotape from class, and the Exton investigation. She determined after the second *Skelly* hearing that Thompson should be discharged. Dr. Steinbeck concluded that Thompson had "mocked" Krista in class based on the tone of his voice and the transcript. This was not appropriate teaching. Dr. Steinbeck did not think it was appropriate to teach that women should stay home with their children. It was a sexist comment. Further, calling women "catty" and jealous, and trying to get students to agree with him, was not appropriate in a Sociology class. His statement about women wanting to be kidnapped by a strong man was also sexist. These comments could alienate students and went against the policy of the College to be inclusive. Students had expressed that they were not participating in Thompson's class if they had a different view. She found the email to Derian to be egregious because it interfered with the complaint process.

Daniel Casella was a marriage and family therapist employed by the District to provide crisis therapy to students at the College. He had not treated any of the students involved in the case. He was designated an expert in mental health. In his experience, a student subjected to derogatory or degrading comments based on their gender could cause the individual to experience anxiety, depression, difficulty concentrating and poor self-esteem. Even a student who was not targeted with the comments would be concerned he or she would become a target. If the person making the comments was a faculty member, the student may be concerned about his or her grade. He stated that subjecting a minor to conversion therapy in California was illegal. The American Psychological Association had a policy that a psychotherapist was not to attempt to coerce a person to change their gender identity.

**\*11** Angela also testified at the hearing. She was currently attending Loma Linda University. While Angela attended the College, she had children at home. She took two of Thompson's classes. She was concerned in his classes that he would grade her differently if she expressed viewpoints different than those held by him. She confirmed he told the class that women should be at home with their children. She was offended by the comment. She felt guilty and degraded. Thompson expressed his views in a persuasive manner. Angela was aware that Victor had submitted a paper to Thompson that opposed Thompson's view and he got a lower grade than she had in agreeing with Thompson. Thompson stated that a patriarchal family was better than a single mother family. Angela and others discussed the video during a Diversity

EXHIBIT B-13

Committee meeting. She observed students visibly upset after viewing the video.

Hendrick was the interim President of the College between 2016 and 2017. Hendrick was the presiding officer for Thompson's first *Skelly* hearing. Thompson threatened Hendrick by looking directly in his eyes and telling him that he had raised his sword against him and that if he and his family were harmed, he would raise his sword against Hendrick. Even if it was a metaphor, it was a threat of violence in Hendrick's opinion. Hendrick reported the exchange to the on-campus police who assured him that Thompson could not come on campus. Hendrick believed that Thompson should be discharged based on the charges. Hendrick did not see the statement by Thompson as a threat of legal action.

Krista was also called as a witness. She graduated from the College with an associate's degree. She confirmed that she received an A in Thompson's class. Thompson said in class that his wife was not educated and stayed at home and he liked it that way. He also stated that if he only had two children, a boy and a girl, he would send the boy to college because it was more "normal" for the girl to stay home and take care of the children. She heard him call women "catty" and gold-diggers.

She was present in class when someone asked why "dykes" are so ugly and he pondered the question, and repeated it. She found it offensive that he used the word. She oftentimes wanted to leave class because of Thompson's statements. Thompson never showed gay families in a positive light. Thompson was not sensitive to the diversity in the classroom. During the

discussion of the California Supreme Court case, he never discussed the pro same-sex arguments. She absolutely felt he targeted her during the discussion. She walked out because she was disgusted by Thompson's statements comparing same-sex marriage to an incestuous relationship. She cried for over 30 minutes after she left class.

Thompson made derogatory comments about women at least once each week. In all of her other college classes she had taken, she never had a professor make derogatory comments about women. She did not drop the course because she needed the grade in the class. Krista was upset that Thompson never reached out to her after she walked out of his class.

Exton also testified. She tried to meet with Derian but Derian initially did not respond to her. When she finally spoke with Derian, which was prior to the email being sent by Thompson, she told Exton she had moved on and did not want to talk about the complaint. After the email, she tried to contact Derian again but received no response. Exton thought the email to Derian was particularly egregious because it was a professor to a student. Exton felt the letter to Derian was clearly an attempt to influence and coerce Derian into dropping her complaint.

Larisa Broyles was a professor at the College. She explained that MV-ALL LISTSERV was an email system that sent messages to the entire faculty at the College. It was mainly for announcements of upcoming events and not a discussion section. The video sent by Thompson in 2014 stated in the subject line "The Research Continues." There was a heated debate on the email. Thompson defended

EXHIBIT B-14

himself stating that he had a right to send it out and that people should look at it.

**\*12**  In 2015, Broyles encountered Charles on campus. He was sitting outside with his head down and seemed upset. He explained that Thompson had been discussing homosexuality in class and he asked any of them if they felt bad about themselves or feeling deviant. Charles felt forced to raise his hand. Charles felt like a deviant after the discussion. Charles asked Broyles if there was something wrong with him. Charles wanted to drop the class but felt he had to finish.

Broyles also spoke with Angela during a Diversity Committee meeting. Angela told her she had gone to Thompson and said she had to be absent because of a family matter. Thompson responded that " 'This is why women shouldn't be in the classroom' " and " 'should be at home taking care of their family.' "

Charles appeared at the arbitration hearing. He had graduated high school in 1972 and came back to the College in 2011. He took Thompson's Sociology class in 2014. He was part of the LGBT community. He heard Thompson make derogatory comments toward women in class at least once each week, stating that a woman's place was in the home doing domestic chores. He was in class when Thompson showed the video. Several students left the class. Charles was very offended by the movie and felt it changed his relationship with Thompson. The movie described being homosexual as an illness that could be cured.

After the video, a student asked Thompson if the College was aware he was showing the video. Thompson responded that he had tenure and could do whatever he felt like in class. This scared Charles because he wore earrings and scarfs to class. Thompson stated to the class if a person felt like they had these "symptoms" of homosexuality that it was an option to cure the "illness." Charles did not speak up in class after that day because he was afraid Thompson would fail him. He received a C in Thompson's class. He was surprised because he got As and Bs in most of his classes. He also had received As and Bs on all his papers he turned in to Thompson. He did not speak with an investigator in 2015 because he wanted to just move on and forget about it.

Lorraine Jones was the compliance officer for the District. She was responsible for managing the District's responses to unlawful discrimination or harassment claims. Jones explained that the District would be subjected to penalties if it did not comply with Title IX, which is a federal law that no person on the basis of their sex can be denied admission or benefit in any program that receives federal assistance. The District could be sued for violating Title IX. The District also each year advised faculty of their nondiscrimination policy. All gender discrimination complaints were taken seriously.

Jones received notice of a complaint against Thompson by Derian; Thompson was sent a letter advising him that the complaint was being investigated. Jones tried contacting Derian on two occasions but she was unable to talk to her. Jones reviewed the email sent by Thompson to

EXHIBIT B-15

Derian. She interpreted the email to be a request for Derian to withdraw her complaint.

Jeff Rhyne was a professor who taught English at the College. He watched the video. He sent a message to all faculty that he disapproved of the video. He thought the video was dangerous because it made homosexual people feel inadequate or inappropriate.

Sergio provided testimony at the arbitration hearing. He had transferred to a four-year college and was studying psychology. He had been at the College between 2011 and 2015. When Sergio first started college, he was very close-minded. He had become more inclusive while at college. He confirmed a diagram that Thompson had presented to the class which put god first, then man and then women. Sergio indicated that students did not complain about Thompson because he was an easy grader.

 **\*13**  Pfeifle testified at the arbitration hearing that Krista came to her three times with complaints about Thompson. Pfeifle recommended that she speak up in class but Krista was afraid it would lower her grade. The third time she came to Pfeifle she was shaking and crying. She said that during a discussion of gay marriage, Thompson called her out in class because she was part of the LGBTSA. When a student used the word "dyke" he did not stop her.

Faith testified in front of the arbitrator. She took Sociology from Thompson in Spring 2016. Thompson oftentimes made offensive statements about gender and sexual orientation in class. He stated that women belong at home and should be subject to men. He spoke about

feminists in a derogatory manner. He said the world starting falling apart when women got birth control. It destroyed morality. Even though Thompson claimed his statements were based on studies, she tried to look up the studies and could not find support for his statements. He also said that "the gays" were ruining the moral fabric of society. He called them deviant and that they should not be raising children.

Thompson offered extra credit to watch the video. He told the class not to tell anyone he was offering the video as extra credit. Every day Faith was subjected to an offensive comment by Thompson. She felt she could not drop the class. She needed the credits. She also feared retaliation. She got an A in the class. She felt he treated those in his class who appeared to be homosexual different.

Victor testified he was upset that Thompson said that professional women were not good mothers; housewives were better. Women were supposed to stay home and take care of their children and husband. Victor walked out of class when Thompson said that homosexuality was an abominable sin. He walked out during a discussion on conversion therapy. Thompson's comments on homosexuality and women were constant in the class.

## 2. *THOMPSON'S EVIDENCE*

Thompson testified that in regards to Krista, they were talking about marriage and family in general including same-sex marriage and polygamy. They were typical topics in a Sociology class. He asked several students questions in the recorded class. He only asked

WESTLAW   © 2023 Thomson Reuters. No claim to original U.S. Government Works.   16

EXHIBIT B-16

Krista four questions. Krista mentioned that marriage was between two people so he followed up with questions about four people getting married, or a father and an estranged daughter. Thompson believed that Krista left class because of the students comment about one of the persons in a lesbian relationship dressing like a man. He felt he tried to ameliorate the situation but Krista left. He denied he treated Krista differently in class. He called on several students in class that day. He admitted he never told the students to not use stereotypes in referring to gay couples.

He did not believe that women who had children should stay at home. He did assign an article about not marrying a career woman. He insisted it was based on data and was not his bias. He assigned another article about not marrying a lazy man. Thompson liked to use provocative material to get the attention of his students. He admitted that stating a woman should stay in the home would be sexist.

He received the 90-Day Notice in March 2016. He received the notice despite the complaints by Krista, Angela, Victor and Sergio all being found to not violate District policy. Thompson felt he was being punished for his views. There were no specifics in the 90-Day Notice as to what he was supposed to do to correct his behavior. Thompson believed that academic freedom meant that students would sometimes by offended.

**\*14** Thompson showed the video in all his classes in Fall 2014. He agreed not to show it for one semester. He kept it as extra credit because he did not agree to never show it. He claimed he never saw anyone cry about the video and denied that half of his class walked out when he showed it.

The letter sent to Thompson about the investigation into Derian's complaint contained directives that he was not to retaliate, intimidate the complainant and not to persuade other students or faculty involved in the investigation. It did not state he could not contact Derian. He just wanted to reach out to Derian to explain he had not discriminated against her. He was not trying to bribe her to dismiss the complaint. When he used the word "status" in speaking with Exton, he meant Derian's sexual orientation. He thought he may have not returned Derian's extra credit paper because she was often missing from class.

Thompson denied that he threatened Hendrick. The use of the word "sword" was a metaphor for a legal remedy. When talking about women wanting a strong man, he was talking about the Hmong culture and was only using a "playful tone" when asking the women in the class if they would like that. He also used the word "catty" in a playful tone. He insisted that "catty" was used in research.

Thompson was evaluated by faculty and students every three years. His last evaluation was Spring 2015. His last reviews were very favorable. Thompson admitted that he was notified when a faculty member would be in his class evaluating him. Thompson felt it was impossible to teach Sociology without hurting the feelings of any student. Academic freedom contemplated students being offended.

The parties both submitted briefs after the arbitration hearing. Thompson argued that

his right to academic freedom and First Amendment rights were being infringed. The District argued that Thompson should be dismissed because he targeted, harassed and discriminated against students based on their gender, sexual expression and orientation. He targeted students who were gay, and women, especially mothers.

### F. ARBITRATION RULING

The arbitrator issued a written ruling. The arbitrator listed the exhibits that had been introduced. The arbitrator then summarized the evidence that included the testimony and investigations from Derian, Dr. Steinbeck, Dr. Casella, Angela, Hendrick, Krista, Exton, Broyles, Charles, Jones, Rhyne, Sergio, Pfeifle, Faith, Victor, and Thompson.

As for the first allegation the arbitrator concluded, "After a review of the documents introduced and testimony presented, what Thompson said and allowed to be said by others could well have caused Krista E. to become upset, but did not violate any of the College's policies or procedure and/or rise to the level of unprofessional conduct." The audio did not corroborate Krista's testimony. She was not singled out as she claimed. The offending statement about lesbians was made by another student. Thompson could not ameliorate the situation because she left. The discussion about same-sex marriage was appropriate in a Sociology class. The arbitrator noted it was difficult to balance academic freedom against discrimination and harassment. The arbitrator expressed it was difficult to understand that, if Thompson was targeting students for harassment and discrimination, and making inappropriate comments, that none of this was

put on his student evaluations. A majority of the student evaluations were positive. Further, he had very positive faculty reviews.

**\*15** As for Thompson's comments about women staying home with their children, the arbitrator found it was supported by the testimony of several students and Thompson admitted he presented studies on working women and marriage. He also made comments to Dr. Steinbeck. The arbitrator found, "Such comments about women had a negative effect on his students and were contrary to established College policies which prohibited discrimination and harassment." The arbitrator further stated, "Having a faculty member actively discourage such participation under the guise of instruction, was prejudicial and contrary to the mission of the College. An academic institution should not have to tolerate such behavior at the expense of its students."

As for the 90-Day Notice, Thompson was given no assistance by the District to change his behavior. Nonetheless, "the weight of the evidence clearly established, he engaged in additional unprofessional conduct after receiving the notice with the letter sent to Derian H. and his false statement to the investigator."

The arbitrator concluded there was no evidence that Derian's grade or the failure to return her extra credit papers was due to her sexual orientation. The arbitrator did find that Thompson violated the directive of the letter sent to him regarding the investigation into Derian's complaint. As such, the arbitrator found, "Even though the evidence was insufficient to prove he had discriminated or

EXHIBIT B-18

retaliated against Derian H. in grading, his denial that he was not trying to threaten or coerce her when he wrote his letter was unpersuasive." An attempt to influence was enough. The arbitrator felt the evidence was sufficient that he lied to Exton when he said he did not know the "status" of Derian's complaint. The arbitrator found that Thompson did not threaten Hendrick.

The arbitrator found that Thompson's comments on the audiotape about being "catty" were inappropriate and a derogatory statement. Such improper characterizations and name calling was unacceptable. These statements on the audiotape showed Thompson was gender biased. The arbitrator concluded, "The evidence was sufficiently supportive in that regard."

The arbitrator found there was not sufficient evidence that students were discouraged from presenting different viewpoints.

As for evidence that Thompson targeted students, the arbitrator concluded, "There is little doubt Thompson had strong opinions in certain areas, however, with the exception of the clearly inappropriate comments he made about women attending college or working, there was insufficient evidence he actually 'targeted' individuals based on gender, religion, or another protected class."

The arbitrator then addressed the appropriateness of dismissal. The arbitrator noted that several events occurred prior to the issuance of the 90-Day Notice but the president chose not to discharge or take any other disciplinary action based on the events

prior to the notice. The arbitrator concluded, "It was his latter conduct, which although still only sustained in part, warranted some type of severe discipline." The arbitrator also found as an aggravating factor that there was a lack of remorse or acceptance of responsibility by Thompson. The arbitrator noted "He exhibited a certain amount of arrogance when he told his students that tenure gave him the right to do what he wanted." The arbitrator also noted, "Even though the 90-day letter clearly put Thompson on notice certain conduct would not be tolerated, he still chose to ignore the directive."

The arbitrator then issued his finding of facts, which, pertinent here, included (1) Thompson did not cause Krista to be humiliated based on her affiliation with the LGBT community; (2) Thompson made derogatory statements toward women and continued through Spring 2016; (3) Thompson failed to adhere to the requirements of his 90-Day Notice when he made discriminatory statements on the basis of gender; (4) he did not discriminate against Derian; (5) Thompson failed to adhere to the directives in Exton's letter of September 14, 2016, when he interfered with an investigation by improperly contacting Derian in attempt to get her to drop her complaint, and made a false statement; (6) Thompson did not threaten Hendrick; (7) the audiotape of his class did not show gender bias;[9] (8) Thompson did not discourage students from presenting different points of view in class; (9) Thompson did not target students based on gender, gender identity or religion; (10) there was sufficient cause to suspend Thompson by a preponderance of the evidence because of immoral conduct, dishonesty, unfit for service and refusal to

obey school laws; (11) the *Morrison*[10] factors of unfitness to teach were shown; and (12) given that not all of the allegations were sustained and because of the presence of mitigating circumstances, the discharge was not appropriate. The arbitrator imposed a 90-day suspension without pay but not discharge.

### G. PETITION FOR WRIT OF MANDATE

**\*16** The District filed a petition for writ of mandate pursuant to Code of Civil Procedure section 1094.5 (petition). The District contended that the arbitrator's decision to suspend Thompson and reinstate him was not supported by the weight of the evidence and constituted a prejudicial abuse of discretion. The finding was inconsistent with the factual findings. The District alleged some of the factual findings by the arbitrator were incorrect, but did not specifically argue the factual findings. The District sought dismissal of the arbitrator's decision and for the trial court to order the arbitrator to enter a new decision upholding the dismissal of Thompson.

Thompson, as the real party in interest, filed an answer to the petition arguing that the petition should be denied.

The District filed its opening brief in support of the petition. The District argued that the arbitrator's decision was erroneous as it orders the reinstatement of a professor who was found unfit to teach, engaged in immoral conduct, was dishonest and disobeyed school laws. The finding that he was unfit to teach itself was enough to warrant Thompson's dismissal. The District was concerned reinstating Thompson would subject them to liability and that students

would be further victimized. The District insisted that *Morrison* mandated dismissal. The District contended the arbitrator abused its discretion by discrediting the accounts of multiple students regarding discrimination based on being part of the LGBT community. However, the District did not argue which of the statement of charges should have been found true. Further, the arbitrator improperly credited student evaluations, which were hearsay as Thompson did not call these students to testify. The District concluded that a community college district could not under any circumstances be required to retain a faculty member who was found unfit to teach.

Thompson filed a responding brief. Thompson argued that the trial court had to afford a strong presumption of correctness to the arbitrator's findings. Further, it was the arbitrator's decision as to the appropriate penalty to be imposed. Although the arbitrator found there was sufficient cause for disciplinary action, it did warrant terminating Thompson. The evidence supported only a 90-Day suspension.

The District filed a reply to Thompson's brief. The District again argued that the finding that Thompson was unfit to teach required his dismissal.

The hearing on the petition was held on July 9, 2019 after the trial court issued its tentative ruling that it was going to deny the petition. The District requested a written statement of decision. The trial court first noted that it did not read Code of Civil Procedure section 632 as requiring a written statement of decision if the hearing was less than eight hours. The trial court ruled it did not have to issue a written

EXHIBIT B-20

statement of decision as the matter was only going to take approximately 20 minutes.

Counsel for the District argued they were "really challenging" the fact that after finding Thompson unfit for teaching, which meant he had a defective temperament that could not be corrected, it was inconsistent under the Education Code to reinstate him. The District noted, "In reaching that determination, he made findings of fact, and we agreed."

The trial court first noted that it could find no case law to support that once a determination of unfitness was found it meant automatic dismissal. It was within the discretion of the arbitrator. Counsel for the District responded that a finding of unfitness meant a defective temperament as a matter of law that cannot be corrected. Further, every case in which a teacher was found unfit, they were terminated. The District argued the arbitrator abused his discretion. The District contended that Thompson had not apologized and continually engaged in the conduct. He had defective temperament that could not be changed. He would continue to behave this way and the District would be liable. Thompson argued that the arbitrator never found he had defective temperament. The trial court adopted the tentative ruling and denied the petition.

**\*17** Judgment adopting the tentative ruling and denying the petition was entered on August 9, 2019.

**DISCUSSION**[11]

The District essentially argues on appeal that the arbitrator and trial court erred by finding that some of the charges were not supported by the evidence; and by finding that Thompson should only be suspended for 90 days rather than be dismissed.

A. <u>STANDARD OF REVIEW</u>

"When a school district seeks to dismiss a permanent employee, ..., for immoral conduct or evident unfitness for service, the [school district] must hold a hearing to determine whether the charged conduct occurred and, if it did, what the proper remedy should be." (*Crawford v. Commission on Professional Competence of Jurupa Unified School Dist.* (2020) 53 Cal.App.5th 327, 336 (*Crawford*).) "The governing board of a community college district may seek the dismissal of a regular (tenured) employee for one of ten specific causes" pursuant to Education Code section 87732. (*West Valley-Mission Community College District v. Concepcion* (1993) 16 Cal.App.4th 1766, 1773 (*West Valley*).)

Education Code section 87732 provides, pertinent to this appeal that, "No regular employee or academic employee shall be dismissed except for one or more of the following causes: [¶] (a) Immoral or unprofessional conduct. [¶] (b) Dishonesty. [¶] ... [¶] (d) Evident unfitness for service. [¶] ... [¶] (f) Persistent violation of, or refusal to obey, the school laws of the state or reasonable regulations prescribed for the government of the community colleges by the board of governors or by the governing board of the community college district employing him or her."

EXHIBIT B-21

Education Code section 87667 provides "A contract or regular employee may be dismissed or penalized for one or more of the grounds set forth in Section 87732." The disciplinary proceeding is heard by an arbitrator who "shall determine" whether there is cause, and if so, the precise penalty to be imposed. (Educ. Code, § 87675.) Here, the arbitrator found that the District had proved Education Code section 87732, subdivisions (a), (b), (d) and (f), and "penalized" Thompson by imposing a 90-day suspension without pay. The District appealed by filing its petition.

**\*18** "Code of Civil Procedure section 1094.5 provides a trial court reviewing the decision of an administrative agency exercises its independent judgment in reviewing the evidence and that an 'abuse of discretion is established if the court determines that the findings are not supported by the weight of the evidence.' [Citation.] Under the independent review standard, the trial court may weigh the credibility of witnesses." (San Diego Unified School Dist. v. Commission on Professional Competence (2011) 194 Cal.App.4th 1454, 1461 (San Diego).) " 'In a proceeding on a writ of administrative mandate, "the party challenging the administrative decision bears the burden of convincing the court that the administrative findings are contrary to the weight of the evidence." [Citation.]' [Citation.] 'Though the trial court is required to exercise its independent judgment on the evidence, it is to give a 'strong presumption of correctness' to the [arbitrator]'s findings.' " (Crawford, supra, 53 Cal.App.5th at p. 336.)

" 'After the superior court makes an independent judgment upon the record of an administrative proceeding, [the] scope of review on appeal is limited.' [Citation.] We must sustain the trial court's findings if they are supported by substantial evidence. [Citation.] In reviewing the evidence, we resolve all conflicts in favor of the party prevailing at the trial court level and must give that party the benefit of every reasonable inference in support of the judgment. ' " ' 'When more than one inference can be reasonably deduced from the facts, the appellate court cannot substitute its deductions for those of the superior court.' " ' " (San Diego, supra, 194 Cal.App.4th at p. 1461.) We will discuss the standard of review for the penalty imposed by an arbitrator and affirmed by the trial court, post.

We first note that the District argues the trial court erred by refusing to issue a statement of decision. The trial court was required to issue such a decision. (Giuffre v. Sparks (1999) 76 Cal.App.4th 1322, 1326, fn. 3 [a hearing on a petition for writ of mandamus is a trial of a question of fact requiring a statement of decision].) Such error does not require automatic reversal. (F.P. v. Monier (2017) 3 Cal.5th 1099, 1108.) We conclude, post, that the arbitrator, and the trial court, by denying the petition, abused their discretion in imposing a 90-day suspension instead of a dismissal. As such, the District cannot show prejudice for the trial court's decision not to issue a statement of decision either orally or in writing.

B. FINDINGS ON STATEMENT OF CHARGES

The District makes specific arguments on appeal that the trial court and the arbitrator

EXHIBIT B-22

findings on the unsustained charges were not supported by substantial evidence. This includes the findings that the audiotape of the class lecture was not evidence of gender bias;[12] the finding that Thompson did not discourage students from presenting views different than his own; by not finding that Thompson targeted students based on protected status; finding that Thompson did not cause Krista to be humiliated based on her affiliation with the LGBT community; finding that Thompson did not treat Derian inequitably based on her sexual orientation; and that Thompson did not make a physical threat to Hendrick. The District further contends the trial court and the arbitrator erred by finding that allegations prior to the issuance of the 90-Day Notice could not form the basis of the discipline.

Despite the arbitrator not finding all of the charges true, and essentially relying on the evidence after the 90-Day Notice, he still found that Thompson was subject to dismissal pursuant to Education Code section 87732. Further, the arbitrator found all of the *Morrison* factors true finding that Thompson was unfit to teach. The charges that the arbitrator found true, and the trial court affirmed by denying the petition, combined with the lack of any evidence to suggest Thompson's behavior would change, are sufficient to support that Thompson should have been dismissed rather than suspended.[13]

## C. DISMISSAL

**\*19** The District contends the trial court and arbitrator abused their discretion by finding that Thompson should not be dismissed. It contends the arbitrator and the trial court failed

to consider the District's potential liability from Thompson's conduct. Further, by finding that Thompson was unfit to teach, as evidenced by finding all of the *Morrison* factors were supported by the evidence, he could not be employed by the District. *Morrison* mandated his dismissal. Further, his immoral conduct, dishonesty and failure to obey school laws also warranted his dismissal.

"The California Supreme Court has interpreted the statutes involving discharge of teachers for the listed causes. Terms such as immoral conduct, unprofessional conduct, or moral turpitude, are so general that they must be given meaning by relation to the particular profession involved. [Citation.] In other words, a teacher may have committed an immoral act, but unless it indicates his unfitness to teach, it is not an appropriate basis for discharge." (*West Valley, supra*, 16 Cal.App.4th at pp. 1774-1775.)

In determining whether an individual is unfit to teach, the following factors may be considered: "[T]he likelihood that the conduct may have adversely affected students or fellow teachers, the degree of such adversity anticipated, the proximity or remoteness in time of the conduct, the type of teaching certificate held by the party involved, the extenuating or aggravating circumstances, if any, surrounding the conduct, the praiseworthiness or blameworthiness of the motives resulting in the conduct, the likelihood of the recurrence of the questioned conduct, and the extent to which disciplinary action may inflict an adverse impact or chilling effect upon the constitutional rights of the teacher involved or other teachers." (*Morrison, supra*, 1 Cal.3d at pp. 229-230, fns. omitted.) "These factors are relevant to the extent that they assist

EXHIBIT B-23

the board in determining whether the teacher's fitness to teach, i.e., in determining whether the teacher's future classroom performance and overall impact on his students are likely to meet the [school district's] standards." (*Ibid.*)

Here, the arbitrator found all of the *Morrison* factors had been met. The District insists this mandated dismissal of Thompson. However, there is no statutory or case law to support such claim. It appears, from both the cases and the language of Education Code section 87667, that even if the arbitrator finds each of the *Morrison* factors are evident, he still has the discretion to impose discipline short of a dismissal.

" ' " "The penalty imposed by an administrative body will not be disturbed in mandamus proceedings unless an abuse of discretion is demonstrated.... Neither an appellate court nor a trial court is free to substitute its discretion for that of the administrative agency concerning the degree of punishment imposed." [Citations.]' '[I]n a mandamus proceeding, an appellate court vis-a-vis the trial court, conducts a de novo review concerning possible abuse of discretion by the administrative agency. [Citation.] The trial court's determination of abuse or nonabuse of discretion by the administrative agency is of no concern to the appellate court. The appellate court gives no deference to the trial court's determination. It makes its own determination, de novo. [¶] Conversely, ... in a mandamus proceeding an appellate court vis-a-vis *the administrative agency*, does not independently or "de novo" determine penalty. "[A] court cannot substitute its discretion for that of the administrative agency on the degree of punishment to be imposed." ' " (*Pollak v. State*

*Personnel Bd.* (2001) 88 Cal.App.4th 1394, 1404; *Cate v. State Personnel Board* (2012) 204 Cal.App.4th 270, 284.)

**\*20** However, "[W]hile the administrative body has a broad discretion in respect to the imposition of a penalty or discipline, 'it does not have absolute and unlimited power. It is bound to exercise legal discretion, which is, in the circumstances, judicial discretion.' [Citation.] In considering whether such abuse occurred in the context of public employee discipline, we note that the overriding consideration in these cases is the extent to which the employee's conduct resulted in, or if repeated is likely to result in, '[h]arm to the public service.' [Citation.] Other relevant factors include the circumstances surrounding the misconduct and the likelihood of its recurrence." (*Skelly, supra*, 15 Cal.3d at pp. 217-218.)

In *West Valley, supra*, 16 Cal.App.4th 1766, Winston H. Miller, a community college teacher, was arrested and charged with selling cocaine. The college district began proceedings for dismissal pursuant to Education Code section 87732. Miller was acquitted of the criminal charges because the cocaine found was excluded from evidence but it was admitted at the administrative hearing on his dismissal. (*West Valley*, at pp. 1770, 1773.) The arbitrator determined that Miller was guilty of immoral conduct, but was not unfit to teach. The arbitrator imposed a one-year suspension without pay. (*Ibid.*) The college district filed a petition for writ of mandate. The trial court issued a writ directing the arbitrator to order Miller's dismissal and no back pay. Miller appealed contending, among other things, that

the trial court abused its discretion in making its own penalty determination and by finding he was unfit to teach. (*Ibid.*)

On appeal, the appellate court reviewed whether the trial court properly determined that the *Morrison* factors were supported by the evidence, which rendered Miller unfit to teach. (*West Valley, supra*, 16 Cal.App.4th at p. 1776.) The appellate court found, "The superior court's findings were sufficient to support its ultimate finding of unfitness to teach." (*Id.* at p. 1778.)

The appellate court then addressed whether the trial court properly determined the appropriate remedy was dismissal, rather than a one-year suspension. The court noted that, "Review of the penalty determination ... traditionally differs from the review of the evidence and factual findings. The superior court upholds the penalty determination of the agency or arbitrator, unless there has been a manifest abuse of discretion. [Citations.] The appellate court uses the same standard as the superior court, reviewing the arbitrator's penalty for manifest abuse of discretion." (*West Valley, supra*, 16 Cal.App.4th at pp. 1778-1779.)

The appellate court in *West Valley* referred to *County of Santa Clara v. Willis* (1986) 179 Cal.App.3d 1240. It summarized *Willis*: "[A] homosexual hospital attendant was accused of making inappropriate sexual advances to paralyzed patients and also to other hospital employees, of being insensitive to patients' needs, and of failing to do his job properly. After administrative proceedings the hospital board determined he had engaged in gross misconduct, but reinstated him without backpay. [Citation.] The superior court granted

a peremptory writ of mandate, finding the board had abused its discretion and ordering it to terminate the employee. [Citation.] [¶] This court affirmed the trial court's order granting the petition for a writ, based on the singular circumstances of the case. [Citation.] We agreed with the superior court that the hospital board had abused its discretion in reinstating Willis. [Citation.] While an administrative body has broad discretion in determining an appropriate penalty, it does not have absolute and unlimited power, but must exercise judicial discretion. We affirmed the trial court's ruling ordering the discharge of the employee." (*West Valley, supra*, 16 Cal.App.4th at p. 1779.)

**\*21** The *West Valley* court concluded that, like *Willis*, the penalty imposed by the trial court was correct. It found, "The arbitrator abused his discretion in selecting the penalty of one year's suspension. The idea of a cocaine-dealing community college instructor communicating moral standards to students is just as repugnant as a hospital aide fondling the genitals of helpless patients with spinal cord injuries. Reasonable minds cannot differ that entrusting impressionable young minds to a teacher who facilitated the sale of a kilo of cocaine would be dangerous. Reasonable minds cannot differ on the propriety of discharge as a penalty for engaging in this immoral conduct. Under the unique circumstances of this case the superior court did not err in determining the appropriate penalty." (*West Valley, supra*, 16 Cal.App.4th at p. 1779.)

In *San Diego, supra*, 194 Cal.App.4th at p. 1457,[14] the employee, Frank Lampedusa, was the dean of students at a middle school. The principal stated that Lampedusa did a good

EXHIBIT B-25

job and was being considered for a vice principal position. An anonymous call was made to the school district that Lampedusa had an advertisement on Craigslist " 'men seeking men' Web page soliciting sex." The advertisement described in detail the sexual acts Lampedusa wanted to engage in and included photographs of his face, anus and genitalia. The advertisement did not list his name or profession. (*Id.* at pp. 1458-1459.) The school district advised Lampedusa to remove the advertisement and he immediately removed it. Lampedusa continued to work for one more month and then was placed on administrative leave. He was then served with a notice of dismissal. (*Id.* at p. 1459.) At a hearing in front of the Commission on Professional Competence (Commission), Lampedusa testified he did not intend the advertisement to be seen by students. The Commission affirmed no student had seen the advertisement. It concluded that although the advertisement was vulgar and inappropriate, there was no connection with him being a dean of students at the middle school. It found the school district failed to show Lampedusa was unfit to teach by a reason of temperamental defect and that he did not engage in immoral conduct such that he was unfit to teach. Further, there was no likelihood of reoccurrence. (*Id.* at p. 1460.) The school district filed a petition for writ of mandate. The trial court adopted the Commission's findings and the school district appealed. (*Id.* at p. 1461.)

On appeal, the appellate court reviewed the *Morrison* factors and found the Commission had improperly rejected them. The court noted, " ' " '[T]he calling [of a teacher] is so intimate, its duties so delicate, the things in which a

teacher might prove unworthy or would fail are so numerous that they are incapable of enumeration in any legislative enactment.... His ability to inspire children and to govern them, his power as a teacher, and the character for which he stands are matters of major concern in a teacher's selection and retention.' " [Citation.] [¶] There are certain professions which impose upon persons attracted to them, responsibilities and limitations on freedom of action which do not exist in regard to other callings. Public officials such as judges, policemen and schoolteachers fall into such a category. [¶] ... "A teacher ... in the public school system is regarded by the public and pupils in the light of an exemplar, whose words and actions are likely to be followed by the [students] coming under [his] care and protection." ' " (*San Diego, supra*, 194 Cal.App.4th at pp. 1463-1464.) The court noted that Lampedusa, during his testimony, had stated that he previously posted these advertisements and placed the onus on the parents and students to not access his site. (*Id.* at p. 1464.) The appellate court found also that the Commission erred by finding that Lampedusa would not commit such acts again, as he had admitted to posting the advertisement several times before. Further, he did not believe he had done anything immoral. Finally, his posting of this sexually explicit content showed a serious lack of judgment. (*Id.* at p. 1465.)

**\*22**  The appellate court in *San Diego* concluded that "The nexus between Lampedusa's conduct and his fitness to teach has been established. It is evident that his conduct was 'detrimental to the mission and functions of [his] employer.' [Citation.] ... The conduct itself, together with Lampedusa's failure to accept responsibility or recognize

EXHIBIT B-26

the seriousness of his misconduct given his position as a teacher and role model, demonstrates evident unfitness to teach." (*San Diego, supra,* 194 Cal.App.4th at p. 1465.) The appellate court also found that he engaged in immoral conduct. The appellate court concluded that "Lampedusa's conduct constituted grounds for dismissal based upon his evident unfitness to teach and his immoral conduct." (*Id.* at p. 1467.)

Similarly, in *Cate v. State Personnel Board, supra,* 204 Cal.App.4th 270, the California Department of Corrections and Rehabilitation filed a petition for writ of administrative mandamus challenging an administrative law judge's (ALJ) decision to impose a 30-day suspension rather than termination of a correctional officer whose actions at the California Institute for Women were found to be inexcusable neglect of duty, dishonest, he engaged in discourteous treatment of inmates and that he lied to his supervisor. The trial court reversed the decision of the ALJ finding an abuse of discretion in imposing a suspension rather than termination. (*Id.* at pp. 279-280.) The correctional officer sought review, and the appellate court affirmed the judgment of the trial court finding that the ALJ found that the correctional officer's misconduct may be repeated "and that such misconduct would likely result in harm to the public service ... the 'overriding' consideration in the determination of penalty is the potential for harm to the public service." (*Id.* at p. 285.)

In *Kolender v. San Diego County Civil Service Commission* (2005) 132 Cal.App.4th 716, a deputy sheriff was dismissed by the sheriff's department because he lied about another deputy's physical abuse of an inmate. The sheriff's deputy appealed to the San Diego Civil Service Commission, which reduced his penalty to a 90-day suspension. (*Id.* at pp. 718, 720.) After the trial court denied the sheriff department's petition for writ of mandamus disputing the penalty determination, on appeal, the court held that such reduction was an abuse of discretion. The court explained: " 'An abuse of discretion occurs where, as here, the administrative decision manifests an indifference to public safety and welfare. "In considering whether such abuse occurred in the context of public employee discipline, we note that the overriding consideration in these cases is the extent to which the employee's conduct resulted in, or if repeated, is likely to result in, '[h]arm to the public service.' [Citations.] Other relevant factors include the circumstances surrounding the misconduct and the likelihood of its recurrence." [Citation.] The public is entitled to protection from unprofessional employees whose conduct places people at risk of injury and the government at risk of incurring liability.' [Citation.] Accordingly, this is not a case where reasonable minds can differ with regard to the appropriate disciplinary action." (*Id.* at p. 721.)

Here, Thompson's conduct in the classroom, which significantly impacted his students, coupled with the evidence that he had no remorse or plans to change his behavior, renders the decision to impose just a 90-day suspension a manifest abuse of discretion in this case. Putting Thompson back in the classroom provided no protection to his students. Both *Kolender* and *Cate* emphasize the harm to the public service by repeated bad

WESTLAW   © 2023 Thomson Reuters. No claim to original U.S. Government Works.

EXHIBIT B-27

behavior. In *San Diego*, the appellate court put great weight on the fact of reoccurrence and that Lampedusa accepted no responsibility for his actions. Similarly, here, Thompson took no responsibility for his actions, despite students testifying at the arbitration hearing that they were upset and even cried during their testimony. Thompson expressed he felt his tenure and right to academic freedom allowed him to discuss controversial subjects even if it upset students. He felt his academic freedom allowed him to offend his students.[15] Thompson said he had no reason to change after the 90-Day Notice. In fact, the arbitrator specifically found that Thompson's conduct was likely to recur. (*Morrison, supra*, 194 Cal.App.4th at pp. 229-230.)

**\*23** The fact that Thompson had no remorse and seemingly would not change his behavior, and his gender bias, was not mitigated by the student evaluations or good faculty reviews. The arbitrator did not provide his reasoning for finding that despite Thompson degrading women in class, trying to influence a student to drop charges against him, and making a false claim to an investigator, and specifically finding that Thompson had no remorse, that the positive evaluations from other students and good faculty reviews were relevant to mitigate such behavior. That some students were not offended by Thompson in no way mitigated the impact his behavior had on the students who were upset by comments made by Thompson. The arbitrator noted also that not all of the charges were sustained. However, the charges that were sustained warranted serious discipline.[16]

Sufficient evidence was presented that Thompson degraded women in class and tried to influence a student who had filed a complaint. Angela testified that she felt degraded. Casella testified that such degrading comments could cause depression and anxiety. Some students were apparently not impacted by Thompson's comments, but that did not mean the impact on the students who testified at the arbitration hearing was any less. The arbitrator found Thompson unfit to teach but failed to give import to the factors—including the chance of recurrence and the impact on his students—in reaching his decision to only impose a suspension.

Thompson contends that the arbitrator never found that Thompson had a temperamental defect, which was required for him to be dismissed. In *Woodland Joint Unified School District v. Commission on Professional Competence* (1992) 2 Cal.App.4th 1429 (*Woodland*), the court addressed a seemingly different analysis to the *Morrison* factors. The appellate court in reviewing the trial court's grant of a petition for writ of mandate ordering termination of a teacher, addressed the meaning of "Evident Unfitness for Service" within the meaning Education Code section 44932. (*Woodland*, at p. 1441.) The court noted, " 'evident unfitness for service' " ... means 'clearly not fit, not adapted to or unsuitable for teaching, ordinarily by reason of temperamental defects or inadequacies.' Unlike 'unprofessional conduct,' 'evident unfitness for service' connotes a fixed character trait, presumably not remediable merely on receipt of notice that one's conduct fails to meet the expectations of the employing school district." (*Id.* at pp. 1444-1445, fn. omitted.) If

EXHIBIT B-28

an analysis of the *Morrison* criteria indicates a teacher is unfit for service, "the next step is to determine whether the 'unfitness' is 'evident'; i.e., whether the offensive conduct is caused by a defect in temperament." (*Woodland*, at p. 1445.)

Here, it is not clear that the arbitrator considered whether Thompson suffered from a temperamental defect. However, the purpose of such determination is a finding of "a fixed character trait, presumably not remediable merely on receipt of notice that one's conduct fails to meet the expectations of the employing school district." (*Woodland, supra*, 2 Cal.App.4th at p. 1444.) Here, the arbitrator concluded that Thompson had a certain "arrogance" about him when he told his students that tenure gave him the right to do whatever he wanted. Thompson accepted no responsibility and showed no remorse. Further, he ignored the directives in the 90-Day Notice. Th arbitrator found that Thompson was gender biased. Nothing in the evidence supports that Thompson would change his beliefs. This supported that Thompson was arrogant and gender biased, character traits that were not likely to be changed despite the findings of the actions of the District or a 90-day suspension. Thompson had exhibited these behaviors since at least 2013. As such, the evidence supports evident unfitness as defined in *Woodland*.

**\*24** Finally, Thompson contends that some of the misconduct alleged against him was protected by the First Amendment. However, in the trial court, Thompson did not file his own petition for writ of mandate claiming that the arbitrator's findings were incorrect or contesting the 90-day suspension. (*Wood*

*v. Superior Court of San Diego* (2020) 46 Cal.App.5th 562, 588, fn. 5.) As such, he has waived any claim that the arbitrator's findings were incorrect.

In sum, in imposing discipline against Thompson, the arbitrator recognized that Thompson had no remorse and that he took no responsibility for his actions. Not once did Thompson express sympathy for his students. The arbitrator concluded that Thompson had made degrading comments about women, he lied to an investigator and tried to convince one of his students to drop a complaint against him. As for the degrading comments about women that Thompson made in class, the arbitrator concluded that "[a]n academic institution should not have to tolerate such behavior at the expense of its students." Thompson refused to comply with the 90-Day Notice, he offered the controversial video as extra credit despite knowing that it caused an uproar on campus when he emailed it to faculty, and he was dishonest.

Despite these findings, the arbitrator decided to return Thompson to the classroom without identifying any reason why Thompson's behavior would change as there was no indication he would be provided any training or tools to change his behavior. As the arbitrator found, there was a likelihood that Thompson would repeat his behavior, and Thompson's lack of remorse underscores that likelihood, as our record nowhere shows any commitment by him to change. The College should not be expected to allow Thompson to teach classes with the fear that he would repeat his past behaviors. Under the unique circumstances of this case, the arbitrator abused its discretion by

failing to give proper weight to the possibility of recurrence and the impact on Thompson's students. The proper penalty was dismissal.

## DISPOSITION

The judgment is reversed. The superior court is directed to issue a writ of mandate instructing the arbitrator to set aside its penalty decision of a 90-day suspension and render a decision dismissing Thompson. Each party is to bear their own costs on appeal.

[*Riverside Comm. College Dist. v. Biersmith; Thompson*, E073818]

I concur:

RAPHAEL J.

RAMIREZ, P. J.

I respectfully concur in part and dissent in part.

I

IMPOSING A SUSPENSION WAS NOT AN ABUSE OF DISCRETION

I agree that the District[1] has forfeited any challenge to the arbitrator's factual findings. (Maj. opn. at p. 44, fn. 13.) I also agree that "even if the arbitrator finds each of the *Morrison* factors are evident, he still has the discretion to impose discipline short of a dismissal." (Maj. opn. at pp. 45-46.) However,

I do not agree that the arbitrator abused his discretion by ruling that the appropriate penalty was a 90-day suspension rather than dismissal. (Maj. opn. at pp. 44-57)

Key to my decision is the highly deferential standard of review.

"Neither an appellate court nor a trial court is free to substitute its discretion for that of the administrative agency concerning the degree of punishment imposed. [Citation.]" (*Barber v. State Personnel Board* (1976) 18 Cal.3d 395, 404.) "Judicial review of an agency's assessment of a penalty is limited, and the agency's determination will not be disturbed in mandamus proceedings unless there is an arbitrary, capricious or patently abusive exercise of discretion by the agency. [Citation.]" (*Flippin v. Los Angeles City Bd. of Civil Service Commissioners* (2007) 148 Cal.App.4th 272, 279.)

**\*25** The abuse of discretion " ' " ... must appear very clearly before the courts will interfere." [Citations.]' [Citation.]" (*Landau v. Superior Court* (1998) 81 Cal.App.4th 191, 218.) "If reasonable minds may differ with regard to the propriety of the disciplinary action, no abuse of discretion has occurred. [Citation.]" (*Flippin v. Los Angeles City Bd. of Civil Service Commissioners, supra*, 148 Cal.App.4th at p. 279.) This is true even if the penalty seems to be too harsh or too lenient in the court's opinion. (*Landau v. Superior Court, supra*, at p. 221.)

" 'An abuse of discretion occurs where ... the administrative decision manifests an indifference to public safety and welfare. "In

EXHIBIT B-30

considering whether such abuse occurred in the context of public employee discipline, we note that the overriding consideration in these cases is the extent to which the employee's conduct resulted in, or if repeated, is likely to result in, '[h]arm to the public service.' [Citations.] Other relevant factors include the circumstances surrounding the misconduct and the likelihood of its recurrence." [Citation.] The public is entitled to protection from unprofessional employees whose conduct places people at risk of injury and the government at risk of incurring liability.' [Citation.]" (*Kolender v. San Diego County Civil Service Com.* (2005) 132 Cal.App.4th 716, 721.)

The majority astutely focuses on the two key issues in this case: The nature of the harm shown, and the likelihood of recurrence. (Maj. opn. at p. 54.) If the evidence conclusively showed that Thompson " 'place[d] people at risk of injury' " (maj. opn. at p. 52), and if it also conclusively showed a likelihood of recurrence, then dismissal was the only possible penalty. But if not, then not.

The arbitrator found that the bulk of the allegations against Thompson were *not* true. He found that Thompson did not discriminate against Krista based on a perception that she was gay or LGBT-affiliated. He found that Thompson did not discriminate against Derian based on her sexual orientation. He rejected Dr. Hendrick's claim that Thompson's comment about a "sword" was a physical threat. He further found that Thompson did not discourage students from expressing views that were different from his. He declined to consider incidents that occurred before the issuance of the 90-Day Notice, on the ground that "[t]hose shortcomings and corresponding corrective action were already addressed in that transmittal."[2]

He did find that Thompson had tried to get Derian to drop her complaint and had made a false statement to the investigator — namely, that he was unaware of the status of Derian's complaint. It must be remembered, however, that he did so under the stress of an investigation based on Derian's allegations, which the arbitrator eventually found to be false. Moreover, his false statement does not appear to have been material to the investigation. In any event, this was not conduct in the classroom; it did not reflect on his fitness to teach — at least not any more than would any other general moral turpitude. Certainly it was not an abuse of discretion for the arbitrator to find that it called for a suspension rather than dismissal.

This leaves only the finding that "Thompson made statements derogatory towards women ...." As to this finding, the arbitrator could reasonably find that neither "the chance of recurrence" nor "the impact on [Thompson's] students" (maj. opn. at p. 54) required dismissal.

A. *Likelihood of Recurrence.*

**\*26** First, the arbitrator could reasonably find no significant likelihood of recurrence.

The arbitrator did not make any express finding that Thompson's conduct *was* likely to recur. (But see maj. opn. at p. 53.)[3] Rather, he found

that "there appeared to be a lack of remorse or acceptance of responsibility on Thompson's part," which he deemed an "aggravating circumstance[ ]." This was a description of Thompson in the past; it was not a finding that, even after a 90-day suspension, Thompson would be unable to change his behavior in the future. To the contrary, by stating that "Thompson owes it to his future students ... to present a wider and/or more balanced approach in his course presentations," and by ordering a suspension rather than dismissal, the arbitrator implicitly found that Thompson *could* use a "more balanced approach" in the future.

This implied finding was supported by substantial evidence. Thompson agreed that he was "not to make statements in class that denigrate women." He further agreed that he was "prohibited from making statements in class to the effect that women should not be out of their home ...." He acknowledged that he should not "denigrate" women or present "negative stereotypes" of women unless his statements were supported by academic research. Thompson denied either believing or "advocating" that women with children should not work. While the arbitrator found that this denial was false, it showed that he was not stubbornly insisting on expressing gender bias in the classroom.

The arbitrator did find that, even after receiving the 90-Day Notice, Thompson continued to make gender-biased statements. The 90-Day Notice found that he had made gender-biased statements and directed him not to do so in the future. At the same time, however, the District made a formal determination that "no violation of District Policy or Administrative Procedure

occurred." Thompson testified that he was "perplexed" by the seeming contradiction. He also felt that the very general directives in the 90-Day Notice did not give him clear guidance. Moreover, the 90-Day Notice stated, "The Administration will assist you in overcoming these deficiencies." As the arbitrator found, however, the administration never did so.

The arbitrator therefore concluded that the 90-Day Notice was "misleading." He further found that the administration's failure to follow up with Thompson was "mitigating." Thus, the arbitrator could also properly find that Thompson's failure to comply fully with the directives in the 90-Day Notice was *not* evidence that he was likely to continue to fail to comply in the future.

 **\*27** Thompson showed no "remorse" in part because he sincerely maintained that his classroom speech was protected by academic freedom under the First Amendment.[4] The arbitrator found that some of Thompson's allegedly gender-biased statements were "within the bounds of free expression and academic freedom," because they were supported by academic research, but that others were not.[5] The arbitrator could reason that, now that Thompson had obtained a ruling on the scope of his First Amendment rights, he would comply with it.

In a criminal case, the defendant's lack of remorse is not aggravating unless the defendant admits guilt (or the evidence of guilt is not in conflict). (*People v. Key* (1984) 153 Cal.App.3d 888, 900.) This is because lack of remorse is relevant to show a likelihood of recurrence only when a defendant acknowledges guilt,

EXHIBIT B-32

not when the defendant maintains his or her innocence. (*Id.* at p. 900.) The arbitrator could reason similarly that Thompson's lack of remorse, although an aggravating factor, did not show a likelihood of recurrence.

Finally, in evaluating the likelihood of recurrence, the arbitrator had the benefit of observing Thompson while he testified. " ' "[A]n administrative hearing officer's proposed decision is entitled to great weight because of his [or her] opportunity to observe the witnesses and weigh their testimony in light of their demeanor." ' [Citation.]" (*County of Sonoma v. Gustely* (2019) 36 Cal.App.5th 704, 712, italics omitted.)

B. *Impact on Students.*

Second, the arbitrator could reasonably find that Thompson's gender-biased statements did not have a significant impact on his students. To the extent that there was conflicting evidence on this point — and to the extent that conflicting inferences could be drawn from the evidence — we must view the evidence in the light most favorable to the arbitrator's choice of discipline.

Certainly several students testified that they found Thompson's gender-biased statements to be "offensive" or "degrading." However, offense alone is not necessarily harm. There was no evidence that any student dropped out of school, or even dropped out of Thompson's class, as a result of any gender-biased statements.

**\*28** The arbitrator was not bound by Casella's testimony that gender-based harassment

"could" cause "anxiety, depression, difficulty concentrating, possibly even appetite/sleep disturbance, poor self-esteem," when none of Thompson's students reported any such conditions.

The record does not show that any student actually cried while testifying at the arbitration.[6] (But see maj. opn.at p. 53.) Apparently Derian got upset while testifying, but only while discussing the conversion therapy video and Thompson's email to her. Angela got "emotional" about the conversion therapy video. No student displayed any emotional distress resulting specifically from Thompson's gender-biased statements. Again, the arbitrator was able to observe the students' demeanors while testifying. We must accept his implied findings.

Witnesses also claimed to have been upset by things that the arbitrator found never actually happened. For example, Krista cried because she felt that Thompson was targeting her for her LGBT affiliation; the arbitrator found that Thompson never did so. Likewise, Angela testified that Thompson's gender-biased statements discouraged her from voicing her own views in class, but the arbitrator found that "Thompson did not discourage students from presenting in his class points of view that were different from his ...." Dr. Hendrick claimed he was upset by Thompson's comment about a "sword," even though immediately afterward, Thompson's attorney said, "He doesn't mean a real sword," and Thompson added, "Of course not. I've always liked you. This is not personal." At the arbitration, Dr. Hendrick even admitted that Thompson's attorney "got us all squared away by indicating

EXHIBIT B-33

that the sword was a metaphor for something else." Hence, the arbitrator was entitled to discount any claims that students were upset by Thompson's gender-biased statements.

This bring me to the elephant in the room: A reasonable fact-finder could conclude that the witnesses against Thompson were biased. Administrators, professors, LGBT students, and their allies were up in arms over Thompson's airing of the conversion therapy video in 2014. After the college investigated this but imposed no discipline other than sensitivity training, people started coming out of the woodwork to accuse Thompson of similar sins. Most of them were members of the ALLY program (Krista and Dr. Steinback) or the Diversity Committee (Sergio, Angela, Victor, Dr. Broyles).

It was in this context that, as the arbitrator properly found, Thompson's faculty and student evaluations were mitigating.[7] Those evaluations tended to show that Thompson's accusers' hindsight claims of harm were overblown.

Fellow faculty members had visited Thompson's classroom, including one who visited a session on "sexism and a sexist society, gender role and gender identity, biological-based vs. social-based inputs into gender, whether males and females are just 'naturally' female and male", but they reported no inappropriate comments.

 **\*29** Thompson's student evaluations were "all great." One fellow faculty member commented, "Personally, I'd say that when the lowest rating was 58% in the 'Outstanding'

category, Mr. Thompson must be doing something right." A majority of students said that he had no weaknesses. No student reported any gender bias — apparently not even Krista, who was in his class at the time of the evaluations. One student specifically said that Thompson had "[n]o bias toward [the] material."

The arbitrator had doubts about the credibility of Thompson's accusers, as shown by his findings that most of the charges against Thompson were not true. On this record, he could reasonably find that Thompson did make some gender-biased statements — but not all of the ones alleged. He could also give very little weight to any claims that the gender-biased statements that Thompson did make adversely affected anyone.

II

THE APPELLATE DISENTITLEMENT DOCTRINE APPLIES

Even apart from the merits, I would dismiss based on the appellate disentitlement doctrine. The District flagrantly disobeyed the arbitrator's decision, even after the trial court reaffirmed it. I see no reason not to apply the doctrine.

" 'An appellate court has the inherent power, under the "disentitlement doctrine," to dismiss an appeal by a party that refuses to comply with a lower court order.' [Citation.] ' "Appellate disentitlement 'is not a jurisdictional doctrine, but a

EXHIBIT B-34

discretionary tool that may be applied when the balance of the equitable concerns make it a proper sanction ....' [Citation.]" [Citation.] No formal judgment of contempt is required; an appellate court "may dismiss an appeal where there has been *willful disobedience or obstructive tactics.* [Citation.]" [Citation.] The doctrine "is based upon fundamental equity and is not to be frustrated by technicalities." ' [Citation.]

"The 'disentitlement doctrine "is particularly likely to be invoked where the appeal arises out of the very order (or orders) the party has disobeyed." ' [Citation.] '[T]he merits of the appeal are irrelevant to the application of the doctrine.' [Citation.]" (*United Grand Corp. v. Malibu Hillbillies, LLC* (2019) 36 Cal.App.5th 142, 166.)

Here, the arbitrator's decision had the force of a decision of an administrative agency. (See Ed. Code, § 87675 [incorporating portions of the Administrative Procedure Act].) The arbitrator has "complete and sole jurisdiction over the matter." (Ed. Code, § 87674.) "The arbitrator shall determine whether there is cause to dismiss or penalize the employee. If the arbitrator finds cause, the arbitrator shall determine whether the employee shall be dismissed, the precise penalty to be imposed, and whether the decision should be imposed immediately or postponed ...." (Ed. Code, § 87675.)

Subject to exceptions not applicable here, the arbitrator's decision "become[s] effective 30 days after it is delivered or mailed to respondent unless ... a stay of execution is granted." (Gov. Code, § 11519; see also Ed. Code, §

87675 [incorporating, inter alia, Gov. Code, § 11519].) The District's mandate petition did not automatically stay the arbitrator's decision. The District could have applied for a stay, but it did not. (Code Civ. Proc., § 1094.5, subds. (g), (h).)

The District asserts that "[a]n arbitrator's award is not directly enforceable; it must be enforced via a court proceeding." It cites Code of Civil Procedure section 1286, which allows a court to confirm, correct, or vacate an arbitration award. Also relevant are Code of Civil Procedure section 1287.4, which provides, "If an award is confirmed, judgment shall be entered in conformity therewith," and Code of Civil Procedure section 1287.6, which provides, "An award that has not been confirmed or vacated has the same force and effect as a contract in writing between the parties to the arbitration."

**\*30**  The flaw in this argument is that the arbitration here was not a contractual arbitration, which would be subject to the provisions of Code of Civil Procedure section 1280 et seq. It was a mandatory arbitration, subject to the provisions of Education Code section 87674 et seq. (See *Levinson Arshonsky & Kurtz LLP v. Kim* (2019) 35 Cal.App.5th 896, 904-907 [Code Civ. Proc., § 1280 et seq. does not apply to arbitration under the Mandatory Fee Arbitration Act, Bus. & Prof. Code, § 6200 et seq.].) Assuming Code of Civil Procedure section 1280 et seq. applied at all, it did not apply to the extent that it is inconsistent with Education Code section 87674 et seq. (See Code Civ. Proc., § 1859; *Agricultural Labor Relations Bd. v. Superior Court* (1976) 16 Cal.3d 392, 420 ["when a special and a general statute are in conflict, the former controls."].)

EXHIBIT B-35

As noted, Code of Civil Procedure section 1286.7, provides that an unconfirmed award is effective as a contract. But when an arbitration is required by statute, not by contract, this makes no sense. Moreover, it conflicts with the specific finality provisions of Government Code section 11519, as incorporated by Education Code section 87675. Accordingly, the District's refusal to reinstate Thompson was a violation of a final and effective administrative order.

As if that were not enough, the trial court entered a final judgment denying the District's petition. The District's appeal did not automatically stay the judgment. Much as with the arbitrator's decision, the District could have sought a stay, but it did not. (Code Civ. Proc., § 1094.5, subds. (g), (h)(3) ["If an appeal is taken from a denial of the writ, the order or decision ... shall not be stayed except upon the order of the court to which the appeal is taken."].) Accordingly, since entry of the judgment, the District's continuing refusal to reinstate Thompson has been a violation of a final and effective court order — the very court order from which it appeals.

The District retorts that Thompson "has not taken any legal action to challenge" the District's refusal to reinstate him. However, he had already successfully litigated the arbitration, in which the arbitrator ordered that he be reinstated; he had already successfully litigated the mandate proceeding, in which the trial court upheld the arbitrator's order. How many times must he prevail before the District will obey?[8] In this appeal, Thompson is invoking the disentitlement doctrine. That is a sufficient challenge.

Thus, I reject the District's only argument — that it has not violated any order. It does not argue that, if it did violate an order, the violation was not willful. The failure to obey an order is willful when the party is aware of the order, has the ability to comply, and knowingly and intentionally does not comply. (In re Aguilar (2004) 34 Cal.4th 386, 389.) Here, the District was aware, first, of the arbitrator's decision, and then, of the trial court's judgment. It had the ability to reinstate Thompson. Nevertheless, it knowingly and intentionally failed and refused to do so. Its counsel took the position that it did not have to, because it was going to file (or had filed) this appeal, but that position was frivolous. Its counsel did not take the position, at least at that time, that the arbitrator's order had to be confirmed in order to be enforceable. In any event, that position, too, is frivolous. The District's noncompliance was persistent; it violated two separate rulings, nine months apart. Even after we raised the issue of the disentitlement doctrine, the District still did not offer or agree to reinstate Thompson. Thus, it satisfactorily appears that the District's violation was willful.

 **\*31** Finally the equities favor Thompson, rather than the District, in light of the significant differential in power and resources between them. It has been nearly three years since the arbitrator's decision. During this time, not only has Thompson been unable to work for the District, he has been unable to work as a teacher anywhere, because the District's charges have been hanging over his head. The District argues that it needed "to protect its ... students from further misconduct directed at them from Mr. Thompson." If so, it should

EXHIBIT B-36

Case 5:23-cv-00138-SSS-SHK   Document 14   Filed 05/11/23   Page 116 of 118   Page ID #:190

Riverside Community College District v. Biersmith, Not Reported in Cal.Rptr. (2021)

have sought a stay. Self-help under these circumstances is not allowed.

**All Citations**

Not Reported in Cal.Rptr., 2021 WL 4810632

## Footnotes

1   This court is aware that this community is currently referred to as LGBTQ but the transcript only identified the group on campus as the LGBT community.

2   Conversion therapy is a controversial method of trying to change a person's sexual orientation.

3   The factual history is based on the exhibits admitted at the arbitration hearing, which included prior investigations into complaints against Thompson and the live testimony at the arbitration hearing.

4   The video apparently used a symptom-based model for homosexuality. It referenced that earlier events in a person's life may have caused them to have homosexual tendencies and that therapy addressing the early trauma could be used to treat homosexuality.

5   *Skelly v. State Personnel Bd.* (1975) 15 Cal.3d 194, 206 (*Skelly*) [a hearing on the dismissal of a public employee].)

6   The statement of charges were amended after the prediscipinary *Skelly* hearing. The charges will be detailed, *post.*

7   Krista had apparently left the class at this point.

8   The audiotape of the class has not been provided to this court on appeal.

9   This clearly was not the intent of the arbitrator. The arbitrator had already concluded that there was sufficient evidence of gender bias in the tape.

10  *Morrison v. State Board of Education* (1969) 1 Cal.3d 214 (*Morrison*).

11  The College did not reinstate Thompson after the denial of the petition despite the 90-day suspension period having long since passed. The parties were asked, on this court's own motion, to provide supplemental briefing on whether the appeal should be dismissed based on the disentitlement doctrine. " ' "A trial court's judgment and orders, all of them, are presumptively valid and must be obeyed and enforced. [Citation.]" ' [Citation.] [¶] 'An appellate court has the inherent power, under the "disentitlement doctrine," to dismiss an appeal by a party that refuses to comply with a lower court order." (*Blumberg v. Minthorne* (2015) 233 Cal.App.4th 1384, 1390.) "Appellate disentitlement is a *discretionary* doctrine that must be applied in a manner that takes into account the equities of the individual case." (*People v. Puluc-Sique* (2010) 182 Cal.App.4th 894, 901, italics added.) After consideration of the supplemental briefing, we do not exercise our discretion to impose the doctrine.

12  We have already concluded that the arbitrator did find the audiotape showed some gender bias.

13  We also note that the District did not raise any specific arguments in the briefing on the petition about the findings of fact. The District stated at oral argument that it agreed with the findings. The failure to raise an issue in a petition for writ of mandate waives the issue on appeal. (*Crawford, supra,* 53 Cal.App.5th at p. 343.) This is an additional reason that the findings of fact by the arbitrator and affirmed by the trial court need not be addressed on appeal.

14  In *San Diego,* the teacher was dismissed pursuant to Evidence Code section 44932, which contains similar categories, including evident unfitness for service, as reasons for dismissal.

15  The dissent appropriately recognizes that the First Amendment protects public community college professors from discipline "based on student offense alone." (Dissent at p. 6, fn. 3.) At a general level, Thompson was correct that his academic freedom gave him broad latitude to challenge and even upset students. As this case comes to us, however,

EXHIBIT B-37

it does not present such an issue of academic freedom. By the time of the arbitration hearing, both sides "agreed such instructional latitude was not unlimited" and subject to a "balancing test" under *Pickering v. Board of Education* (1968) 361 U.S. 563. Considering those legal positions, the arbitrator found that there is a difference between presenting challenging ideas and "targeting students to such a level to harass, threaten, ridicule, or impose one's views." Thus, the arbitrator found that Thompson's comments about women "had a negative effect on his students and were contrary to established College policies which prohibited discrimination and harassment" and that an academic institution "should not have to tolerate such behavior at the expense of its students." These findings are not challenged here. At this stage, the relevance of Thompson's absolutist view about his academic freedom is simply that it provided no indication that he was willing to consider curbing even classroom conduct found to be harassing.

16  The dissent contends the arbitrator "could reasonably find no significant likelihood of reoccurrence." The dissent further argues that the arbitrator did not make a specific finding on recurrence. (Dissent at p. 4.) However, the record supports that the arbitrator did find a likelihood of recurrence. The arbitrator specifically stated that he had found that all the *Morrison* factors were supported by the evidence, which included likelihood of recurrence. We rely on the detailed findings in the arbitrator's decision rather than what the arbitrator "could" have found.

1  I use the same defined terms as does the majority opinion.

2  A recitation of the evidence underlying these charges is therefore irrelevant to the arbitrator's choice of penalty.

3  The arbitrator did find that all of the *Morrison* factors were satisfied. The *Morrison* factors, however, go to primarily whether there is cause for discipline, not so much to what discipline is appropriate. (*Morrison v. State Board of Education* (1969) 1 Cal.3d 214, 229; *Ricasa v. Office of Administrative Hearings* (2018) 31 Cal.App.5th 262, 285.) The arbitrator could reasonably find that there was some likelihood of recurrence if Thompson received no discipline at all, but no likelihood of recurrence if Thompson received a 90-day suspension. As he could make such a finding — and as it would support his decision — we must assume he did so find.

4  The majority says that "Thompson ... felt his ... right to academic freedom allowed him to discuss controversial subjects even if it upset students. He felt his academic freedom allowed him to offend his students." (Maj. opn. at p. 53.) He did, and he was correct — the District could not limit his speech based on student offense alone. (See *Snyder v. Phelps* (2011) 562 U.S. 443, 458 [" 'the point of all speech protection ... is to shield just those choices of content that in someone's eyes are misguided, or even hurtful.' "]; *Demers v. Austin* (9th Cir. 2014) 746 F.3d 402, 411-413 [academic employee speech is protected under the First Amendment].)

5  The arbitrator specifically found that Thompson's statement that women "are prone to be catty" was not protected speech because there was no "academic debate" about it. This was erroneous; in his testimony, Thompson specifically cited support for it in the academic literature. (See T. Ghose, *Mean Girls: Women Evolved to Be Catty?* (Oct. 27, 2013), available at https://www.livescience.com/40717-indirect-aggression-between-females-works.html, as of Oct. 15, 2021; T. Vaillancourt, et al., Abstract, *Intolerance of Sexy Peers: Intrasexual Competition Among Women* (Sept. 19, 2011), available at <https://pubmed.ncbi.nlm.nih.gov/21932332>, as of Oct. 15, 2021.)

I agree with the majority that Thompson cannot challenge this finding now because he failed to cross-petition below. (Maj. opn. at pp. 55-56.) Nevertheless, the evidence shows that Thompson's First Amendment rights were genuinely under attack.

6  The District asserted in its closing arbitration brief that "[s]everal students became emotional and cried as they testified during the arbitration." However, " '[i]t is axiomatic that argument is not evidence.' [Citation.]" (*People v. Stanley* (2006) 39 Cal.4th 913, 961, fn. 10.)

7  The District contends that these evaluations were inadmissible hearsay. The parties stipulated, however, that the evaluations were admissible.

8  The District's assertion that the arbitrator's decision was unenforceable unless and until it was confirmed under Code of Civil Procedure section 1286 makes me wonder: What did the District intend to do if we affirmed the judgment? Did it intend to disregard our opinion, too, on the ground that the arbitrator's decision has never been confirmed?

EXHIBIT B-38

**End of Document**

© 2023 Thomson Reuters. No claim to original U.S. Government Works.

 © 2023 Thomson Reuters. No claim to original U.S. Government Works.

EXHIBIT B-39